# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD S. GUTMAN, On Behalf of himself and All Others Similarly Situated, | Civil Action No.____ |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc., | |
| Defendants. | |

Plaintiff brings this federal securities class action pursuant to §§10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of all investors who purchased or otherwise acquired the common stock of SFX Entertainment, Inc. ("SFX" or the "Company"), between February 25, 2015 and August 17, 2015, inclusive (the "Class Period").  Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review and analysis of Securities and Exchange Commission ("SEC") filings by SFX; press releases and media reports issued by and disseminated by SFX, and other publicly available information concerning SFX.

## NATURE OF THE ACTION

1.      Plaintiff Edward S. Gutman ("Plaintiff") brings this action against SFX and certain members of its Board of Directors (the "Board") for violations of §§10(b) and 20(a) of

the Exchange Act and Rule 10b-5 promulgated thereunder, for the materially false and misleading statements made by Defendants in connection with the proposed acquisition of SFX by Robert F.X. Sillerman ("Sillerman"), SFX's Chief Executive Officer ("CEO") and largest shareholder, for all of the outstanding common stock he did not already own.

2.     On February 25, 2015, Defendant Sillerman announced a proposed transaction to acquire all of the outstanding common stock of SFX he did not already own for $4.75 (the "Initial Offer"). At the time of his Initial Offer, Defendant Sillerman owned 39.8% of SFX's outstanding stock. Throughout the Class Period, Defendant Sillerman repeatedly affirmed his commitment to acquire SFX. However, Defendant Sillerman knew or recklessly disregarded and failed to disclose that he did not have any financing in place at the time he made his Initial Offer and knew or recklessly disregarded that he could not obtain the financing to consummate the transaction. Sillerman's true intent was not to take the Company private, but to sell it along with his 34.9 million shares. Indeed, he had no financing in place and no real hope to obtain the over $275 million needed to consummate his Initial Offer. Sillerman publicly stated from the beginning that he was willing to vote his 39.8% of SFX shares in favor of any third party offer negligibly higher (2.5%) than his own.

3.     Given the Company's growing debt and decreasing margins it was not feasible that Sillerman was ever going to buy the Company and, with the aid of the other defendants, Sillerman initiated and maintained a sham process designed to lure third party offers, in an attempt to shed his failing investment before the truth about the deterioration of the Company could no longer be concealed. The effect of the sham Initial Offer and the false and misleading statements by Defendants during the Class Period was to fraudulently inflate and maintain the market price of SFX shares at levels that would not otherwise have prevailed based on the true

financial performance and future prospects of the Company. This effort failed to attract a buyer, but not before thousands of investors paid fraudulently inflated market prices for SFX shares that are currently trading at about fifty cents per share.

4. Moreover, Defendants knew or recklessly disregarded that SFX's heavy spending and limited borrowing options were catching up with it and the Company was beginning to experience a real liquidly crisis. Defendants knew or recklessly disregarded that SFX was in precarious financial condition and that it could not support a $774 million going forward enterprise value. Defendants' statements were designed to mask this impending liquidity crisis and inflate SFX's stock price in order to keep SFX as an attractive acquisition candidate for a third party purchaser.

## JURISDICTION AND VENUE

5. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b.5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §1391(b) as the Company conducts business in this District, false statements were made in this District, and the acts and conduct giving rise to the violations complained of occurred from this District. SFX maintains it principal executive offices in this District.

7. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the

mails and telephonic communications and the facilities of the Nasdaq Global Select Market ("NASDAQ").

## THE PARTIES

8.      Plaintiff purchased SFX common stock during the Class Period as set forth in the attached certification.

9.      Defendant SFX is a corporation organized and existing under the laws of Delaware, with its principal executive offices located at 902 Broadway, New York, New York. SFX was formed on June 5, 2012, under the name SFX Holding Corporation. On February 13, 2013, the name was changed to SFX Entertainment, Inc. SFX is engaged in the production and promotion of live music festivals and events, production of music tours, selling event tickets through a ticketing platform, merchandising and related services. SFX common stock is listed on the NASDAQ under the ticker symbol "SFXE".    As of May 8, 2015, SFX had 93 million shares outstanding.

10.     Defendant Sillerman founded SFX and has been its Chairman and CEO of the Company since its inception.   Defendant Sillerman and entities controlled by him control 37.4% of SFX's shares. Defendant Sillerman controls Sillerman Investment Company III LLC ("SIC"). Defendant Sillerman is also the Executive Chairman and controlling shareholder of Viggle Inc. ("Viggle"). Defendant Sillerman has been executive director of Live Nation, Inc. since 1997.

11.      In the 1990s, Sillerman founded a company also called SFX Entertainment, Inc., ("Old SFX") which was sold to Clear Channel Communications in 2000. Since January 2008, Sillerman has served as director and from January 2008 to January 2013, served as Chairman and Chief Executive Officer of Circle Entertainment, Inc. ("Circle"), a company developing location-based entertainment venues. As of December 31, 2014, Sillerman owned 41% of the Circle's

4

common stock. Sillerman also served as the Chief Executive Officer and Chairman of CKX, Inc., a company that owns, develops, manages and commercially uses entertainment content, from February 2005 until May 2010. From August 2000 to February 2005, Defendant Sillerman was Chairman of FXM, Inc., a private investment firm. Sillerman is the founder of FXM Asset Management, LLC, the managing member of MJX Asset Management, a company principally engaged in the management of collateralized loan obligation funds, and served as its managing member from November 2003 through April 2010. Defendant Sillerman and defendant D. Geoffrey Armstrong ("Armstrong") together founded SFX Broadcasting, Inc., ("SFX Broadcasting") which went public 1993 and was later sold to AMFM, Inc.

12. Defendant Armstrong has served on the Board of SFX since December 2012. Defendants Armstrong and Sillerman founded of SFX Broadcasting and he subsequently served as Chief Financial Officer, Chief Operating Officer, and a director of that company until it was sold. Defendant Armstrong has also been a director of Live Nation, Inc. since 1997. Defendant Armstrong is chairperson of the Audit Committee. Defendant Armstrong is currently Chief Executive Officer of 310 Partners, a private investment firm.

13. Defendant John Miller ("Miller") has served on the Board of SFX since October 2012. Defendant Miller was appointed as a non-executive board member of Viggle in 2012. Defendant Miller is the chairman of the Compensation Committee of Viggle. Defendant Miller was also a director of Circle from January 2009 to August 2012. From February 2005 through January 2009, Miller served as a director of CKX.

14. Defendant Michael John Meyer ("Meyer") has served on the Board of SFX since May 2013. Defendant Meyer serves as a director of Circle and of Viggle.

15.     Defendants Sillerman, Armstrong, Miller, and Meyer are referred to collectively herein as the Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     In the 1990s, Sillerman formed Old SFX, a company whose business was the acquisition and consolidation of regional concert promoters into a single national entity.   In 2000, Sillerman sold Old SFX to radio broadcasting company Clear Channel Communications for $4.4 billion.  In June 2012, Sillerman founded the SFX.

17.     On October 10 2013, SFX commenced an initial public offering of 20 million shares for $13.00 per share raising a total of $260 million.  The prospectus for the IPO touted the Company as "the largest producer of live events and entertainment content focused exclusively on the electronic music culture ("EMC"), based on attendance and revenue."

18.     Prior to the IPO, SFX purchased Beatport, LLC ("Beatport") for $58 million. Beatport is the principal source of music for EMC Disc Jockeys. Beatport offers over 3.5 million tracks from over 31,000 labels, and its free music previews generate approximately four million streams daily.   Beatport also provides access to music and industry news, music reviews, podcasts, videos, DJ profiles, event listings and venue details.

19.     Since its IPO and prior to Sillerman's Initial Offer the Company grew through acquisitions.   SFX used most of the over quarter billion dollars it raised from public stock markets to buy up EDM festivals.  On November 4, 2013, SFX announced that it had acquired Made Event, the premiere electronic music production company and the creator of the Electric Zoo Festival.  On November 13, 2013, SFX completed its acquisition of Arc90, Inc., a designer and builder of mobile and web applications, services and platforms.  On November 19, 2013,

SFX announced that it acquired i-Motion GMBH, the leading electronic music promoter in Germany. On November 21, 2013, SFX acquired a 50% interest in Rock in Rio, one of the world's largest festival franchises. On December 3, 2013, SFX announced that it acquired 75% of Paylogic, a leading new generation ticketing company in Europe for approximately $22 million.

20.     On February 12, 2014, SFX completed its acquisition of a 50% interest in a holding company that owns 80% of the equity shares of Rock World S.A., a Brazilian company engaged in the entertainment business, including the organization of music festivals held under the "Rock in Rio" name for $62.3 million. On February 28, 2014, SFX acquired the remaining 50% of B2S Holding BV it did not already own for $14.3 million in cash. B2S is one of the world's leading EMC event organizers. Its festival and live events include Decibel, Hard Bass, Thrillogy, Knock Out and Loudness. On March 14, 2014, SFX entered into a stock purchase agreement with 430R Acquisition LLC, pursuant to which SFX acquired Flavorus, Inc., for $18.0 million in cash. Flavorus is a ticketing company with a software platform allowing for high-volume sales and customizability to serve the needs of many types of events.

**Sillerman's Initial Offer**

21.     On February 25, 2015, Sillerman announced his Initial Offer. More specifically Sillerman proposed that he would acquire all of the outstanding shares of common stock of the Company that he does not already own for $4.75 per share in cash and also that existing stockholders who did not want to sell their shares could instead become holders in the private company owned and controlled by him.

22.     In connection with his Initial Offer, Sillerman was quoted as stating:

I have put forward a proposal that offers substantial value and flexibility to all shareholders. Given the inherent risks in our business, my offer guarantees a

7

> substantial premium to current price. Those shareholders who are interested in remaining as investors in the company alongside me will have the ability to elect to keep all or part of their shares.

While assuring the market that he was going to guarantee shareholder a substantial premium, Sillerman specifically stated that he would assist the special committee of SFX directors that was being formed if it decided to explore alternative transactions and that he was prepared to support an alternative sale.

23.    Defendant Sillerman, as SFX's CEO and largest shareholder, with complete information regarding the Company's financial condition and its future prospects, "guaranteed" shareholders that he would consummate the transaction at a price that was a "substantial premium" to the then current price of SFX stock.  Defendant Sillerman's statements were materially false and misleading because at that time he did not have access to financing sufficient to do the proposed transaction and he knew or was reckless in not knowing that he could not obtain the financing to consummate the transaction.  Defendant Sillerman's statements were also materially false and misleading because Sillerman knew or recklessly disregarded and failed to disclose that SFX's period of acquisitions was ending, that the Company was not going to meet Wall Street's expectations, and that the Company's present financial condition and future prospects were deteriorating.

24.    Moreover, Defendant Sillerman's statements were intended to condition the market to believe that Sillerman's Initial Offer was firm and credible and established a floor on the market value of SFX, and that any alternate proposal had to be at a price greater than $4.75. In addition, the provision to allow shareholders to remain as investors in the new company gave the false impression that these shareholders would continue to own a security that was worth at least $4.75 and that Sillerman would be able to finance the transaction.

25.     Defendant Sillerman never had the financial capacity to buy SFX and his Initial Offer was nothing more than a sham designed to lure third party offers, in an attempt to shed his failing investment before the truth about the deterioration of the Company could no longer be concealed.  Defendant Sillerman's statements were meant to and did inflate the price of SFX common stock in order to make SFX a more attractive acquisition candidate for potential third party buyers. No such buyer could be found before the true financial condition of the Company was revealed to the market.

26.     In response to Sillerman's Initial Offer of $4.75, SFX's stock price rose from $3.70 to $4.79.

27.     On March 10, 2015, SFX announced that the Company had formed a special committee of the Board comprised of Defendants Miller, Meyer, and Armstrong (the "Special Committee").  The announcement said that the Special Committee was formed to evaluate Sillerman's Initial Offer and also consider alternatives to the proposed transaction that would enhance shareholder value, including any other offers to acquire the company.

28.     On March 13, 2015, the Company issued a press release announcing its fourth quarter and full-year 2014 financial results.  For the 2014 year end, SFX reported that its loss widened to $131 million, or $1.49 per share.   The year-end loss was much wider than expected. Revenue for 2014 was $386.2 million compare with $356.7 million in 2013.  Pro forma adjusted EBITDA for 2014 was a loss of $(3.4) million, compared with 2013 pro forma adjusted EBITDA of $17.7 million.  For the year ended December 31, 2014, pro forma attendance for all events and festivals increased 8.9%, with 88 festivals in 2014 compared to 71 in 2013.  For the year ended December 31, 2014, direct costs totaled $218.4 million compared with $113.5 million for 2013.

29.     For the fourth quarter, SFX reported a loss of $41.1 million or $0.46 per share. The Company's pro forma revenues for the fourth quarter ended December 31, 2104, fell 7.7% to $95.9 million in 2014 from $103.9 million in 2013. Adjusted EBITDA fell to ($7.7) million in 2014 from $0.5 million in 2013.  In the fourth quarter ended December 31, 2014, pro forma same festival attendance (for festivals held in both the 2014 and 2013 fourth quarters), fell 18.5%. The company held 24 festivals in the fourth quarter of 2014 versus 16 for the same period in 2013. Fourth quarter pro forma festival attendance declined 8.7% year over year to approximately 560,000.  The cost of putting on more festivals was increasing but the attendance was decreasing.

30.     Also on March 13, 2015, for the first time ever, SFX provided full year guidance on its projected fiscal year financial results.  Notwithstanding the weak performance of SFX going into the 2015 fiscal year, the Company publicly stated that "full year 2015 revenues are expected to be in excess of $500.0 million with adjusted EBITDA of $60.0 million to $70.0 million inclusive of the anticipated impact of foreign exchange as a significant portion of the Company's operations occur internationally."  This "guidance" was false and misleading because Defendants knew or recklessly disregarded and failed to disclose that there was no reasonable basis, given the recent past results and current performance of the Company's business, to project such high revenues and EBITDA.  In fact, Defendants knew or recklessly disregarded and failed to disclose that SFX's debt was increasing, its margins were decreasing, it was running out of money and its borrowing options were limited.  By providing false "guidance" for the first time ever, Defendants misled the market and maintained SFX's stock at fraudulently inflated market prices to make SFX appear more attractive to potential third party buyers.

31.     At the time he made his Initial Offer on February 25, 2015, Sillerman, as SFX's CEO and largest shareholder, knew or recklessly disregarded and failed to disclose that the

fourth quarter and 2014 year-end results were going to miss analysts' expectations by a wide margin. Sillerman, who is known for keeping a close eye on SFX's financial details, timed the announcement of his Initial Offer to inflate the price of SFX stock and mitigate adverse market reaction to the upcoming announcement of 2014 annual and fourth quarter financial results Defendants knew or recklessly disregarded that ticket sales were decreasing and the cost of putting on more festivals was increasing and therefore knew or were reckless in not knowing that the Company was burning through cash and needed to decrease costs or increase revenues in order to become profitable.

32. On May 11, 2015, SFX reported its financial results for the three months ended March 31, 2015. While revenue for the three months ended March 31, 2015 grew 56.6% to $52.2 million the Company reported a net loss and diluted loss per share of $(41.6) million and $(0.46), respectively compared with $(56.0) and $(0.65) in the prior year's first quarter. The Company further reported that direct costs for the three months ended March 31, 2015 totaled $34.2 million. As of March 31, 2015, SFX had cash and cash equivalents totaling $45.8 million. Pro Forma Adjusted EBITDA was $(10.6) million compared to the prior quarter's $(7.7) million. Defendants' tried to explain the first quarter loss by stating that "the first quarter is the Company's seasonally slowest quarter for live events and revenue, and during the period SFX held five owned festivals that were also held in the first quarter of 2014. On a same festival basis, attendance for these festivals grew 1.2% and revenue grew 1.2% . . . ." SFX continued to provide 2015 guidance in its first quarter press release, projecting revenues of $500 million and pro forma adjusted EBITDA in the range of $55.0 to $65.0 million, reduced from the March 2015 guidance only to reflect reduction due to foreign exchange losses and losses related to startup costs of the Rockin Rio Las Vegas event. This guidance was false and misleading and

Defendants knew or were reckless in not knowing that that there continued to be no reasonable basis, given the recent past results and current performance of the Company's business, to project such high revenues and EBITDA.

33.     However, the Company was already beginning to experiencing a liquidity crisis and Defendants knew it. As of March 31, 2015, SFX had drawn $6.0 million under its $30 million revolving credit line ("Revolver") with Barclays Bank PLC ("Barclays"). As of May 8, 2015, SFX had drawn an aggregate amount of $18.3 million under the Revolver and had only $11.7 million available.   In a footnote to the First Quarter 10-Q, filed March 16, 2015, SFX disclosed that Barclays and SFX had entered into an amendment to the February 7, 2014 Revolver credit agreement ("Credit Agreement"). Among other things, the amendment prohibited SFX from borrowing money or requesting letters of credit under the Credit Agreement unless an amount equal to 105% of the amount of the loan or letter of credit, as applicable, was paid into a deposit account of Sillerman Investment Company III LLC, an entity controlled by Sillerman, that is subject to a first priority lien in favor of the administrative agent under the Credit Agreement.

**The Merger Agreement**

34.     On May 26, 2015, the Company announced that SFX had signed the Merger Agreement by and among the Company, SFXE Acquisition LLC ("SFXE Acquisition"), an affiliate of Sillerman Investment Company III LLC ("SIC"), an entity controlled by Defendant Sillerman and SFXE Merger Sub Inc. ("Merger Sub"), a wholly owned subsidiary of SFXE Acquisition LLC (collectively Sillerman) pursuant to which Defendant Sillerman would acquire all of the outstanding shares of SFX that he did not already own for $5.25 per share (the "Cash Merger Consideration"). The Merger Agreement valued the Company at $774 million.

35.     The Merger Agreement also provided that any shareholder who is a holder of record of shares of SFX common stock evidenced by Certificates or by book-entry in the Company's stock transfer books shall be entitled to make an election to receive in lieu of the Cash Merger Consideration, one share of non-voting Class B common stock, par value $0.0001 per share, of the surviving corporation of the Merger (the "Stock Merger Consideration").

36.     The Merger Agreement provided that from the date of the Merger Agreement until July 10, 2015 the Company could "initiate, solicit and encourage any alternative acquisition proposals from third parties, provide nonpublic information to such third parties and participate in discussions and negotiations with such third parties regarding alternative acquisition proposals." (the "Go-Shop" period)   As of May 26, 2015, Defendant Sillerman beneficially owned 37.4% of SFX's outstanding common stock, which he publically stated from the beginning that he was willing to vote his shares in favor of any third party offer negligibly higher (2.5%) that his own offer.

37.     The Merger Agreement further provided that Sillerman had to provide the Special Committee with his fully executed debt and/or equity commitment letters or similar agreements (in a reasonable form) from one or more Persons (which could include Sillerman and/or his Affiliates) describing the terms and conditions for the financing of 100% of the aggregate amount of the Cash Merger Consideration within ten days after receiving a written request from the Special Committee.   The Merger Agreement stated that this written request would not be delivered before the go-shop period was over.   In other words, Sillerman did not have to provide evidence of his financing until after other entities made an offer for the Company.

38.     In connection with the Merger Agreement, Defendant Sillerman stated that: "I hope to use all-equity financing to fund the proposed going-private transaction. I have no plans to have the Company incur additional debt to fund the transaction."

39.     The members of the Special Committee knew that entering into the Merger Agreement, especially since it increased the consideration from $4.75 to $5.25, would have a positive impact on the price of SFX stock. In fact, the reaction was very positive and the price of SFX stock rose from $4.12 to $4.94.

40.     However, the Defendants knew or recklessly disregarded that SFX was in a precarious financial condition and Sillerman did not have and could not obtain financing necessary to support a $774 million going forward enterprise value or for him to buy the outstanding shares of SFX he did not already own at $5.25 per share. Defendants knew or recklessly disregarded that Sillerman did not have the financing in place and nor was he going to be able to obtain the financing, which is why the Merger Agreement did not require Sillerman to provide financing commitments until after the go-shop period was over and only after the Special Committee gave him a written request.

41.     By entering into the Merger Agreement, Defendants misrepresented to the investing public that SFX was worth $5.25 and confirmed that the transaction was credible and feasible. Unfortunately, nothing was further from the truth. Defendants knew or recklessly disregarded that SFX was experiencing increased costs and decreased attendance at its festivals. Defendants' statements were designed to and did inflate SFX's stock price during the go-shop period of the Merger Agreement in order to keep SFX as an attractive acquisition candidate for a third party purchaser at a price greater than $5.25.

**The Special Committee's Recommendation**

42.    According to the Merger Agreement, the Special Committee unanimously determined that the transaction was fair to the Company's stockholders and unanimously recommended that the Board approve the Merger Agreement.   By recommending that the Board approve the Merger Agreement, Defendants misrepresented to the investing public that SFX was worth $5.25 and confirmed that the transaction was credible and feasible.   The Special Committee's recommendation was false and misleading because the members of the Special Committee knew or recklessly disregarded that Sillerman did not have and could not obtain financing necessary to support a $774 million going forward enterprise value or for him to buy the outstanding shares of SFX he did not already own at $5.25 per share.

**SFX Sells 3.34 Million Shares to Two Hedge Funds and Sillerman**

43.    Defendants knew that SFX was in desperate need of cash to support its business. The cost of putting on festivals was continually increasing. Defendants knew that SFX was unable to issue new debt without breaching bond covenants.  In addition, its banker, Barclays had demanded that SFX raise collateral in order to be able to borrow from the Company's line of credit.   Therefore, on June 18, 2015, SFX agreed to sell 2.305 million shares to Wolverine Flagship Fund Trading and Virtual Point Holdings (the (Funds") for aggregate cash consideration of $10 million, or $4.34 per share.  In addition, SFX sold 1.04 million shares to Sillerman Investment Partners III, for aggregate cash consideration of $5 million or $4.82 per share.    Sillerman then entered into a put right agreement with the Funds which required Sillerman to purchase 2,305,210 shares from the Funds for $5.25 per share, among other things, if the transaction did not occur.  In addition, to providing the Company with much needed cash, the transaction made Sillerman's $5.25 offer much more attractive and gave credibility to him

being able to finance the transaction and to assure the investing public that he was capable of obtaining financing to consummate the Merger Agreement.

44.     As the CEO and the Company's largest shareholder, Sillerman knew that he did not have the financial partners to close the deal.  But this did not matter because he never had the financial capacity or intent to buy the Company.   Nevertheless, Sillerman continued to falsely assure the investing public that he was committed to buying the Company   On July 19, 2015, in connection with the sale of the stock, Defendant Sillerman was quoted as stating:

> The recent stock transactions demonstrate an increased commitment on my part to consummate this transaction.  My advisors and I are continuing to advance this going-private transaction under the same terms as those spelled out in a definitive agreement executed on May 26, 2015.

On this news, SFX stock rose from $4.49 to $4.63.

45.     Sillerman's statement affirming his commitment to acquire SFX pursuant to the terms set forth in the Merger Agreement was materially false and misleading because he knew or recklessly disregarded and failed to disclose that he did not have and could not get the financing to consummate the Merger Agreement. Sillerman knew or recklessly disregarded that the Company's financial condition could not support a $774 million going forward enterprise value.

46.     Defendant Sillerman's false statements were designed to mask the Company's impending liquidity crisis and inflate SFX's stock price during the go-shop period of the Merger Agreement in order to keep SFX as an attractive acquisition candidate for a third party purchaser at a price greater than $5.25.

**Defendants Amend the Merger Agreement**

47.     In an effort to try to keep interest alive, SFX announced on July 10, 2015, that the Special Committee and Sillerman had amended the Merger Agreement to extend the "Go Shop" period during which SFX is permitted to solicit acquisition proposals from alternative purchasers

other than Sillerman. The "Go Shop" period was extended to July 24, 2015 to permit interested bidders and financing sources additional time to evaluate their proposals.

48.    The Amendment also extended the time for delivery of Sillerman's financing commitments from 10 days to 15 days after receiving the written request therefor from the Special Committee.  The Amendment further amended the Voting Agreement by providing that, if during the extension of the go-shop period the Company terminates the Merger Agreement to enter into an alternative transaction providing for a price that exceeds his $5.25 per share offer by any amount, Sillerman and his affiliates would vote in favor of that transaction.

49.    Defendants failed to provide the investing public with an explanation of why they extended the go-shop period and the time for the delivery of Sillerman's financing commitments. By amending the Merger Agreement, Defendants once again misrepresented to the investing public that SFX was worth $5.25 and confirmed that the transaction was credible and feasible. Defendants knew or recklessly disregarded and failed to disclose that Sillerman could not provide the necessary financing commitments and that the extension of the Go Shop period was a last ditch attempt to get a buyer for the Company at any price.

50.    On July 30, 2015, SFX announced that the Special Committee had delivered notice to Sillerman that he had to deliver to the committee on August 13, 2015, fully executed commitment letters describing the terms and conditions for the financing of 100% of the aggregate amount of the Cash Merger Consideration to be paid to stockholders upon consummation of the Merger Agreement.

## SFX Announces Second Quarter and Six Month Financial Results

51.    On August 10, 2015, SFX reported financial results for its second quarter and six months ended June 30, 2015.  While the company reported that revenue for the second quarter

was $121.1 million, it also reported a net loss and loss per share of $(48.0) million and $(0.52), respectively. Direct costs for the three months ended June 30, 2015 totaled $99.1 million. Direct costs for the six months ended June 30, 2015 totaled $133.2 million.

52.     SFX's revenue in the second quarter grew 48.3% to $121.1 million from 29 festivals and 238 other events. However, net loss in the quarter grew 36.2% to ($48.0) million. The high growth in costs more than canceled out the growth in SFX's revenue. While revenue grew 48.3% in the quarter, direct costs grew 61%.

53.     The second quarter financial results underscore how SFX continued to burn through millions in cash each quarter. After raising hundreds of millions of dollars in the IPO and then issuing nearly $300 million in debt in subsequent years, SFX was practically down to its last dime. Cash and cash equivalents ended the second quarter at $38.6 million (excludes which included $13.6 million of cash proceeds held on behalf of third party ticketing client.) That figure, however, overstates SFX's true cash availability. There is approximately $5.8 million remaining on SFX's original $30 million credit line after the company tapped it for $24.2 million at the end of the quarter.

**Sillerman Fails to Deliver Financial Commitment Letters But the Sham Continues**

54.     On August 13, 2015, Sillerman failed to provide the Special Committee with financial commitment letters.

55.     On August 14, 2015, SFX announced that the Special Committee with the concurrence of Sillerman "has authorized the continued exploration of strategic alternatives for the Company, including the sale of all or substantially all of the Company's assets in whole or in part." The Company further added that it will entertain offers for the entire Company as well as assets not central to the Company's core business through at least October 2, 2015. The

18

Company stated that it was extending the offer period to October 2, 2015 in order to "allow potential bidders and their financing sources to have visibility into the Company's performance during its peak festival season."

56.     Defendants' extension of the offer period and the explanation for doing it were materially misleading.  Defendants knew or recklessly disregarded that SFX's ticket sales were declining and that it had substantial cash requirements that if not met would force the cancellation of events.  In fact, on September 1, 2015, SFX cancelled its One Tribe festival scheduled for September 25th and 26th due to poor ticket sales.

57.     Moreover, in an apparent effort to conserve cash and appear more profitable, SFX withheld music royalty payments to artists from its Beatport platform.  SFX reported that royalty payments for April, May and June were "trapped" until it completes the Merger Transaction. Needless to say this news elicited a very negative response from artists and the investing public and SFX quickly reversed its position and apologized to the artists.

58.     The August 14 press release further represented that Sillerman "continues to be interested in taking the Company private, either alone or with one or more strategic partners, although also at a lower price given the Company's share price has declined substantially below that in the merger agreement."

59.     On this news the price of SFX stock fell from $1.94 to $1.39.

60.     On August 17, 2015, Sillerman once again reaffirmed his intention to provide a revised offer for all of the Company's common shares not owned by him. However, Sillerman knew that this was never going to happen given the Company's financial results and deteriorating business because he knew or recklessly disregarded that he could not get the necessary financing.

61.     On August 18, 2015, SFX terminated the Merger Agreement.  Pursuant to the terms of the Merger Agreement, Sillerman is obligated to pay the Company a fee of $7,800,000 as a result of such termination. The Company agreed to extend the due date for the payment of the Purchaser Termination Fee until October 2, 2015. On August 18, SFX closed at $1.15 per share.

62.     On August 26, 2015, Moody's Investors Service downgraded SFX debt.  Moody's reported: that the company has "no tangible sign" of producing positive cash flow and has limited remaining cash and therefore it was lowering SFX corporate and second-lien note ratings by two steps each to Caa3.

## PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

63.     Throughout the Class Period, Plaintiff and the members of the Class justifiably expected the Defendants to disclose material information in connection with the offering and sale of the Company's stock. Plaintiff and the members of the Class would not have purchased the Company's stock at artificially inflated prices if Defendants had disclosed all material information.  Thus, reliance by Plaintiff and the Class members should be presumed with respect to Defendants' false and misleading statements and the failure to disclose material information necessary to make the statement made not misleading.

64.     Throughout the Class Period, the Company's stock traded in an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the prices of the Company's stock.

65.     The following facts demonstrate that the market for SFX's common stock was efficient at all time during the Class Period:  (a) SFX's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated

market; (b) as a regulated issuer, SFX filed periodic public reports with the SEC; (c) SFX regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (d) SFX was followed by a number of securities analysts employed who wrote reports that were distributed to the sales force and customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

66.    As a result of the foregoing, the market for SFX common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the stock price. Plaintiff and the other Class members relied on the integrity of the market price for the Company's stock and are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired SFC common stock during the period between February 25, 2015 and August 17, 2015, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest.

68.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SFX's common shares were actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are tens of thousands of members in the proposed Class who are geographically dispersed throughout the United States. Members of the Class may be identified from records maintained by SFX or its transfer agent and may be notified of the pendency of this action by mail, using the form(s) of notice customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class, because all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the numerous questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about SFX and Sillerman's ability to consummated his offer to buy the Company;

(c) whether Defendants acted with scienter;

(d) whether reliance upon Defendants' alleged false and misleading statements can be presumed pursuant to the fraud-on-the-market doctrine;

(e) whether and to what extent the market price of SFX's stock was artificially inflated during the Class Period as a result of Defendants' violations of the securities laws; and

(f) to what extent the members of the Class have sustained damages resulting from Defendants' violations of the federal securities laws and the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for many members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

73.     During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted to state material facts necessary to make the statements made not misleading and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of SFX common stock and operated as a fraud or deceit on Class Period purchasers of SFX common stock by materially misrepresenting Defendant Sillerman's intent to purchase all of the outstanding common stock of SFX he did not already own when they knew that he did not have and nor could he obtain the financing necessary to consummate the Merger Agreement. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of SFX's common stock fell precipitously, as the prior artificial inflation came out of the price.   As a result of their purchases of SFX common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

74.     Defendants' false and misleading statements had the intended effect and caused SFX's stock to trade at artificially inflated levels throughout the Class Period.

## **NO SAFE HARBOR**

75.     SFX's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

76.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made and/or were in actuality statements of then-present fact.

77.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

78.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading.

## **COUNT I**

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 of the Securities and Exchange Commission
(Against All Defendants)**

79.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80.     This Count is asserted against all Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.     As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading and engaged in acts and practices, and in a course of conducted which operated as a fraud and deceit upon the purchasers of the Company's common stock and in an effort to maintain artificially high market prices for SFX common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

82.     Defendants' false and misleading statements and omissions were intended to, and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially inflate and maintain the market for and market price of the Company's stock; and (iii) cause Plaintiff and the other members of the Class to purchase the Company's stock at inflated prices.

83.     During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84.     Defendants had actual knowledge of the misrepresentations and omission of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth from the investing public and to support the artificially inflated prices of the Company's common stock.

85.     As described above, Defendants made the materially false and misleading statements knowingly and intentionally, or in such an extremely reckless manner as to constitute

willful deceit and fraud upon Plaintiff and other members of the Class who purchased SFX stock during the Class Period.

86.     Defendants' materially false and misleading statements were made in connection with the purchase or sale of the Company's stock.

87.     In ignorance of the false and misleading nature of the Company's and the Defendants' materially false and misleading statements, and relying directly or indirectly on those statements and/or upon the integrity of the market price for SFX stock, Plaintiff and the other members of the Class purchased SFX stock at artificially inflated prices during the Class Period.

88.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SFX common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for SFX common stock had been artificially inflated by Defendants' fraudulent course of conduct.

89.     The market price for SFX stock declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by SFX and the Defendants, as described above.

90.     Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of SFX stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

91.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiff for damages suffered in connection with Plaintiff's transactions in SFX's common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

92.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93.     This Count is asserted against Defendants under Section 20(a) of the Exchange Act.

94.     As alleged above, SFX violated Section 10(b) and Rule 10b-5, promulgated thereunder, by making false and misleading statements in connection with the purchase or sale of securities. This fraudulent conduct was undertaken with scienter because SFX is charged with the knowledge and scienter of Defendants and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme.

95.     Defendants were controlling persons of SFX within the meaning of Section 20(a) of the Exchange Act by reason of their positions as senior executive officers and/or directors of SFX, their ability to approve the content and issuance of SFX's public statements, and their control over SFX's day-to-day operations. The individual Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein. Each Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same.

96.     Defendants prepared, signed, and/or approved the Company's press releases and SEC filings that contained material false and misleading statements or omitted material facts. They were provided with or had unrestricted access to copies of those statements prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be made.

97.     Defendants did not act in good faith in connection with the conduct at issue in this claim.

98.     Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or they acted with reckless disregard for the truth.

99.     By virtue of their positions as controlling persons of SFX, Defendants are jointly and severally liable to Plaintiff pursuant to Section 20(a) of the Exchange Act for SFX's violations of Section 10(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Defendants, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as the class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of and the other members of the Class against all of the Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein;

C.     Awarding Plaintiff and the Class their fees and expenses incurred in this action, including attorneys' fees and expert fees;

F.     Awarding Plaintiff and other members of the Class prejudgment interest and/or opportunity cost damages; and

G.     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  September 11, 2015

ABBEY SPANIER, LLP

By: _____

Arthur N. Abbey
aabbey@abbeyspanier.com
Nancy Kaboolian
nkaboolian@abbeyspanier.com
Stephen T. Rodd
srodd@abbeyspanier.com
212 East 39th Street
New York, NY  10016
Tel.:  212-889-3700
Fax:    212-684-5191

## CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Edward S. Gutman, declare as follows:

1. I have reviewed a copy of the Complaint filed in this action.

2. I did not purchase the security that is the subject of this action, SFX Entertainment, Inc. (NASDAQ:SFXE), at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in SFX Entertainment, Inc. securities during the class period identified in Complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase) | Quantity | Trade Date | Price Paid |
|---|---|---|---|---|
| Common | Purchase | 5000 | May 27, 2015 | $4.96 |
| Common | Purchase | 2000 | July 8, 2015 | $4.01 |
| Common | Purchase | 2000 | July 9, 2015 | $3.98 |
| Common | Purchase | 2000 | July 13, 2015 | $4.15 |
| Common | Purchase | 1000 | July 13, 2015 | $4.20 |
| Common | Purchase | 1000 | July 13, 2015 | $4.40 |
| Common | Purchase | 2000 | July 13, 2015 | $4.07 |
| Common | Purchase | 4000 | July 13, 2015 | $4.05 |
| Common | Purchase | 1000 | July 13, 2015 | $4.03 |
| Common | Purchase | 2000 | July 13, 2015 | $4.00 |
| Common | Purchase | 3000 | July 13, 2015 | $3.98 |
| Common | Purchase | 3000 | July 13, 2015 | $3.96 |
| Common | Purchase | 1000 | July 14, 2015 | $3.95 |
| Common | Purchase | 1000 | July 14, 2015 | $3.93 |
| Common | Purchase | 1000 | July 14, 2015 | $3.90 |
| Common | Purchase | 1000 | July 14, 2015 | $3.86 |
| Common | Purchase | 1000 | July 16, 2015 | $3.66 |
| Common | Purchase | 3000 | August 17, 2015 | $1.39 |

| Common | Purchase | 3000 | August 17, 2015 | $1.375 |
| Common | Purchase | 3000 | August 17, 2015 | $1.32 |

5. I have not served as or sought to serve as a representative party on behalf of a class during the last three years, except as stated herein:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   September 10, 2015

Signed:   _Edward S. Gutman_
Edward S. Gutman

2