**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GUEVOURA FUND LTD., On Behalf of Itself and All Others Similarly Situated,

Plaintiff,

v.

ROBERT F.X. SILLERMAN, D. GEOFFREY ARMSTRONG, JOHN MILLER, MICHAEL JOHN MEYER, and SFX ENTERTAINMENT, INC.,

Defendants.

**Case No. 1:15-cv-07192-CM**

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Guevoura Fund Ltd. ("Guevoura" or "Plaintiff") brings this federal securities class action pursuant to §§10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder on behalf of all investors who purchased or otherwise acquired the common stock of SFX Entertainment, Inc. ("SFX" or the "Company"), between February 25, 2015 and November 17, 2015, inclusive (the "Class Period"). Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review and analysis of SEC filings by SFX, press releases, analyst reports and media reports issued by, or about, SFX.

## NATURE OF THE ACTION

1. Plaintiff brings this action against SFX and certain members of its Board of Directors (the "Board") engaging in market manipulation and issuing false and misleading statements throughout the Class Period in connection with purported proposals by Robert F.X.

Sillerman ("Sillerman"), SFX's founder, Chief Executive Officer ("CEO") and largest shareholder, to purchase all of the outstanding common stock he did not already own (the "Merger"), in violation of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5.

## INTRODUCTION

2. On October 10 2013, SFX commenced an initial public offering of 20 million shares for $13.00 per share raising a total of $260 million. The prospectus for the IPO touted the Company as "the largest producer of live events and entertainment content focused exclusively on the electronic music culture ("EMC"), based on attendance and revenue."

3. Since its IPO, the Company grew through acquisitions. To finance these acquisitions, SFX used most of the over a quarter of a billion dollars it raised in the IPO, incurred significant debt, which was frequently guaranteed by Sillerman, and committed to share revenues in earn-out agreements.

4. Over the ensuing financial quarters following the IPO, SFX consistently reported disappointing earnings which were negatively impacted by SFX's frequent and substantial acquisitions as well as the inherent delays in monetizing new festivals.

5. However, by December 30, 2014, *SeekingAlpha.com* reported that SFX "[m]anagement is slowing its heavy investment and acquisition strategy so results in the 4Q14 and into 2015 may begin to shine." And that "[l]ong expected EBIDTA contributions from marketing partnerships and sponsorships should begin showing up in results as "substantial work" has been completed for them." The article observed that "[t]he key concern here is that if cash burn and SFXE's acquisition spree continue at the same pace in the future, the [C]ompany will be wholly reliant on the capital markets to continue its operations." Although the article

proved to be prescient with respect to the Company's eventual liquidity crisis, it nevertheless concluded that "SFXE is creating true value that is on the cusp of showing up in the results."

6. By the beginning of 2015, however, unbeknownst to the market, the Company faced a financial crisis with imminent defaults under its credit facilities and was struggling to monetize its investments. As a result, Defendants, defined below, knew that the Company faced a risk of a precipitous decline in its share price and potential bankruptcy. The Company had also exhausted its ability to raise funds through equity offerings as it had already significantly diluted its shareholder's equity since the IPO.

7. In light of these facts, Sillerman, who, in addition to being SFX's CEO and Chairman is also the Company's largest shareholder (holding approximately 40% of the outstanding shares) was desperate to salvage his huge equity stake in the Company and hoped that he could buy enough time for the Company to finally start demonstrating the earnings the market expected while forestalling the imminent decline in SFX's stock price in order to renegotiate its debt covenants, refinance its debt and/or raise additional capital. Moreover, since Sillerman has guaranteed much of SFX's financial obligations, SFX's collapse and subsequent defaults and/or bankruptcy would expose Sillerman to substantial personal liabilities.

8. On February 25, 2015, after considering SFX's fourth quarter and full-year 2014 financial results which were not yet disclosed to the market, Sillerman publicly proposed an offer to acquire all of the outstanding common stock of SFX he did not already own for $4.75 per share (the "Initial Offer"). At the time of his Initial Offer, Sillerman owned 39.8% of SFX's outstanding stock and SFX was trading for approximately $3.70 per share. However, Sillerman knew or recklessly disregarded and failed to disclose the fact that he did not have any financing in place at the time he made his Initial Offer and knew or recklessly disregarded that he could not

obtain the over $275 million needed to consummate his Initial Offer. Sillerman's true intent was not to take the Company private, but to condition the market to believe that SFX had value despite its precarious condition and thus delay a fire sale of SFX shares by its public investors that would follow further disclosures of negative news and operational difficulties. Indeed, Sillerman knew that once he made an offer, the market would be less concerned with the Company's near-term financial results and would instead focus on the metrics and valuation implicated by the proposed deal.

9. Moreover, as explained in detail herein, given the Company's and Sillerman's pending litigation with its co-founders which put a cloud on Sillerman's approximately 40% ownership of SFX, SFX's lack of sufficient cash to meet its financial obligations, growing debt, decreasing margins, and debt covenant violations it was not feasible for Sillerman to buy the Company on the terms of the Initial Offer. Instead, with the aid of the other Defendants, Sillerman initiated and maintained a sham process designed to forestall the decline in SFX stock price to enable the Company to renegotiate and/or refinance its debt, raise much needed cash, and potentially lure a third party offer, in an attempt to shed his failing investment before the truth about the deterioration of the Company could no longer be concealed. The effect of the sham Initial Offer and the false and misleading statements by Defendants during the Class Period was to fraudulently inflate and artificially maintain the market price of SFX shares at levels that would not otherwise have prevailed based on the true financial performance and future prospects of the Company.

10. On March 10, 2015, SFX named the three non-management members of its Board, defendants John Miller, Michael Meyer, and D. Geoffrey Armstrong, to serve on the a

committee (the "Special Committee") with a purported mandate to independently evaluate Sillerman's Initial Offer and consider alternatives to the proposed transaction.

11. On May 26, 2015, the Company announced that it had signed an agreement (the "Merger Agreement") by and among the Company, SFXE Acquisition LLC ("SFXE Acquisition"), an affiliate of Sillerman Investment Company III LLC ("SIC"), an entity controlled by Sillerman, and SFXE Merger Sub Inc. ("Merger Sub"), a wholly owned subsidiary of SFXE Acquisition (collectively Sillerman) pursuant to which Sillerman would purportedly acquire all of the outstanding shares of SFX that he did not already own for $5.25 per share (the "Cash Merger Consideration"). The Merger Agreement valued the Company at $774 million.

12. The Special Committee unanimously determined that the transaction was fair to the Company's stockholders and unanimously recommended that the Board approve the Merger Agreement. However, despite SFX's representations that the Special Committee was independent, all three members were actually Sillerman cronies and were hand-picked by him to serve on the Board. Each of the Special Committee members has known Sillerman for years and has held officer and/or director positions at other entities founded or controlled by Sillerman. Each has significant prior business relationships with Sillerman or Sillerman controlled entities.

13. As with the Initial Offer, in connection with the proposed Merger, Defendants knew or recklessly disregarded that SFX's heavy spending and limited borrowing options were catching up with it and the Company was beginning to experience a real liquidly crisis. Defendants knew or recklessly disregarded that SFX was in precarious financial condition and that it could not support the $774 million implied enterprise value. Defendants' actions and statements were designed to mask this impending liquidity crisis and inflate SFX's stock price in order to, *inter alia*, keep SFX as an attractive acquisition candidate for a third party purchaser.

14. Defendants' scheme was, *inter alia*, also intended to improve SFX's and Sillerman's bargaining position with its partners as well as its creditors. And as set forth herein, the scheme did enable Defendants to convince numerous parties to forebear declaring SFX in default on its obligations and on collection of monies due from SFX, and to renegotiate the terms of certain of its debt. Defendants were also able to induce various third parties to make other investments in SFX which provided SFX with much needed cash.

15. However, ultimately time ran out because SFX continued to substantially underperform and the scheme failed to attract a genuine buyer. As the true nature of Defendants' strategy became known to the market, SFX's stock price collapsed, but not before thousands of investors paid fraudulently inflated market prices for SFX shares. Indeed, SFX's condition has devolved to such a degree that its shares are currently trading at about $0.30, which is less than a 1/40th of the IPO price and 1/12th of SFX's closing price on the day before the Initial Proposal was announced. Not surprisingly SFX is rumored to be considering seeking protection under U.S. bankruptcy laws.

## **JURISDICTION AND VENUE**

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, 17 C.F.R. §240.10b.5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as the Company conducts business in this District, the manipulative conduct and misleading statements were made in this District, and the acts and

conduct giving rise to the violations complained of occurred from this District. SFX maintains it principal executive offices in this District.

17. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the Nasdaq Global Select Market ("NASDAQ").

18. Plaintiff purchased SFX common stock during the Class Period as set forth in the certification attached to Plaintiff's motion for appointment as lead plaintiff.

19. Defendant SFX is a corporation organized and existing under the laws of Delaware, with its principal executive offices located at 902 Broadway, New York, New York 10010. SFX was formed on June 5, 2012, under the name SFX Holding Corporation. On February 13, 2013, the name was changed to SFX Entertainment, Inc. SFX is engaged in the production and promotion of live music festivals and events, production of music tours, selling event tickets through a ticketing platform, merchandising and related services. SFX common stock is listed on the NASDAQ under the ticker symbol "SFXE". As of November 6, 2015, SFX had approximately 99 million shares outstanding.

20. Defendant Sillerman controls Sillerman Investment Company III LLC (SIC). Sillerman founded SFX and has been Chairman and CEO of the Company since its inception. Sillerman and entities controlled by him control approximately 40% of SFX's shares.

21. In the 1990s, Sillerman founded a company also called SFX Entertainment, Inc., ("Old SFX") which was sold to Clear Channel Communications in 2000. Since January 2008, Sillerman has served as a director and, from January 2008 to January 2013, served as Chairman and Chief Executive Officer of Circle Entertainment, Inc. ("Circle"), a company developing

location based entertainment venues. As of December 31, 2014, Sillerman owned 41% of the Circle's common stock. Sillerman is also the Executive Chairman and controlling shareholder of Viggle Inc. ("Viggle"). Sillerman has been executive director of Live Nation, Inc. since 1997. Sillerman also founded and served as the Chief Executive Officer and Chairman of CKX, Inc., a company that owns, develops, manages and commercially uses entertainment content, from February 2005 until May 2010. From August 2000 to February 2005, Sillerman was Chairman of FXM, Inc., a private investment firm. Sillerman is the founder of FXM Asset Management, LLC, the managing member of MJX Asset Management, a company principally engaged in the management of collateralized loan obligation funds, and served as its managing member from November 2003 through April 2010. Sillerman and defendant D. Geoffrey Armstrong ("Armstrong") together founded SFX Broadcasting, Inc., ("SFX Broadcasting") which went public 1993 and was later sold to AMFM, Inc.

22. Defendant Armstrong has served on the Board of SFX since December 2012. Defendants Armstrong and Sillerman founded of SFX Broadcasting and Armstrong subsequently served as Chief Financial Officer, Chief Operating Officer, and a director of that company until it was sold. Armstrong has also been a director of Live Nation, Inc. since 1997. Armstrong is chairperson of the Audit Committee. Armstrong is currently Chief Executive Officer of 310 Partners, a private investment firm.

23. Defendant John Miller ("Miller") has served on the Board of SFX since October 2012. Miller was appointed as a non-executive board member of Viggle in 2012. Miller is the chairman of the Compensation Committee of Viggle. Miller was also a director of Circle from January 2009 to August 2012. From February 2005 through January 2009, Miller served as a director of CKX.

24. Defendant Michael John Meyer ("Meyer") has served on the Board of SFX since May 2013. Meyer also serves as a director of Circle and of Viggle.

25. Defendants Sillerman, Armstrong, Miller, and Meyer are referred to collectively herein as the "Individual Defendants" and collectively, with SFX, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26. In the 1990s, Sillerman formed Old SFX, a company whose business was the acquisition and consolidation of regional concert promoters into a single national entity. In 2000, Sillerman sold Old SFX to radio broadcasting company Clear Channel Communications for $4.4 billion. In June 2012, Sillerman founded SFX.

27. Prior to the IPO, SFX purchased Beatport, LLC ("Beatport") for $58 million. Beatport is the principal source of music for EMC Disc Jockeys. Beatport offers over 3.5 million tracks from over 31,000 labels, and its free music previews generate approximately four million streams daily. Beatport also provides access to music and industry news, music reviews, podcasts, videos, DJ profiles, event listings and venue details.

28. On October 10 2013, SFX commenced an initial public offering of 20 million shares for $13.00 per share raising a total of $260 million. The prospectus for the IPO touted the Company as "the largest producer of live events and entertainment content focused exclusively on the electronic music culture ("EMC"), based on attendance and revenue."

### The *Moreno* Action

29. The formation and creation of SFX is presently the subject of litigation in a lawsuit that was filed on February 5, 2014, in the United States District Court for the Central District of California *Paolo Moreno et al. v. SFX Entertainment Inc et al.*, 2:14-cv-00880-

RSWL-CW (the "*Moreno* Action"). At issue in the *Moreno* Action is whether the plaintiffs (the "Morenos"), on the one hand, and SFX and Sillerman, on the other, formed a joint venture to pursue the consolidation of EDM festivals and concert businesses – the present business of SFX. Although the parties dispute whether a joint venture – actual or implied – was formed and what the Morenos' interest in such a venture should be, it is now undisputed that the Morenos were actively involved in the formation of SFX and that SFX and Sillerman actively engaged in negotiations with the Morenos relating to employment agreements and share ownership in SFX.

30. In early 2012, defendant Sillerman began collaborating with Paolo Moreno, who had worked as the manager of party promoter "Disco Donnie" Estopinal and had relationships with artists and others in the EMC community, his brother, Gabriel Moreno, and DJ manager Lawrence Vavra to create a large EMC company. Paolo Moreno claims that it was originally his idea to roll-up the "highly-fragmented" EMC industry "consisting of independent promoters spread throughout the country" into a single integrated company, and that he only approached Sillerman for funding for what was to be a joint venture.

31. As set forth in pleadings and declarations filed in the *Moreno* Action in connection with summary judgments proceedings following the close of discovery in the action, SFX and Sillerman now concede that the Morenos' "proposed terms of employment with SFX included salary, bonus potential, and future stock options," and that Sillerman himself had "proposed to allocate some founders' shares in SFX to each of them." Sillerman also testified that he had "informed Paolo Moreno that any proposed allocation of founders' shares would be received immediately before SFX became a publicly-traded company." The Morenos represent in the litigation that Paolo Moreno was to be named "Chief Acquisitions Officer-EDM Division " of SFX and that January 2012 Deal Correspondence confirm[ed that the Morenos] would

receive 2.5 million founders' shares and would be partners with Sillerman in the new venture, but did not specify the percentage of the company [they] would own." Indeed, in the ongoing litigation, the Morenos represent that as "set forth in the January 2012 Deal Correspondence, … they [were to] receive (1) salaries (a total of $600,000 per year for 5 years); (2) options (a total of 500,000 options per year for 5 years); and (3) 2.5 million founders' shares."

32. Not only do the Morenos represent in the ongoing litigation that the parties had agreed to "joint control over and management of their proposed enterprise or joint ownership of their proposed enterprise," they have represented to the Court there that "in the January 2012 Deal Correspondence, Sillerman told Paolo to 'take control" of the new EDM company.'"

33. The Morenos claim that after obtaining the benefit of their contributions, defendants SFX and Sillerman actually reneged on the January 2012 agreement and ultimately attempted to force the Morenos to accept lesser positions at SFX and much lower compensation and percentage of ownership than had been agreed to. As such, as SFX was being taken public in the fall of 2013, the Morenos and SFX had reached an impasse as to the Morenos' ownership interest in SFX.

34. Following the undertaking of extensive discovery, depositions and the exchange of extensive evidence, including scores of contemporaneous emails between the parties, Defendants SFX and Sillerman sought summary judgment on all claims. On July 29, 2015, their motion for summary judgment was denied with U.S. District Court Judge Ronald S.W. Lew expressly finding that the Morenos had "provide[d] ample admissible evidence creating a genuine dispute of material fact as to" the existence of a joint venture/partnership agreement based on the Morenos' understanding of what they'd been promised in January 2012, and their subsequent contributions to SFX in reliance on those promises. In addition to denying

Defendants' SFX's and Sillerman's motion for summary judgment "in its entirety," Judge Lew also expressly found that the Morenos had "provide[d] evidence that they shared their valuable business plan with Defendants [SFX and Sillerman] and performed valuable services for Defendants [SFX and Sillerman] at Defendants[ SFX's and Sillerman's] request and with the expectation of being compensated, and that [the Morenos] were never compensated for their performance." Judge Lew further found that the Morenos "provide[d] evidence that Defendants [SFX and Sillerman] made clear and unambiguous promises to [them]; that [the Morenos] reasonably and foreseeably relied on Defendants[ SFX's and Sillerman's] promises; and that [the Morenos] were injured by their reliance on the promises because [they] were never compensated, as expected, for the valuable services [they] performed for Defendants" SFX and Sillerman. Trial on the matter was slated to begin on October 6, 2015, but the parties are in the midst of settling the matter and the trial date was continued.

35. As a result of the Morenos' claim to being entitled to a significant – while disputed – ownership interest in SFX via receipt of the founders' shares they claim to have earned prior the Company's IPO, the true ownership of Sillerman's approximately 40% ownership is indeterminate and therefore Sillerman could not reasonably secure financing to purchase SFX and no alternative party is likely to bid on SFX and/or cannot obtain financing for a potential transaction due to the cloud on ownership of much of the Company. However, despite Defendants' admissions in the *Morena* Action concerning the legitimacy of the Moreno's claims and the effect of such claims, Defendants failed to disclose this information in connection with the proposed Merger and, instead, continued to represent to SFX shareholders that Moreno's claims are meritless. Moreover, as recently as November 9, 2015, in SFX's Form 10-Q for the quarterly period ended September 30, 2015, Defendants admitted that they have set aside no

reserves for the *Moreno* Action and continue to misrepresent the significance of the lawsuit despite the fact that they are in the midst of negotiating a settlement of the matter. Specifically, Defendants stated that:

> The Company believes this lawsuit is without merit and intends to vigorously defend against it. At this time, the Company cannot reasonably estimate the likelihood of an unfavorable outcome or the magnitude of such an outcome, if any, but based upon expected insurance recoveries and potential contributions from the non-Company defendant, the Company does not believe it is reasonably probable that the claims will have a material effect on its financial statements.

**SFX Goes on a Buying Spree, Uses Up All its Cash and Incurs Substantial Debt**

36. Since its IPO and prior to Sillerman's Initial Offer, the Company grew through acquisitions. To finance them, SFX used most of the over a quarter of a billion dollars it raised from public stock markets, incurred significant debts which were frequently guaranteed by Sillerman, and committed to share revenues in earn-out agreements.

37. Indeed, even prior to the Company's IPO, much of its acquisitions were financed through debt which was guaranteed by Sillerman. For example, as disclosed in SFX's Amendment No. 7 to Form S-1, filed October 2, 2013, the Company's First Lien Term Loan Facility of $75 million was used to finance acquisitions, and the loan facility and each of the amendments thereunder were guaranteed by Sillerman.

38. On October 21, 2013, SFX announced that it had acquired 100 percent ownership of ID&T, the leading producer of dance music festivals and events worldwide. Total consideration paid for ID&T and the ID&T joint venture was approximately $130 million, including approximately $30.4 million in shares of SFX common stock.

39. On October 24, 2013, SFX announced that it entered into an agreement to purchase Arc90, a product design and development agency; acquired Fame House, a leading digital marketing agency specializing in the music and entertainment industry; and signed an

agreement to purchase Tunezy, a commerce platform for entertainment that connects content creators to their fans. The total consideration to be paid at closing was $4.0 million in cash and 591,000 shares of common stock of the Company. On November 13, 2013, SFX completed its acquisition of Arc90, Inc.

40. On October 29, 2013, SFX announced that it had acquired 100 percent of the assets of Totem OneLove Group Pty Ltd., the promoter and producer of the leading Australian EMC festival, Stereosonic. The Company paid total consideration of AUD$74.4 million in cash, and issued 1,105,846 shares of common stock of the Company. The Totem purchase agreement provided that the Company was required to make an earn-out payment of AUD$10.0 million if the EBITDA of the business exceeded AUD$18.0 million for the one-year period ended December 31, 2014.

41. On November 4, 2013, SFX announced that it had acquired Made Event, the premiere electronic music production company and the creator of the Electric Zoo Festival.

42. On November 19, 2013, SFX announced that it acquired i-Motion GMBH, the leading electronic music promoter in Germany. The consideration transferred at closing consisted of a cash payment of approximately $16.4 million and the issuance to the sellers of i-Motion of an aggregate of 409,357 shares of common stock of the Company. In addition, the sellers of i-Motion were entitled to receive a cash earn-out payment in 2014 and 2015 in an amount equal to $1.0 million (or, if greater, the U.S. dollar equivalent of €0.79 million based on the exchange rate on the business day prior to the due date of the earn-out payment) if the EBITDA of i-Motion for either or both of the fiscal years ending on December 31, 2013 and December 31, 2014 exceeded the lesser of $4.0 million, converted into Euros based on the exchange rate on the last banking day of the respective fiscal year, and EUR 3.15 million.

43. On December 3, 2013, SFX announced that it acquired 75% of Paylogic, a leading new generation ticketing company in Europe, for approximately $22 million.

44. On December 16, 2013, SFX announced that it had exercised a previously announced purchase option to acquire an interest in Rock in Rio. On February 12, 2014, SFX completed its acquisition of a 50% interest in a holding company that owns 80% of the equity shares of Rock World S.A., a Brazilian company engaged in the entertainment business, including the organization of music festivals held under the "Rock in Rio" name for $62.3 million. In order to finance the transaction, the Company entered into a letter of credit and reimbursement agreement (the "LC Agreement") with Deutsche Bank AG ("Deutsche Bank") in which Deutsche Bank issued an irrevocable standby letter of credit (the "Letter of Credit") that provided approximately $66.0 million of financing. In connection with the LC Agreement, Sillerman entered into a guarantee agreement with Deutsche Bank, dated December 12, 2013, pursuant to which he personally guaranteed all of the Company's obligations under the LC Agreement and agreed, at all times during the term of the Letter of Credit, to deposit a minimum of $10.0 million with Deutsche Bank.

45. On January 6, 2014, SFX and Clear Channel Media and Entertainment, the leading media company in America with a greater reach in the U.S. than any radio or television outlet, announced a marketing and content partnership centered on the fast-growing electronic music category. The partnership contained three key initiatives: a national DJ/Producer contest in partnership with Beatport; a weekly Beatport Countdown show; and an original live event series.

46. On January 28, 2014, SFX announced that it was launching the offering of $200 million aggregate principal amount of its second lien senior secured notes due 2019 (the "Second Lien Senior Secured Notes" or "Notes") in a private offering. The net proceeds from the Second

Lien Senior Secured Notes were to repay SFX's existing debt, to finance certain acquisitions and for general corporate purposes, including funding future acquisitions and paying related fees and expenses. On January 31, 2014, SFX announced that it upsized and priced $220.0 million aggregate principal amount (adding an additional $20 million) of its 9.625% (initially presumed to have a rate of 8.25%) Second Lien Senior Secured Notes.

47. On February 4, 2014 (the "Notes Closing Date"), SFX issued the Second Lien Senior Secured Notes. The Company used a portion of the net proceeds of the offering to repay the entire amount outstanding under the Company's former $75.0 First Lien Term Loan Facility and pay related fees and expenses, and intended to use a portion of the net proceeds of the offering to fund the purchase price of its previously announced planned acquisition of Rock World.

48. In addition, on February 7, 2014 (the "Revolver Closing Date"), the Company entered into a credit agreement (the "New Credit Agreement"), dated as of the Revolver Closing Date, with the lenders party thereto and Barclays Bank PLC, as administrative agent, letter of credit issuer and swingline lender, which provides for a $30.0 million revolving credit facility (the "Revolver"), which includes a $10.0 million subfacility for loans in certain approved currencies other than US dollars and a $7.5 million subfacility for letters of credit.

49. In connection with the issuance of the Notes, on the Notes Closing Date, the Company, certain of its subsidiaries and U.S. Bank National Association, as trustee (in such capacity, the "Trustee") and collateral agent (in such capacity, the "Notes Collateral Agent"), entered into an indenture governing the Notes (the "Indenture"). The Notes are second-priority lien senior secured obligations of the Company and are fully and unconditionally guaranteed by the Company's present and future wholly owned domestic subsidiaries that guarantee the

indebtedness under the New Credit Agreement, as well as the Company's non-wholly owned domestic subsidiary, SFX-Nightlife Operating, LLC (collectively, the "Guarantors"). The Notes and the guarantees thereof are secured by a second-priority lien on substantially all of the present and future assets of the Company and the Guarantors, subject to certain exceptions and permitted liens. The Notes will mature on February 1, 2019 and accrue interest at a rate of 9.625% per annum, which is payable semi-annually in arrears on February 1 and August 1 of each year, commencing on August 1, 2014.

50. The Indenture contains certain covenants, including limitations on the Company's and its restricted subsidiaries' ability to incur additional indebtedness or issue certain preferred shares, pay dividends, make any distribution in respect of, redeem or repurchase stock, make certain investments or other restricted payments, enter into certain types of transactions with affiliates, incur liens, apply proceeds from certain asset sales or events of loss, and consolidate or merge with or into other entities or otherwise dispose of all or substantially all of its assets.

51. On February 5, 2014, the *Moreno* Action was commenced against SFX and Sillerman, clouding Sillerman's SFX share ownership and impairing his, SFX's, and any potential SFX acquirer's ability to obtain financing for SFX.

52. On February 18, 2014, SFX entered into an asset and membership interest contribution agreement (the "React Agreement") with SFX-React Operating LLC, a wholly owned subsidiary of the Company, React Presents, Inc. ("React"), Clubtix, Inc. ("Clubtix"), Lucas King, and Jeffery Callahan, pursuant to which the Company acquired substantially all of the assets of React and Clubtix used in connection with their businesses in exchange for (i) $8.2 million in cash and (ii) $2.0 million in shares of common stock of the Company. Purusant to the React Agreement, the selling parties were entitled to receive an earn-out payment

based on performance of the acquired business in 2014. Due to issues concerning the timeliness of closing the React Agreement, the agreement was amended on March 14, 2014 and provided for an additional $3 million advance payment.

53. On February 18, 2014, the Company entered into an asset contribution agreement (the "West Loop Agreement") with SFX-React Operating LLC, West Loop Management I, LLC ("West Loop"), Lucas King, Jeffery Callahan, and the additional signatories named therein, pursuant to which the Company acquired substantially all of the assets of West Loop used in connection with its business in exchange for (i) $3.2 million in cash and (ii) $0.8 million in shares of common stock of the Company. West Loop is engaged in the business of providing operations and management services for a nightclub in Chicago, Illinois, including talent procurement and event promotion in connection therewith. Messrs. Callahan and King, who together owned 100% of React and Clubtix, also owned 50% of West Loop. The West Loop Agreement was amended on March 14, 2014 to provide additional time for closing the transaction.

54. On February 28, 2014, SFX acquired the remaining 50% of B2S Holding BV it did not already own for $14.3 million in cash and 400,000 shares of SFX common stock. SFX previously acquired 50 percent of B2S as part of its acquisition of ID&T in October 2013, which has produced events such as Sensation, Mysteryland and Tomorrowland in Europe and around the world. B2S is one of the world's leading EMC event organizers. Its festival and live events include Decibel, Hard Bass, Thrillogy, Knock Out and Loudness.

55. On March 14, 2014, SFX entered into a stock purchase agreement with 430R Acquisition LLC, pursuant to which SFX acquired Flavorus, Inc., for $18.0 million in cash. Flavorus is a ticketing company with a software platform allowing for high-volume sales and

customizability to serve the needs of many types of events. Pursuant to the purchase agreement, the Sellers will be entitled to receive an earn-out payment based on the 2016 EBITDA of Flavorus.

56. On April 1, 2014, SFX entered into an asset purchase agreement (the "Teamwork Agreement") with Workteam Acquisition, LLC ("Workteam"), a wholly owned subsidiary of the Company, Teamwork Management One, LLC ("Teamwork One"), Teamwork Management Two, LLC ("Teamwork Two"), Teamwork Management Three, LLC ("Teamwork Three"), Teamwork Management Four LLC (together with Teamwork One, Teamwork Two and Teamwork Three, "Teamwork"), Andrew McInnes, and Kevin Kusatsu, pursuant to which Workteam acquired substantially all of the assets of Teamwork used in connection with its business in exchange for (i) $7.0 million in cash and (ii) 319,748 shares of common stock of the Company. Teamwork is engaged in the business of personal and professional management for musical and other performing artists. In addition, the selling parties will be entitled to receive an earn-out payment based on the performance of the acquired business in 2015 and 2016.

57. On May 15, 2014, SFX issued a press release disclosing earnings and other financial results for the three month period ended March 31, 2014. Revenue for the three months ended March 31, 2014 totaled $33.3 million. Direct costs for the three months ended March 31, 2014 totaled $22.8 million. Net loss for the three month period was $(63.6) million, or $(0.73) per share. Pro Forma Revenue for the three months ended March 31, 2014 was $38.1 million, while Pro Forma Adjusted EBITDA was a loss of $(11.9) million. After the Company reported its earnings and held a conference call, analysts from Stifel and Jefferies issued reports analyzing the results and observing in a positive fashion that the Company noted that it plans on reducing the pace of its acquisitions as the foundation for much of SFX's platform is now in place.

58. On June 19, 2014, SFX announced that it had signed a five-year, $75 million international sponsorship agreement with viagogo, the world's largest ticket marketplace, to provide a state-of-the-art ticketing marketplace for SFX event and festival brands on a global basis. The deal extended the SFX global ticketing platform by adding a resale partner to previous acquisitions, which include Paylogic, Flavorus and Club Tix.

59. On August 5, 2014, SFX announced a multi-year global partnership with MasterCard to bring innovative technology solutions to the SFX platform. As part of the agreement, SFX planned to leverage MasterCard's innovative technologies for its digital and physical platforms including ticketing, retail, live events and social networking, pioneering a new model for enterprise-wide partnerships. In addition, MasterCard became the exclusive financial services sponsor for all of SFX's platforms.

60. On August 14, 2014, SFX issued a press release disclosing earnings and other financial results for the three and six month periods ended June 30, 2014. Revenue for the three and six months ended June 30, 2014 totaled $82.0 million and $115.3 million, respectively. Direct costs for the three and six months ended June 30, 2014 totaled $61.5 million and $84.4 million, respectively. Net loss and net loss per share for the three month period was $(43.7) million and $(0.50), respectively, while net loss and net loss per share for the six month period was $(107.2) million and $(1.23), respectively. Pro forma revenue for the three and six months ended June 30, 2014 was $82.1 million and $121.2 million, while pro forma adjusted EBITDA for the respective periods was a loss of $10.2 million and $22.2 million.

61. After the financial results were disclosed, Jefferies issued a report analyzing the Company's performance and observed that the expansive nature of SFX's marketing

partnerships "is driving a roughly 6-mo delay in terms of timing (along with the expanded EBITDA projections)."

62. On August 15, 2014, SFX entered into Amendment No. 1 to the New Credit Agreement, dated February 7, 2014 which governs the terms of the Company's Revolver. The amendment modified certain financial covenants in the New Credit Agreement that require the Company to comply with a maximum total leverage ratio and a minimum interest coverage ratio on a quarterly basis. In accordance with the New Credit Agreement, as modified by the amendment, through the fiscal quarters ending December 31, 2014, the Company's Maximum Total Leverage Ratio is 5.50:1.00. From March 31, 2015 through December 31, 2015, the Company's Maximum Total Leverage Ratio is 5.00:1.00. And from March 31, 2016, and on, the Company's Maximum Total Leverage Ratio is 4.50:1.00. In addition, the amendment modified the definition of Consolidated EBITDA to allow the Consolidated EBITDA of SFX to be increased by certain incremental contributions. These amendments eased the imposition of the covenants concerning the Company's maximum leverage ratio by expanding the definition of Consolidated EBIDTA.

63. On August 18, 2014, SFX drew $20 million under its Revolver for working capital and general corporate purposes, including funding acquisitions and paying related fees and expenses.

64. On August 18, 2014, SFX announced its intention to commence an offering of new 9.625% Second Lien Senior Secured Notes Due 2019 (the "New Notes"). The New Notes constituted an additional issuance of SFX's 9.625% Second Lien Senior Secured Notes Due 2019 issued on February 4, 2014.

65. On September 10, 2014, SFX announced that it had received the requisite consents with respect to its solicitation of consents for an amendment to the indenture governing its outstanding 9.625% Second Lien Senior Secured Notes Due 2019. Like the amendment to the Revolver, the amended indenture modified and expanded the definition of Consolidated EBITDA reducing the imposition of the covenants concerning the Company's maximum leverage ratio by expanding the definition of Consolidated EBIDTA.

66. On September 12, 2014, SFX and its wholly-owned subsidiary, SFXE Netherlands Holdings B.V., entered into a share purchase agreement with Monumental Productions Beheer B.V., Monumental Productions B.V., ("Monumental Productions"), and Rochus Abraham Paulus Veenboer ("Veenboer"), pursuant to which SFXE will acquire all of the outstanding ordinary shares in Monumental Productions. Monumental Productions organizes and promotes electronic music culture festivals under the brand "Awakenings" throughout the Netherlands. Under the terms of the purchase agreement, SFX will acquire all of the shares of Monumental Productions in exchange for (i) EUR 11.0 million in cash and (ii) a number of shares of common stock of the Company equal to EUR 3.0 million. Pursuant to the purchase agreement, the seller may be entitled to receive an earn-out payment following calendar year 2014. The Company completed the acquisition on September 24, 2014.

67. On September 18, 2014, SFX announced it commenced a private debt offering to certain institutional investors of $50 million aggregate principal amount of additional 9.625% second lien senior secured notes due 2019 ("New Notes"). The New Notes were in addition to the $220 million aggregate principal amount of SFX's 9.625% second lien senior secured notes due 2019 issued on February 4, 2014. On September 19, 2014, SFX announced that it upsized the offering of the New Notes by $25 million to $75 million, including $10 million in a

concurrent private placement to an entity controlled by Sillerman. The offering of the New Notes closed on September 24, 2014.

68. On September 25, 2014, Maxim Group LLC ("Maxim") initiated coverage on SFX. In the initiation report Maxim commented on SFX's two main sources of revenue, namely sponsorship partnerships and production of festivals, and noted that "current signed partnerships are anticipated to generate high margin $50M-$60M in sponsorship revenue over the next 12 months with upside if performance benchmarks are hit" and the "cash generating ability of SFXE's festival brands [were] obscured by start up costs."

69. On November 14, 2014, SFX issued a press release disclosing earnings and other financial results for the three month period ended September 30, 2014. Revenue for the three months ended September 30, 2014 rose 194.5% to $143.5 million while revenue for the first nine months of 2014 increased 199.9% to $258.8 million. Revenue in the 2014 third quarter included $114.7 million of revenue (79.9% of total revenue) from festivals and live events that were produced, promoted, licensed or managed by SFX during the period. Platform revenue, which represents SFX's 365-day a year engagement with fans outside of live events and includes sales of digital music, ticketing fees and commissions, and certain marketing and digital activities, totaled $28.8 million (20.1% of total revenue) for the three months ended September 30, 2014. Direct costs for the three months ended September 30, 2014 totaled $110.0 million, with costs from Live representing $93.8 million, or 85.3% of total direct costs, while platform costs related to products sold was $16.2 million, or 14.7% of total direct costs. Direct costs for the nine months ended September 30, 2014 totaled $194.4 million. Net income and diluted earnings per share for the three month period was $2.8 million and nil, respectively, while net loss and net loss per share for the nine month period was $(94.2) million and $(1.40), respectively. Pro forma

revenue for the three and nine months ended September 30, 2014 was $289.2 million and $150.7 million, respectively, while pro forma adjusted EBITDA for the respective periods was $15.0 million and a loss of $2.1 million, respectively.

**<u>The Market Becomes Optimistic for SFX</u>**

70. On November 21, 2014, Rhino Trading Partners LLC ("Rhino") initiated coverage of SFX. In the initiation report, Rhino noted that:

> We have been closely following SFXE over the past six months believing that unrealistic expectations set early in the year would lead to quarter after quarter of disappointing results. ***We now believe expectations, both buy-side and sell-side, have become appropriately reset and the prices of SFXE's securities to match***.

Emphasis added.

Rhino's sentiment was expressed when SFX's shares were trading for approximately $4.07 share.

71. As explained by Rhino:

> At the beginning of the year [2014], SFXE was on the road raising $200M in 2nd Liens which got upsized to $220M. Acquisitions using equity also cost less with a higher share price. Management has always viewed 2014 as a year to build the business. And looking back now, we see they've largely accomplished that. But the collateral damage is a stock down 70% from its IPO and 2nd Liens trading well below par. One could get into a lengthy debate on management's role in setting expectation versus the pitfalls of focusing on short term results to "beat" contrived guidance. But is there any use in pointing fingers now? ***To existing investors, we advise you to stay the course. You'd be selling at the bottom. To new investors, we say now is the time to get involved.***
>
> * * *
>
> We believe the 4Q'14 earnings release may be a positive catalyst for the stock. Actual 4Q'14 results will be a non-event. Investors already are focused on FY'15. We expect SFXE will provide more detail to allow analysts to bridge to the consensus low $80's million EBITDA. The stock should react positively on this.

Emphasis added.

72. On November 25, 2014, SFX announced that it had acquired 50 percent of Alda Holding B.V., an Amsterdam-based company that is a leader in developing, producing and promoting dance music events and experiences around the world. SFX acquired Alda Holding B.V. in exchange for (i) €1.35 million in cash and (ii) 2,000,000 shares of common stock of the Company. The Company granted the sellers the right to require SFX to repurchase up to 1,800,000 of the SFX shares at $5.56 per share. SFX is also required to make certain distributions based on the first year profit associated with the company to the sellers.

73. In a company update on November 25, 2014, Maxim reported that:

> Last week, we hosted a lunch with SFXE's CEO Bob Sillerman and CFO Rich Rosenstein. The tone of the lunch was positive as investors appeared to be receptive to the roadmap laid out by management and Wall Street coalescing around an $80M + EBITDA target.
>
> We believe there are four key drivers of EBITDA to $84M in 2015, up from an estimated $15M loss in 2014 []:
>
> • **Increased sponsorship revenue.** We estimate that there is at least $65M worth of signed qualified marketing agreements with associated revenue to be booked over the next 12 months. The reported revenue should ramp over this period and is not a function of specific festival attendance. Sponsorship deals have been slower to come on relative to initial expectations. However, we see 2015 as providing an inflection point.
>
> • **Substantial reduction in new festival start-up costs and Beatport investments.** Through the first three quarters of 2014, SFXE invested $10M in festival start-up costs in addition to $17M in the December relaunch of Beatport. Management has stated that these costs should be largely non-recurring in 2015 and provide a combined $27M EBITDA tailwind.
>
> • **Contribution of Rock in Rio.** As a bi-annual event, Rock in Rio and the ~$8M of SFXE's share of the event's EBITDA should benefit 2015 results.
>
> • **Rationalization of smaller events.** In order to generate scale, some of the companies acquired by SFXE (particularly Donnie Disco Presents and Life in Color) held more small-scale events than would otherwise make sense as part of a larger operation. As result, we see SFXE reducing the number of smaller events throughout 2015, with the total number of events likely declining ~5% from 2014.

> The lack of these smaller loss-making events (plus sponsorship) should improve gross margin to 36% in 2015 from our 26% estimate for 2014.
>
> **Challenges remain. Despite what we view to be a clear path to our $84M EBITDA target, execution remains critical.**

74. Similarly, a December 30, 2014 article on *SeekingAlpha.com*, reported that SFX "[m]anagement is slowing its heavy investment and acquisition strategy so results in the 4Q14 and into 2015 may begin to shine." And that "[l]ong expected EBIDTA contributions from marketing partnerships and sponsorships should begin showing up in results as "substantial work" has been completed for them." The article observed that "[t]he key concern here is that if cash burn and SFXE's acquisition spree continue at the same pace in the future, the company will be wholly reliant on the capital markets to continue its operations." Although the article proved to be prescient with respect to the Company's liquidity crisis, it nevertheless concluded that "SFXE is creating true value that is on the cusp of showing up in the results."

75. On January 23, 2015, SFX announced that it entered into an agreement with Viggle pursuant to which SFX will take over the 25-person revenue team of Viggle. According to the three-year agreement between SFX and Viggle, the combined sales organization will sell all inventory for both companies.

**<u>Sillerman's Initial Offer</u>**

76. By the beginning of 2015, the Company spent hundreds of millions of dollars on acquiring companies and the market was expecting to finally see returns. However, unknown to the market was the fact that SFX faced a financial crisis with imminent defaults under its Notes and Revolver. Indeed, with the fourth quarter and full-year 2014 completed, the poor results were known to Sillerman. In light of these facts, the Company faced a risk of a major decline in its stock price, which would make salvaging the SFX enterprise an extremely difficult, if not

impossible, task. Sillerman made an offer to acquire SFX at a price substantially above its trading price at the time in order to attempt to save his huge stake in the Company by buying enough time for the Company to finally start demonstrating the earnings the market expected, and to forestall the imminent decline in SFX's share price, which would enable him to renegotiate its debt covenants, refinance its debt and/or raise additional capital. Sillerman knew that once he made an offer, the market would be less concerned with the Company's financial results and would instead focus on the metrics and valuation implication of the proposed deal. Further, the market would believe that, as SFX's most senior executive, Sillerman would not offer such a premium unless he had a basis to believe the value existed that could justify such a price.

77. On February 25, 2015, Sillerman announced his Initial Offer. Specifically Sillerman proposed that he would acquire all of the outstanding shares of common stock of the Company that he did not already own for $4.75 per share in cash and also that existing stockholders who did not want to sell their shares could instead become holders in the private company owned and controlled by him. On February 24, 2015, the day before Sillerman announced his Initial Offer, SFX shares closed at $3.70.

78. In connection with his Initial Offer, Sillerman was quoted as stating:

> I have put forward a proposal that offers substantial value and flexibility to all shareholders. Given the inherent risks in our business, ***my offer guarantees a substantial premium to current price***. Those shareholders who are interested in remaining as investors in the company alongside me will have the ability to elect to keep all or part of their shares.

Emphasis added.

While assuring the market that he was going to guarantee shareholders a substantial premium, Sillerman specifically stated that he would assist the Special Committee of SFX directors that

was being formed if it decided to explore alternative transactions and that he was prepared to support an alternative sale.

79. Sillerman, as SFX's CEO and largest shareholder, with complete information regarding the Company's desperate financial condition and its future prospects, represented to SFX shareholders that his offer guaranteed them a "substantial premium" to the then current price of SFX stock. Sillerman's statements were materially false and misleading because at that time he did not have access to sufficient financing to do the proposed transaction and he knew or was reckless in not knowing that he could not obtain the financing to consummate the transaction.

80. Sillerman's statements were also materially false and misleading because Sillerman knew or recklessly disregarded and failed to disclose that the Company was not going to meet Wall Street's expectations, and that the Company's present financial condition and future prospects were deteriorating, which would make obtaining financing for a deal at his proposed price even more impossible. Indeed, as reported in an August 23, 2015 article published on *NYTimes.com*, Sillerman "is known to keep a close eye on the financials of the [C]ompany, reflecting a career building media networks and selling them at a profit."

81. By making his Initial Proposal, and thereby convincing the market that SFX could reasonably sustain a valuation of at least $4.75 per share, Sillerman was obligated to disclose the yet to be reported financial results for the fourth quarter and full-year 2014. Indeed, Sillerman could not acquire SFX without first disclosing this financial information. However, Sillerman knew that if he disclosed SFX's true financial condition at the time he made his Initial Proposal his scheme would have been revealed to the market and SFX's stock price would have collapsed.

Instead, Sillerman designed the scheme to condition the market to view the upcoming earnings report with patience and more forgivingly in light of his pending offer.

82. Sillerman's statements were intended to manipulate the market and condition the market to believe that Sillerman's Initial Offer was real and to establish a floor on the market price of SFX with the hope that an alternate proposal could be obtained. In addition, the provision to allow shareholders to remain as investors in the new company gave the false impression that these shareholders would continue to own a security that was worth at least $4.75 and that Sillerman would be able to finance the transaction.

83. Sillerman's gambit succeeded at first. In response to Sillerman's Initial Offer of $4.75, SFX's stock price rose from $3.70 to $4.79 on unusually heavy volume. And, on March 5, 2015, Imperial Capital LLC ("Imperial") issued a report analyzing SFX observing, as Sillerman intended, that SFX "appears on the verge of generating strong growth in earnings…. We think the recent acquisition offer by Mr. Sillerman shows that there is value in this company." The report further noted that "LTM adjusted EBIDTA, as of 9/30/14, is largely neutral as the company heavily invested in growing its operations and generated negative adjusted EBIDTA in the first half of the year…. The company should start to receive a return on those investments over the next few quarters."

84. On March 10, 2015, SFX named the three non-management members of its Board, defendants Miller, Meyer, and Armstrong, to serve on the Special Committee with a purported mandate to independently evaluate Sillerman's Initial Offer and consider alternatives to the proposed transaction. However, although the Special Committee was purportedly deemed "independent" by the Board, all three members have longstanding relationships with Sillerman and were hand picked by him to serve on the Board. Each of them has known Sillerman for years

and has held officer and/or director positions at other entities founded or controlled by Sillerman. Defendants Miller and Meyer both serve on the board of directors of Viggle with Sillerman, and Myer also serves on the board of directors of Circle Entertainment with Sillerman. Both Viggle and Circle Entertainment are led and largely controlled by Sillerman, and both companies engage in businesses that could create a conflict of interest between SFX, Viggle, and Circle Entertainment. Accordingly, the decision of the Special Committee to support Sillerman and vote in favor of and endorse his proposal was improperly influenced by their longstanding ties to Sillerman, as well as their obligations to Viggle and Circle Entertainment, respectively.

85. On March 11, 2015, Albert Fried & Company LLC ("Albert Fried"), ignorant of the Company's true financial condition and Sillerman's inability to finance or consummate the purported offer, issued a report analyzing SFX and Sillerman's Initial Offer observing that they thought that there is a "70% probability" that Sillerman's bid is accepted, a "25% probability" of a better offer, and a "5% probability" of no deal. The report further observed that the upcoming Q4 and FY2014 results "are less important than body language on the proposed deal." However, what Albert Fried and the market did not know was that, in light of the existence and merit of the *Moreno* Action, the probability of "no deal" was actually closer to 100%.

**<u>SFX Announces Disappointing Fourth Quarter and Full-Year 2014 Financial Results</u>**

86. On March 13, 2015, the Company issued a press release announcing its fourth quarter and full-year 2014 financial results. As Sillerman had known, for the 2014 year end, SFX reported that its loss widened to $(131) million, or $(1.49) per share. The year-end loss was much wider than expected. Revenue for 2014 was $386.2 million compare with $356.7 million in 2013. Pro forma adjusted EBITDA for 2014 was a loss of $(3.4) million, compared with 2013

pro forma adjusted EBITDA of $17.7 million. For the year ended December 31, 2014, direct costs totaled $218.4 million compared with $113.5 million for 2013.

87. For the fourth quarter, SFX reported a loss of $(41.1) million or $(0.46) per share. The Company's pro forma revenues for the fourth quarter ended December 31, 2204, fell 7.7% to $95.9 million in 2014 from $103.9 million in 2013. Adjusted EBITDA fell to ($7.7) million in 2014 from $0.5 million in 2013. In the fourth quarter ended December 31, 2014, pro forma same festival attendance (for festivals held in both the 2014 and 2013 fourth quarters), fell 18.5%. The company held 24 festivals in the fourth quarter of 2014 versus 16 for the same period in 2013. Fourth quarter pro forma festival attendance declined 8.7% year over year to approximately 560,000. The cost of putting on more festivals was increasing but the attendance was decreasing. As of December 31, 2014, SFX had outstanding $295 million principal amount of its 9.625% second lien senior secured notes due 2019 and cash and cash equivalents of $63.3 million.

88. Also on March 13, 2015, ***for the first time ever***, SFX provided full year guidance on its projected fiscal year financial results. Notwithstanding the weak performance of SFX going into the 2015 fiscal year, and its inability to raise additional debt or access fresh capital, the Company publicly stated that "full year 2015 revenues are expected to be in excess of $500.0 million with adjusted EBITDA of $60.0 million to $70.0 million inclusive of the anticipated impact of foreign exchange as a significant portion of the Company's operations occur internationally." This "guidance" was false and misleading because Defendants knew or recklessly disregarded and failed to disclose that SFX's debt was increasing, its margins were decreasing, it was running out of money and its borrowing options were limited. By providing baseless full-year "guidance" for the first time ever, together with the pending Sillerman

Proposal, Defendants manipulated and misled the market and maintained SFX's stock at fraudulently inflated market prices.

89. Nevertheless, on the revelation that the financial results were not as strong as suggested by the Initial Offer, shares of SFX declined from a close of $4.68 per share on March 12, 2015, to $4.31 per share on March 13, 2015 and continued to decline on March 16, 2015 to a closing price of $4.18 per share.

90. At the time he made his Initial Offer on February 25, 2015, Sillerman, as SFX's CEO and largest shareholder, knew or recklessly disregarded and failed to disclose that the fourth quarter and 2014 year-end results were going to miss analysts' expectations by a wide margin. Sillerman, who is known for keeping a close eye on SFX's financial details, timed the announcement of his Initial Offer to inflate the price of SFX stock and mitigate adverse market reaction to the upcoming announcement of 2014 annual and fourth quarter financial results Defendants knew or recklessly disregarded that ticket sales were decreasing and the cost of putting on more festivals was increasing and therefore knew or were reckless in not knowing that the Company was burning through cash and needed to decrease costs or increase revenues in order to become profitable.

**Analysts and the Market Are Swayed by the Offer and Guidance**

91. On March 13, 2015, Albert Fried published an analyst report on SFX observing that "[w]e also think 2015 guidance enhances management's ability to gain the financing and investor equity support necessary to make founder Bob Sillerman's $4.75 a share bid work."

92. Moreover, as Defendants had anticipated, the Sillerman Proposal shifted analysts' focus from the financial results in connection with pricing the stock for investors, to valuations in the context of an acquisition. As noted in a March 13, 2015 report from Stifel, "we have kept our

price target [for SFX] above the bid price under the view that the Special Committee of the Board may push for a higher bid."

93. In a March 13, 2015 report on SFX, Jefferies noted that the fourth quarter results were below estimates and did not meet expectations but still pointed out that "the proposed go-private offer [] should provide [near term] support for the stock."

94. And, a March 17, 2015, report from Rhino observed that "[w]e think SFXE's numbers are poised for a turnaround. We've always credited Sillerman as being a savy [sic] businessman. We believe he is getting the company on the cheap though it is not readily visible from the numbers."

95. A March 25, 2015 article on *SeekingAlpha.com* observed that "SFXE issued forward guidance for the first time in its history; a milestone that could imply that heavy investment will now give way to financial delivery." And, "Sillerman's buy-out offer places a tentative floor on the stock and provides a potential catalyst for near-term upside."

**SFX Utilizes its Scheme to Raise Funds**

96. On March 16, 2015, shortly after Sillerman made his offer and manipulated SFX's stock price and the market's assessment of the Company, and after the Company issued its baseless and unrealistic guidance, SFX capitalized on the scheme by renegotiating and entering into Amendment No. 2 (the "Second Amendment") to the New Credit Agreement which governed the Revolver. Among other things, the renegotiated terms of the Second Amendment removed the maximum total leverage ratio and minimum interest coverage ratio financial covenants and eliminated the incurrence tests to which certain exceptions to the negative covenants were subject. Additionally, the Second Amendment prohibited SFX from borrowing loans or requesting letters of credit under the New Credit Agreement unless an amount equal to

105% of the amount of the loan or letter of credit, as applicable, is deposited into a deposit account of SIC, an entity controlled by Sillerman, that is subject to a first priority lien in favor of the administrative agent under the New Credit Agreement.

97. Also on March 16, 2015, in connection with the Second Amendment, SFX entered into a commitment letter with SIC pursuant to which it committed to cash collateralize any credit extensions under SFX's credit facility in an aggregate amount of up to $31.5 million for a period of one year. For the three months ended March 31, 2015, SIC contributed cash collateral of $14.7 million into the collateral account.

98. In response to this information, SFX shares declined from a closing price of $4.18 on March 16, 2015, to close at $3.99 on March 17, 2015.

**SFX Replaces its Auditor**

99. On April 23, 2015, the Audit Committee of the Board approved the engagement of BDO USA, LLP ("BDO") as the Company's outside public accounting firm for the Company's fiscal year ended December 31, 2015, and ended its audit relationship with Ernst & Young LLP ("E&Y"). Although the Company vigorously denied it, during the Company's first quarter 2015 earnings call an analyst suggested that the change in accounting firms was due to E&Y's insistence that SFX "expense a lot of items that might otherwise have been capitalized" and thus were impairing its balance sheet.

**SFX Announces Disappointing First Quarter 2015 Financial Results and Lowers Guidance**

100. On May 11, 2015, SFX reported its financial results for the three months ended March 31, 2015. While revenue for the three months ended March 31, 2015 grew 56.6% to $52.2 million the Company reported a net loss and diluted loss per share of $(41.6) million and $(0.46), respectively compared with $(56.0) and $(0.65) in the prior year's first quarter. The Company

further reported that direct costs for the three months ended March 31, 2015 totaled $34.2 million. As of March 31, 2015, SFX had cash and cash equivalents totaling just $45.8 million. Pro Forma Adjusted EBITDA was $(10.6) million compared to the prior quarter's $(7.7) million. Defendants tried to explain the first quarter loss by stating that "the first quarter is the Company's seasonally slowest quarter for live events and revenue, and during the period SFX held five owned festivals that were also held in the first quarter of 2014. On a same festival basis, attendance for these festivals grew 1.2% and revenue grew 1.2% . . . ." SFX continued to provide 2015 guidance in its first quarter press release, projecting revenues of $500 million and pro forma adjusted EBITDA in the range of $55.0 to $65.0 million, reduced from the March 2015 guidance. This guidance was false and misleading and Defendants knew or were reckless in not knowing that that there continued to be no reasonable basis, given the recent past results and current performance of the Company's business, to project such high revenues and EBITDA.

101. The Company was in the midst of a liquidity crisis and Defendants knew it. As of March 31, 2015, SFX had drawn $6.0 million under its $30 million Revolver. As of May 8, 2015, SFX had drawn an aggregate amount of $18.3 million under the Revolver and had only $11.7 million available. Moreover, as disclosed in the 10-Q filed on May 11, 2015:

> We have funded our operations from inception through March 31, 2015, including our acquisitions, through operations and net proceeds raised from the issuance of equity and the incurrence of debt. We have experienced net losses and negative cash flow from operations since inception, and as of March 31, 2015, had an accumulated deficit of $(294.7) million.
>
> As of March 31, 2015, we had cash and cash equivalents totaling $45.8 million.
>
> We believe we will be required to make earnout, capital calls or similar payments of up to $25.0 million in cash during the second and third quarters of 2015 pursuant to the terms of applicable agreements. With respect to earnout payments, the sellers of certain businesses reached or exceeded certain performance thresholds that were established in the purchase agreements, and as a result, we owe additional payments to the sellers of acquired businesses. To the extent we do

> not have available cash on hand on the payment date for each payment, we will be required to negotiate for extensions or other modifications of the payment terms.

102. In a May 12, 2015 analyst report, Stifel observed that the Company's reduction in guidance was even larger than disclosed since SFX started using current exchange rates as opposed a Euro/USD parity rate.

103. Ironically, as discussed in a May 12, 2015 Rhino analyst report, it was speculated that SFX management was intentionally toying with the financial figures to make them look worse in the near term in order to enable Sillerman to easily acquire the Company without an additional price increase to his offer. Thus, Defendants had successfully conditioned the market to view the poor financial results in light of Sillerman's offer and to underestimate the implications of the actual performance of the Company.

**<u>The Merger Agreement</u>**

104. On May 26, 2015, the Company announced that it had signed the Merger Agreement pursuant to which Sillerman would purportedly acquire all of the outstanding shares of SFX that he did not already own for $5.25 per share. The Merger Agreement valued the Company at $774 million.

105. The Merger Agreement also provided that any shareholder who is a holder of record of shares of SFX common stock, evidenced by Certificates or by book-entry in the Company's stock transfer books, shall be entitled to make an election to receive in lieu of the Cash Merger Consideration, one share of non-voting Class B common stock, par value $0.0001 per share, of the surviving corporation of the Merger.

106. The Merger Agreement provided that from the date of the Merger Agreement until July 10, 2015, the Company could "initiate, solicit and encourage any alternative acquisition proposals from third parties, provide nonpublic information to such third parties and

participate in discussions and negotiations with such third parties regarding alternative acquisition proposals" (the "Go-Shop" period). In addition, the Merger Agreement contained a matching rights provision that granted Sillerman access to the material details of any competing bid as well as the ability to match any such bid.

107. As of May 26, 2015, Sillerman beneficially owned 37.4% of SFX's outstanding common stock and he publically stated from the beginning that he was willing to vote his shares in favor of any third party offer negligibly higher (2.5%) that his own offer.

108. The Merger Agreement further provided that Sillerman had to provide the Special Committee with his fully executed debt and/or equity commitment letters or similar agreements describing the terms and conditions for the financing of 100% of the aggregate amount of the Cash Merger Consideration within ten days after receiving a written request from the Special Committee. The Merger Agreement stated that this written request would not be delivered before the Go-Shop period was over. In other words, Sillerman did not have to provide evidence of his ability to finance the transaction until after other entities made an offer for the Company.

109. In connection with the Merger Agreement, Sillerman stated that: "I hope to use all-equity financing to fund the proposed going-private transaction. I have no plans to have the Company incur additional debt to fund the transaction." However, Sillerman knew, or should have known, but failed to disclose that he would not be able to obtain financing for the transaction and no other bidder would emerge.

110. Defendants knew that entering into the Merger Agreement, especially since it increased the consideration from $4.75 to $5.25, would have a positive impact on the price of SFX stock; possibly entice potential bidders for all or part of SFX; and enable, or at least make it easier, for the Company to renegotiate the terms of its credit agreement, refinance its debt, and

raise the money it so desperately needed to meet its financial obligations. Indeed, after the Merger Agreement was announced, the price of SFX stock rose from $4.12 to $4.94.

111. However, the Defendants knew or recklessly disregarded that SFX was in a precarious financial condition and Sillerman did not have and could not obtain the financing necessary to support a $774 million going forward enterprise value or for him to buy the outstanding shares of SFX he did not already own at $5.25 per share. Defendants knew or recklessly disregarded that Sillerman did not have the financing in place and he was not going to be able to obtain the financing, which is why the Merger Agreement did not require Sillerman to provide financing commitments until after the 45 day Go-Shop period was over and only after his cronies on the Special Committee gave him a written request for such evidence. Moreover, pursuant to the Merger Agreement, if the Merger Agreement was terminated due to, *inter alia*, Sillerman's inability to secure financing, the termination fee was only $7.8 million, payable in SFX shares valued at $5.25 per share. Thus, in order to implement his scheme to salvage his approximate 40% ownership of the Company, Sillerman only had to risk a *de minimis* portion of his SFX holdings valued at a manipulated and inflated price.

112. By entering into the Merger Agreement, Defendants misrepresented to the investing public that Sillerman was capable of obtaining financing and that shares of SFX were worth $5.25 and confirmed that the transaction was credible and feasible. Unfortunately, nothing was further from the truth. Defendants knew or recklessly disregarded that SFX was experiencing increased costs and decreased attendance at its festivals. Defendants' statements were designed to and did inflate SFX's stock price.

113. Moreover, the scheme temporarily succeeded in distracting the market form SFX's disintegrating financial condition. As expressed in a June 1, 2015 article on

*SeekingAlpha.com*, "[d]ue to the fact that the company has a signed definitive agreement to sell itself, [we] will not discuss the operating fundamentals of the business in further detail as they are now irrelevant."

**The Special Committee's Recommendation**

114. According to the Merger Agreement, the Special Committee unanimously determined that the transaction was fair to the Company's stockholders and unanimously recommended that the Board approve the Merger Agreement. By recommending that the Board approve the Merger Agreement, and specifically representing that the proposed transaction was fair, Defendants misrepresented to the investing public that SFX was worth $5.25 per share and confirmed that the transaction was credible and feasible. The Special Committee's recommendation was false and misleading because the Special Committee knew or recklessly disregarded that Sillerman's offer was a sham and he did not have and could not obtain financing necessary to support a $774 million going forward enterprise value and buy the outstanding shares of SFX he did not already own at $5.25 per share.

**Moody's Reviews SFX Ratings for Downgrade**

115. As Defendants knew all along, but manipulated the market and concealed, SFX was in a precarious financial position and could not meets its obligations. On May 27, 2015, Moody's Investors Service ("Moody's") placed SFX ratings on review for downgrade. "The company's Caa1 corporate family rating (CFR), Caa1-PD probability of default rating (PDR), B1 first lien revolving credit facility rating, and Caa1 second lien notes rating were placed on review for downgrade. SFX' speculative grade liquidity rating of SGL-3, indicating adequate liquidity, was affirmed." "That said, if financing arrangements provide the company with a sufficient

period in which to prove out its business model and cash flow generating capability before refinance milestones arise, there is the potential of the ratings being affirmed."

**Sillerman Affirms His Offer**

116. On May 29, 2015, in reaction to the downgrade review and in furtherance of the scheme, Sillerman issued a press release affirming that the proposed acquisition of SFX would be financed on an all-equity basis and reaffirming that he has agreed to vote his shares in favor of any superior proposal that has a value of at least 2.5% more than his highest offer.

117. However, Sillerman knew that he could not obtain the financing he needed to fund the transaction and did not really intend on consummating same. However, the true purpose of Sillerman's commitment was to communicate to the potential bidders, which he wanted the market to believe would emerge, that they should not be deterred by his purported interest in the Company and to assure them that, as the Company's largest and most influential shareholder who's support was indispensable for a potential transaction with SFX, he would not impede any proposal that they may make. Yet, once again, Sillerman knew that no such bidder would emerge or be able to obtain financing to acquire SFX for a price in excess of his offer.

**SFX Utilizes the Scheme to Raise Much Needed Cash**

118. One of the main drivers behind Defendants' manipulative scheme was SFX's desperate need for additional cash to fund its business. The cost of putting on festivals was continually increasing and SFX had burned through much of its cash. Defendants knew that SFX was unable to issue new debt without breaching existing loan covenants. In addition, its banker, Barclays had demanded that SFX raise collateral in order to be able to borrow from the Company's line of credit. Therefore, consistent with, and facilitated by, Defendants' scheme, on June 18, 2015, SFX agreed to sell 2.305 million shares to Wolverine Flagship Fund Trading

("Wolverine") and Virtual Point Holdings ("Virtual Point" and together with Wolverine, the "Funds") for aggregate cash consideration of $10 million, or $4.34 per share. In connection with the sale to the Funds, Sillerman entered into a letter agreements with the Funds pursuant to which he granted the Funds put rights to sell to him, at a put price of $5.25 per share in cash, all or a portion of the shares acquired by each of the Funds.

119. However, the transaction with the Funds was also in furtherance of Defendants' manipulative scheme as it falsely reassured SFX's creditors and partners that SFX could raise additional cash as needed to fulfil its various obligations. Indeed, as explained below, less than six weeks after this transaction, and once SFX capitalized on same to negotiate with its creditors, partners, and potential new investors, on July 31, 2015, ESFX, a new investment company of which Sillerman is the manager, and of which SIC is a member and owns 50% of the membership interest, bought back the shares previously sold to Virtual Point and negotiated the termination of the put right.

120. In addition, on June 18, 2015, SFX sold 1.04 million shares to SIC, for aggregate cash consideration of $5 million or $4.82 per share. In addition, to providing the Company with much needed cash, the transaction was designed to make Sillerman's $5.25 offer and valuation of SFX much more realistic and gave credibility to him being able to finance the transaction and falsely assured the investing public that he was capable of obtaining financing to consummate the Merger Agreement.

121. In the midst of the scheme, on July 7, 2015, SFX entered into a letter agreement (the "React Amendment") amending certain provisions of the React Agreement. Under the React Agreement, the sellers were entitled to receive an earn-out payment based on the performance of the acquired assets in 2014, payable eighty percent in cash and twenty percent in common stock

of the Company. Pursuant to the React Amendment, the parties agreed upon an aggregate earn-out amount of $14.7 million, the cash portion of which is to be paid in five installments through March 2016. On June 8, 2015, the stock portion of the earn-out was issued through the private placement of 656,907 shares of common stock of the Company. The sellers were advanced $1.0 million of the cash portion of the earn-out prior to entering into the React Amendment, and the remaining cash portion was to be paid over the course of five installments as follows: (i) $1.0 million on or before July 14, 2015; (ii) $2.0 million on or before September 1, 2015; (iii) $2.0 million on or before November 2, 2015; (iv) $3.0 million on or before January 4, 2016; and (v) the balance of approximately $2.8 million on or before March 1, 2016.

122. The React Amendment also eliminated a requirement that a portion of the earn-out proceeds were to be placed into an indemnity escrow, and further provided for cost-sharing between SFX and the sellers with respect to any payments that may become due as a result of a potential pre-closing litigation liability of the sellers. SFX's obligation to pay the remaining cash portion of the earn-out on each of the installment dates was evidenced by way of a subordinated promissory note in the aggregate principal amount of $10.8 million. In connection with the issuance of the note, Sillerman once again entered into a guaranty agreement and personally guaranteed up to $7.0 million of SFX's obligations under the note.

123. None of these desperately needed capital infusions and modifications could have occurred if Sillerman's purported offer to buy the Company, which implied a minimum value per SFX share of $5.25, were not outstanding.

**Defendants Amend the Merger Agreement, Extend the Go-Shop, and Suspend Sillerman's Matching Rights**

124. On July 10, 2015, Sillerman sent an email to SFX employees advising them that he had an update call with the Special Committee during which they asked for, and Sillerman

agreed to, extend the Go-Shop period for 2 more weeks. This move was designed to falsely communicate to the market that there was active interest by third parties to acquire all or part of SFX and thereby continue to inflate SFX's stock price and enable SFX to negotiate the terms of its debt and/or refinance same. This extension, of course, also pushed out Sillerman's obligation to present evidence of his financing for his $5.25 per share offer, buying him additional time to attempt to right the sinking SFX enterprise. Moreover, despite claiming that the extension was requested by the Special Committee, and not by Sillerman, Sillerman nevertheless felt the need to reassure the public and reaffirm his purported offer to acquire SFX by stating that "[t]his in no way indicates any lessening on my commitment to complete this transaction; rather this is a way to make sure that any potential party has adequate time to evaluate our great company."

125. As the CEO and the Company's largest shareholder, Sillerman knew that he did not have the financing to close the deal, and could not obtain it. But this did not matter because he never had the financial capacity or intent to buy the Company. Nevertheless, Sillerman continued to falsely assure the investing public that he was committed to buying the Company for $5.25 per share.

126. Also on July 10, 2015, the parties to the Merger Agreement entered into an Omnibus Amendment (the "Amendment"). The Amendment formally extended the Go-Shop period until 5:01 pm on July 24, 2015 and provided that during the extension of the Go-Shop period, Sillerman's right to match competing offers, as provided in the Merger Agreement, are suspended. Thus, Sillerman's purported commitment to support a 2.5% higher offer now meant that he would accept any competing offer to acquire SFX for approximately $5.38 per share or higher (or as little as $0.13 higher than Sillerman's offer). This commitment is incomprehensible if Sillerman had a bona fide interest in acquiring the Company pursuant to the Merger

Agreement. Moreover, in light of the *Moreno* Action, Defendants knew, or should have known, but failed to disclose that no alternative bidder was likely to emerge and any such bidder would be unable to obtain financing for the transaction.

127. The Amendment also changed the time for delivery of Sillerman's financing commitments from 10 days to 15 days after receiving the written request therefor from the Special Committee (which request could not be delivered prior to the end of the Go-Shop period). The Amendment also amended the Voting Agreement by providing that, if during the extension of the Go-Shop period the Company terminates the Merger Agreement to enter into an alternative transaction providing for a price that exceeds his $5.25 per share offer by any amount, Sillerman and his affiliates would vote in favor of that transaction.

128. Defendants failed to provide the investing public with an explanation of why they extended the Go-Shop period and the time for the delivery of Sillerman's financing commitments. By amending the Merger Agreement, Defendants once again misrepresented to the investing public that SFX was worth $5.25 and confirmed that the transaction was credible and feasible. Defendants knew or recklessly disregarded and failed to disclose that Sillerman could not provide the necessary financing commitments and that the extension of the Go-Shop period was a means to continue their manipulative scheme to artificially maintain the price of SFX's shares while Sillerman attempted his financial gymnastics to obtain additional financing for SFX and additional concessions from SFX's creditors and partners.

**<u>The Market Begins to Suspect there are Problems with the Company and Proposed Merger</u>**

129. On July 17, 2015, *Forbes.com*, published an article commenting on the unexpected Go-Shop extension and dearth of disclosures. Specifically, the article observed that the Company did not identify any specific competing bids even though it based the extension on

the existence of same. Moreover, the article observed that since the Company announced the extension, SFX shares had fallen nearly 8% in price reflecting uncertainty surrounding Sillerman's bid. Similarly, the article explained that the 23% price decline following the announcement of the various financing and cash infusion transactions reflect investors "confusion with SFX's finances and health."

**Sillerman Reffirms His Commitment to the Transaction**

130. On July 19, 2015, reacting to the significant price decline in SFX stock and to blunt the affect of the *Forbes.com* report, which threatened to curtail Defendants' manipulative scheme, Sillerman once again attempted to reassure the market of his intention to acquire SFX and was quoted as follows:

> The recent stock transactions demonstrate an increased commitment on my part to consummate this transaction. My advisors and I are continuing to advance this going-private transaction under the same terms as those spelled out in a definitive agreement executed on May 26, 2015.

On this news, SFX stock rose from $4.49 to $4.63.

131. Sillerman's statement affirming his commitment to acquire SFX pursuant to the terms set forth in the Merger Agreement was materially false and misleading because he knew or recklessly disregarded and failed to disclose that he did not have and could not get the financing to consummate the Merger Agreement.

132. Sillerman's misleading statements were designed to mask the Company's impending liquidity crisis and inflate SFX's stock price during the Go-Shop period of the Merger Agreement in order to keep SFX as an attractive acquisition candidate for a third party purchaser at a price greater than $5.25 and/or facilitate the renegotiation of the Company's debt covenants and/or enable SFX to refinance its debt.

**SFX Announces the End of the Go-Shop Period**

133. On July 27, 2015, SFX issued a press release announcing the expiration of the Go-Shop period. However, contrary to the impression that Defendants gave the market when it extended the Go-Shop purportedly "to permit interested bidders and financing sources additional time to evaluate their proposals," the Company now admitted that "none of the third parties contacted by Moelis & Company LLC [] provided the Company with a proposal or offer regarding an alternative acquisition proposal." Thus, there were never any actual "interested bidders" but only solicitations from SFX's financial advisors. Instead, according to the Company, the Special Committee "received several indications of interest regarding the potential acquisition of ***various components*** of the Company's business. [And] [t]he committee and management are continuing to review these indications of interest." (Emphasis added.) The press release further stated that, barring an alternative transaction approved by the Special Committee, "the previously announced [Sillerman] merger transaction is expected to close during the fourth quarter of 2015," and thus continued the scheme. However, the scheme continued to unravel and, after the Company revealed that there were no bidders interested in purchasing SFX and that the Company was considering dismembering itself, shares of SFX declined from $3.86 per share, the closing price on July 24, 2015, to $3.32 per share, the closing price on July 27, 2015, and continued to decline the following day to $3.12 per share, the closing price of July 28, 2015.

134. After employing various artifices and delaying as long as possible in order to further their manipulative scheme, on July 30, 2015, SFX finally announced that the Special Committee had delivered notice to Sillerman that he had to deliver fully executed commitment letters describing the terms and conditions for the financing of the proposed Merger to the Special Committee by August 13, 2015. However, Defendants continued to deceive the market

by again stating that "the previously announced merger transaction is expected to close during the fourth quarter of 2015."

135. On August 4, 2015, after the markets closed for trading, Sillerman disclosed that on July 31, 2015, Virtual Point sold the 1,152,605 shares of SFX it acquired on June 18, 2015, to ESFX for $5.0 million, or approximately $4.34 per share, foregoing their apparent (but false) opportunity to sell the shares for $5.25 each at the time of the Merger, or otherwise put the shares to Sillerman for $5.25 in the event the Merger is not consummated. This signaled to the market that the Merger was less likely than Defendants had led the market to believe and that Sillerman's finances were so precarious that Virtual Point feared that they would not be able to capitalize on their put option. On this news, shares of SFX declined from a closing price of $3.13 per share on August 4, 2015, to a closing price of $3.05 per share on August 5, 2015.

**SFX Withholds Royalty Payments to Inflate its Cash**

136. On August 5, 2015, in an attempt to preserve its cash on hand, it was reported that Beatport had frozen payments to labels while "SFX, continues a 'going private' process from a publicly listed company to a private one." According to reports, Beatport claimed that the pending transaction had "trapped certain earned label payments" for the past quarter, from April through June. However, as reported in an article published on *NYTimes.com* on August 12, 2015, as detailed below, "[a]fter an uproar in the independent world, Beatport reversed course and said it would pay the royalties on time."

**SFX Announces Second Quarter and Six Month Financial Results**

137. On August 10, 2015, SFX reported financial results for its second quarter and six months ended June 30, 2015. While the company reported that revenue for the second quarter was $121.1 million, it also reported a net loss and loss per share of $(48.0) million and $(0.52),

respectively. Direct costs for the three months ended June 30, 2015 totaled $99.1 million. Direct costs for the six months ended June 30, 2015 totaled $133.2 million.

138. SFX's revenue in the second quarter grew 48.3% to $121.1 million from 29 festivals and 238 other events. However, net loss in the quarter grew 36.2% to ($48.0) million. The high growth in costs more than canceled out the growth in SFX's revenue. While revenue grew 48.3% in the quarter, direct costs grew 61%.

139. The second quarter financial results underscore how SFX continued to burn through millions in cash each quarter. After raising hundreds of millions of dollars in the IPO and then issuing nearly $300 million in debt in subsequent years, SFX was practically down to its last dime. Cash and cash equivalents ended the second quarter at $38.6 million (excluding the improperly retained $13.6 million of cash proceeds which was overdue to a third party ticketing client.) However, even that figure overstates SFX's true cash availability. There is approximately $5.8 million remaining on SFX's original $30 million credit line after the company tapped it for $24.2 million at the end of the quarter. Thus, as Defendants knew all along, SFX was in breach of its debt covenants and could not meet its financial obligations—on this news SFX dropped from $3.05 per share, the closing price on August 7, 2015, to $2.36 per share, the closing price on August 10, 2015.

140. On August 10, 2015, *Forbes.com* published an article following the earnings release. The article noted that "profits and cash flow continue to be elusive for the company" and SFX's "rising revenues aren't generating profits, or even a narrowing of losses or cash burn." It further noted that while the Company had previously provided pro forma adjusted EBIDTA guidance for 2015 of $55-$65 million, the Company made no mention of the guidance in the current report.

141. An August 12, 2015 article published on *NYTimes.com* echoed the observations in the *Forbes.com* article and also commented on the Company's recent decision to withhold certain royalty payments stemming from use of Beatport as follows:

> Other financial maneuvers by SFX have raised eyebrows. In June, the company sold $10 million in stock to two investors at $4.34 a share, with Mr. Sillerman agreeing to buy the shares back at $5.25, a move analysts and commentators interpreted as demonstrating SFX's urgent need for cash. (Mr. Sillerman also bought $5 million in stock.) But six weeks later, one of those investors, Virtual Point Holdings, sold the stock back to Mr. Sillerman at $4.34, forgoing its right to the higher price.
>
> SFX's liquidity problems have also affected its relationships in the music industry. Last week, Beatport informed independent record labels that their royalty payments had been "trapped" during the process of going private and would be late. "There wasn't even a hint of apology," said Morgan Geist, an electronic musician who owns his own label, Environ, and publicized Beatport's letter on Facebook.
>
> After an uproar in the independent world, Beatport reversed course and said it would pay the royalties on time.
>
> "The way we handled this was inexcusable and should never have happened," Mr. Sillerman said in a statement circulated to record labels late last week. "I am deeply embarrassed, both personally and professionally, by what has happened."

**<u>Sillerman Fails to Deliver Financial Commitment Letters But the Sham Continues</u>**

142. On August 13, 2015, Sillerman failed to provide the Special Committee with financial commitment letters.

143. On August 14, 2015, after taking note of SFX's silence regarding the passage of the deadline for Sillerman to confirm his financing SFX shares declined from an opening price of $1.91 per share to close at $1.39. That morning, Bloomberg published an article observing that:

> SFX Entertainment sinks as much as 29% to record low as yday's deadline for CEO Robert Sillerman to deliver final financing terms came and went with no disclosure from co., Stifel analyst Benjamin Mogil writes in note.
>
> - Cuts fair value est. to $2 from $4; cites likelihood Sillerman has "materially changed" his $5.25 bid for SFXE

144. Early that afternoon, *SeekingAlpha.com* published a similar article noting that:

> A little over day after a deadline to show financing in taking SFX Entertainment (NASDAQ:SFXE) private, both CEO Robert Sillerman and the company are silent, and shares are down 24.2% and at all-time lows.
>
> Sillerman had until 10 a.m. yesterday to show financing for 100% of the cash commitment in his $5.25/share offer; shares have now dropped to $1.47, giving it a market cap of just over $142M.
>
> The stock has lost 78.4% of its value over the past year, and Sillerman and the company agreed on the $5.25/share price on May 26. But the end of a go-shop period had the company speculating about selling off parts, and extending Sillerman's deadline to prove financing an extra few days, to yesterday.

145. On August 14, 2015, shortly after the *SeekingAlpha.com* was published, SFX announced that the Special Committee, with the concurrence of Sillerman, "has authorized the continued exploration of strategic alternatives for the Company, including the sale of all or substantially all of the Company's assets in whole or in part." The Company further added that it will entertain offers for the entire Company as well as assets not central to the Company's core business through at least October 2, 2015. The Company stated that it was extending the offer period to October 2, 2015 in order to "allow potential bidders and their financing sources to have visibility into the Company's performance during its peak festival season." Moreover, the Board falsely claimed that in order "[t]o facilitate potential offers during this period, all 'no-shop' restrictions and the related breakup fees provisions applicable to the Company under the merger agreement will no longer apply, enabling potential bidders to freely evaluate the Company in light of the recent substantial decline in its share price." However, Sillerman was already liable for the termination fee since he failed to timely procure financing and the Merger Agreement was terminable by its terms and SFX was entitled to collect the termination fee from Sillerman

and enter into a new agreement without triggering an obligation to pay Sillerman a termination fee. Thus, the purported waiver was illusory and the statement was false and misleading.

146. Indeed, even Defendants' extension of the offer period and the explanation for doing it were materially misleading. Defendants knew or recklessly disregarded that SFX's ticket sales were declining and that it had substantial cash requirements that if not met would force the cancellation of events. In fact, on September 1, 2015, SFX cancelled its One Tribe festival scheduled for September 25th and 26th "due to poor ticket sales."

147. The August 14 press release further represented that Sillerman "continues to be interested in taking the Company private, either alone or with one or more strategic partners, although also at a lower price given the Company's share price has declined substantially below that in the merger agreement."

148. That same day, Albert Fried issued a report explaining that:

> Key risks to our investment thesis are SFXE's current negative working capital and a past history of management missing estimates as it has over promised and under delivered. [] We think last weeks debacle was created by Management. SFXE following the Go Shop period should have provided more transparency and preannounced results.
>
> * * *
>
> In our view SFXE has risks. Suboptimal execution has been compounded by potential acquires being aloof and a management team that have zero incentive to maximize public shareholder value.

149. After the disclosures on August 14, 2015, SFX stock fell precipitously and closed at $1.39 per share on high volume.

**<u>SFX Terminates the Merger Agreement</u>**

150. On August 17, 2015, SFX terminated the Merger Agreement. Pursuant to the terms of the Merger Agreement, Sillerman is obligated to pay the Company a fee of $7,800,000

as a result of such termination. However, further demonstrating their complicity in Sillerman's scheme, the Special Committee agreed to extend the due date for the payment of the termination fee until October 2, 2015.

151. Moreover, in an effort to continue the scheme, Sillerman once again reaffirmed his intention to provide a revised offer for all of the Company's common shares not owned by him.

152. As noted in an article published on the morning of August 17, 2015, by *SeekingAlpha.com*, Sillerman's affirmation caused SFX stock to trade up over 9% in pre-market trading. However, after digesting the implications of the disclosures, the market quickly capitulated and SFX shares closed at $1.33, down nearly 15% from the opening price of $1.55 per share.

153. Later that day, Stifel published a note wherein it advised that, in light of the recent events and disclosures concerning the Merger, it was lowering SFX's rating to "Sell."

154. The following day, on August 18, 2015, shortly after the market opened *SeekingAlpha.com* published an article wherein it observed that "SFX is off 11.3%-now down to $1.18/share-after it filed an official termination to its go-private deal and call for $7.8M termination fee."

155. Later that day, *SeekingAlpha.com* published another article, titled "SFX Entertainment: The House Of Cards Is Collapsing" wherein it concluded that:

> We believe ***SFXE is under significant financial duress. It is quickly burning through cash and has limited financing options.*** We believe the company is on its way to bankruptcy and that Robert Sillerman's latest interest in taking the company private carries little weight. ***While the company and Sillerman have stated that SFXE extended the offer period to October 2, 2015 in order to "allow potential bidders and their financing sources to have visibility into the Company's performance during its peak festival season," we believe this is a false statement.*** Deferred revenues, a proxy for ticket sales, are declining, and

> SFXE has substantial cash requirements that it says it may not be able to meet. We believe management has stepped away because they can see that SFXE is going to go bankrupt. We share this view and have a price target of $0.

Emphasis added.

156. Although the market began to perceive Defendants' scheme, and realized the intractable issues the Company faced, SFX's share price was still artificially inflated due to the market's belief that there was still a possibility that Sillerman's offer was legitimate. An August 18, 2015 research summary published by Stifel noted as follows:

> *We are moving to a Sell rating as the company's merger termination fee request to CEO Robert Sillerman likely indicates that no new bid is forthcoming. We see dilutive equity offerings as likely in order to avoid debt covenant violations.*
>
> Last night, SFX disclosed that it had terminated its merger agreement with CEO Robert Sillerman and that a $7.8mn termination fee is due by October 2nd. At this stage, while there remains the possibility that Mr. Sillerman comes back with another bid, given the termination fee notice and the current valuation we think a new bid is unlikely. As we noted in our downgrade note of last week, the 2Q15 financials were much weaker than expected and we see the company as in risk of covenants going forward without additional equity being injected. While Mr. Sillerman may be such a source of capital, we expect any new capital to be on dilutive terms and set a target price of 1.00.

157. In light of these revelations and realizations, on August 18, 2015, SFX shares continued to drop in price and closed at $1.15 per share, a decline of approximately 13.5% from the closing price of $1.33 per share on August 17, 2015. The shares continued to decline over the following days and closed at $0.79 per share on August 20, 2015.

158. As reported by *Forbes.com* on October 16, 2015, by withdrawing his bid, Sillerman "caus[ed] the company's stock to fall below $1 a piece. Sillerman's failed bid reflected an inability to raise financing to complete the tender, and was likely hindered by the company's deteriorating financial position under his watch."

159. On August 19, 2015, SFX entered into amendments to the employment agreements between the Company and each of Gregory Consiglio and Kevin Arrix providing for guaranteed bonuses instead of bonuses determined on a sliding scale based on the achievement of gross revenue and net income targets and providing generous severance payments, tacitly acknowledging that their respective SFX subsidiaries could not meet their target income and revenue.

160. On August 20, 2015, after the markets closed, *SeekingAlpha.com* published an article explaining that:

> SFXE cratered again today, down 24.4%. The stock has lost more than 74% of its value in the past five days, in the wake of confirmation that a go-private deal with its CEO Robert Sillerman was off.

**SFX Debt is Downgraded by Moody's**

161. On August 26, 2015, as the scheme was unravelling, Moody's Investors Service downgraded SFX's debt. Moody's reported: that the company has "no tangible sign" of producing positive cash flow and has limited remaining cash and therefore it was lowering SFX corporate and second-lien note ratings by two steps each to Caa3.

162. In a meeting with certain of its noteholders on September 1, 2015, SFX claimed that "the downgrading to the Company's corporate credit rating by rating agencies has contributed to short-term disruption to its business operations. Specifically, the Company has been required to expend more of its cash reserves than planned on unforeseen live event expenses, including making upfront payments to more of its live event vendors, impacting the Company's liquidity." However, as explained herein, this was precisely the type of outcome that the scheme was designed to forestall. Despite Defendants' false assertions, this downgrade was foreseeable and imminent and was merely delayed by the scheme in order to give Defendants a

shot at securing sufficient cash and enticing a potential interested party to acquire all or part of the Company before its true condition was revealed to the market.

163. Additionally, in continuance of the scheme and in an effort to facilitate the acquisition of much needed cash, the Company claimed that the Special Committee received indications of interest regarding the potential acquisition of various components of the Company's business and stated that it would continue to accept proposals for the Company.

164. As a result of these revelations, on September 2, 2015, the price of SFX shares declined nearly 34% from a closing price of $1.01 on September 1, 2015, to $0.67 on September 2, 2015, and continued to decline the following day to close at $0.50 on September 3, 2015.

165. A September 2, 2015 article published on *SeekingAlpha.com* observed as follows:

> SFXE is among today's top entertainment losers, down 33.2% after its filing noting "short-term disruption" to operations as it has to spend more cash up front due to ratings changes.

**SFX Obtains Much Needed Cash on Oppressive Terms and By Continuing to Engage in <u>Deceptive Practices</u>**

166. On September 17, 2015, SFX announced that it had secured $60 million in new financing and refinanced its existing $30 million revolving credit facility, securing capital for new initiatives and operating and working capital needs. The $90 million came from both new and existing investors, with $60 million in private placement financing and $30 million in a revolving credit facility. Additionally, the Company stated that the Special Committee and its advisors continue to accept proposals for the entire Company, as well as assets not central to its core business, with a deadline of October 2, 2015.

167. In an attempt to continue the scheme, in the press release Sillerman stated as follows:

> This round of financing from these sophisticated investors reflects a level of confidence and provides growth capital to support many of the exciting new initiatives SFX is undertaking. While the Company continues to explore strategic alternatives, this solidifies SFX for the short and long term, so we can focus on producing great festivals and events and operating globally recognized digital properties.

168. In actuality, half of the $60 million in "new financing" was provided by Sillerman for the purpose of inducing Allianz Global Investors U.S. LLC ("Allianz") to provide the other $30 million and, as explained below, Sillerman only provided $15 million out of the $30 million he committed and then defaulted on the balance.

169. As disclosed on September 17, 2015, SFX raised the capital by entering into a series of transactions, including (i) the assignment of its existing $30 million Revolver to affiliates of GoldenTree Asset Management LP, and the entry into certain amendments to the New Credit Agreement, (ii) the sale of $30 million of new Series A Preferred Stock (the "Series A Preferred Stock") to SIC, and (iii) the issuance of $30 million of new Series B Convertible Preferred Stock (the "Series B Preferred Stock"), to an institutional investor.

170. Pursuant to the Series A Subscription Agreement ("Subscription Agreement"), SIC agreed to purchase from the Company an aggregate of 300 shares of the Company's new Series A Preferred Stock for an aggregate purchase price of $30.0 million, at a price of $100,000 per share. Pursuant to the Subscription Agreement, SIC purchased $15.0 million of Series A Preferred Stock on September 17, 2015 and is obligated to purchase an additional $2.5 million of Series A Preferred Stock on six subsequent closings to be held every fifth day following the initial closing. Dividends on the Series A Preferred Stock accrue at the rate of 29.5% per annum on the sum of the liquidation value, which is $100,000 per share of Series A Preferred Stock (the "Liquidation Value"), plus accrued and accumulated dividends, until the aggregate Liquidation Value of and accrued and accumulated dividends on the outstanding shares of Series A Preferred

Stock is equal to $53.0 million. Thereafter, dividends on the Series A Preferred Stock accrue at the rate of 9.0% per annum.

171. Pursuant to the Series B Purchase Agreement, funds managed by Allianz purchased from the Company an aggregate of 30,000 shares of new Series B Preferred Stock for an aggregate purchase price of $30.0 million, at a price of $1,000 per share (the "Series B Original Issue Price"). Cumulative dividends on the Series B Preferred Stock accrue at the rate of 9% per annum on the sum of the Series B Original Issue Price thereof plus all unpaid accrued and accumulated dividends thereon.

172. Aside for continuing to misrepresent its financial position and Sillerman's interest and ability to acquire the Company, Sillerman induced Allianz to purchase the $30 million in Series B Preferred Stock by entering in the Subscription Agreement and implicitly representing that even he was willing to continue investing in SFX. However, after securing the much needed cash from Allianz, Sillerman defaulted on his obligation to purchase the additional $15 million of Series A Preferred Stock by October 17, 2015 in accordance with the Subscription Agreement.

**SFX Amends The New Credit Agreement and is Forced to Reinstate a Maximum Total Leverage Ratio and a Minimum Interest Coverage Ratio Financial Covenant**

173. As a result of the unravelling of Defendants' manipulative scheme, on September 17, 2015, the Company entered into an Amendment and Restatement Agreement ("Amendment No. 2") in respect of the New Credit Agreement, dated February 7, 2014, as amended. Among other things, Amendment No. 2 modified the New Credit Agreement by (i) reinstating a maximum total leverage ratio and a minimum interest coverage ratio financial covenant, (ii) increasing the applicable margins for base rate loans and Eurodollar loans to 9.00% per annum and 10.00% per annum, respectively, and instituting a 1.00% LIBOR floor,

(iii) eliminating or restricting certain exceptions to the negative covenants and (iv) extending the maturity date of the Credit Agreement from February 7, 2017 to September 17, 2017.

**SFX Extends the October 2, 2015 Proposal Deadline**

174. On October 1, 2015, SFX announced that the Special Committee set an initial bid deadline of October 14, 2015 for third-parties to submit their proposals to acquire the entire Company or assets not central to the Company's core business resulting in a two week extension to the initial target bid date of October 2, 2015 "in an attempt to give all parties sufficient time to complete their due diligence review following events occurring in September 2015, including the closing of the Company's financing transactions on September 17, 2015 and the conclusion of the Fall festival season."

**Sillerman's New Proposal**

175. On October 14, 2015, Sillerman delivered a non-binding letter to the Board to propose a purported new transaction for him to acquire SFX ("New Proposal"). Under the New Proposal, Sillerman would acquire all of the outstanding shares of SFX not already beneficially owned by him for up to $3.25 per share in cash. The New Proposal was disclosed by Sillerman in a Schedule 13D filing with the SEC before the markets opened on October 16, 2015. In response to the New Proposal, SFX shares opened on October 16, 2015, at $1.51 per share, increasing over 45% from the pre-disclosure closing price of $1.04 per share on October 15, 2015.

176. The New Proposal further provided that stockholders of the Company who wished to retain their equity interest in the Company would have the option to do so, subject to a maximum of 75 shareholders, and roll over their shares into equity interests of the acquiror alongside Sillerman. Under the New Proposal, each stockholder of the Company (other than those who elect to roll over their shares) would receive at closing (i) an amount per share in cash

equal to the sum of $1.75 plus 100% of the amount Sillerman receives, up to $50MM in the aggregate applied pro rata to all shareholders, for the credit and other support he has provided to the Company, and (ii) a non-tradeable contingent payment right entitling the holder to receive up to an additional $1.00 per share in cash upon future sale of the Company. The New Proposal is also not subject to receipt of financing.

177. Although the Company set a bid deadline of October 14, 2015 for third-parties to submit their proposals to acquire the Company, at the expiration of the deadline the Company failed to disclose the status of that process. Instead, on October 22, 2015, the Special Committee announced that it has received preliminary indications of interests from parties interested in acquiring the Company, including a preliminary bid from Sillerman. The Special Committee did not disclose the terms contained in these purported preliminary indications of interest or the identities of the alleged third-parties.

178. Sillerman's New Proposal continued to have the desired effect of manipulating the market for SFX stock. As explained in an October 16, 2015 analyst report published by Albert Fried, Sillerman's New Proposal resulted in Albert Fried rating SFX as "overweight," which "suggests capital appreciation to our 12 to 18 Month Price Target on the initiation or upgrade date of coverage." As of the date of the report, Albert Fried set a $5 price target for SFX shares and concluded that it "continues to think that the value of SFX's holdings could be much greater than the current Equity [sic] value of SFXE shares."

**SFX Receives Notices of Delisting or Failure to Satisfy a Continued Listing Rule or <u>Standard From NASDAQ</u>**

179. On October 15, 2015, SFX received a written notification (the "Notice") from the NASDAQ stating that the Company is not in compliance with NASDAQ Listing Rule 5450(a)(1), because for the last 30 consecutive business days the closing bid price of the

Company's common stock was below the $1.00 per share minimum required for listing. In accordance with NASDAQ Listing Rule 5810(c)(3)(A), the Company has an initial period of 180 calendar days, or until April 12, 2016, to regain compliance with the minimum closing bid price requirement.

180. Shortly thereafter, on October 30, 2015, SFX received another letter from the NASDAQ notifying the Company that it violated the shareholder approval requirements of Listing Rules 5635(c) and 5635(d)(2) in connection with its sale of the $60 million of Series A Preferred Stock and Series B Preferred Stock.

**Sillerman Defaults on the Subscription Agreement**

181. On November 4, 2015, SFX filed a Form 8-K with the SEC disclosing that, pursuant to the Subscription Agreement, Sillerman, through SIC, was obligated to purchase an additional $15 million of Series A Preferred Stock in installments with the final payment due October 17, 2015. However, on September 29, 2015, the Company delivered notice to SIC that it was in breach of the Subscription Agreement. Following SIC's failure to fund the additional $15 million of Series A Preferred Stock, the Company and SIC engaged in discussions about remedying the breach. On November 2, 2015, the Company delivered notice to SIC that it continued to be in breach of the Subscription Agreement and demanded payment of the $15 million. According to the Company, it was in the midst of discussions with Sillerman about curing the breach.

**SFX Discloses Earnings and Other Financial Results for the Three and Nine Month Period Ended June 30, 2015**

182. On November 9, 2015, SFX issued a press release disclosing earnings and other financial results for the three and nine month period ended June 30, 2015. Unable to conceal the Company's financial hardship any longer, although still not completely belying Sillerman's New

Proposal, the Company reported revenue for the three months ended September 30, 2015 declined by $10.3 million, or 7%, year over year to $133.2 million. Excluding foreign currency impact, revenue in the three months ended September 30, 2015 would have declined by $0.5 million, or less than 1%, year over year. Revenue for the period was also adversely impacted by approximately $4.0 million of lost revenue due to the cancellation and/or partial cancellation of several events during the quarter, which is expected to be partially replaced by insurance recoveries during later periods, as well as a reduction in the volume of digital music downloads. Revenue for the first nine months of 2015 grew 18.6% year over year to $306.5 million. Excluding foreign currency impact, revenue in the nine months ended September 30, 2015 increased by $88.3 million, or 34%, year over year. Net loss and diluted loss per share for the three month period ended September 30, 2015 were $(54.5) million and $(0.57), respectively, while net loss and diluted loss per share for the nine month period ended September 30, 2015 were $(144.0) million and $(1.55), respectively. The Company's pro forma revenue for the three and nine months ended September 30, 2015, was $133.2 million and $305.0 million, respectively. Pro forma adjusted EBITDA for the three and nine months ended September 30, 2015, was a loss of $(3.5) million and $(17.1) million, respectively.

183. In the press release announcing the financial results, Sillerman made one last ditch effort to give a false positive spin to the Company's poor performance but was forced to acknowledge that the Company could not perform in accordance with the previous provided guidance. Sillerman stated as follows:

> Despite continued strong gains in total attendance, the third quarter of 2015 was challenging for SFX in several respects, including the impact of foreign exchange and the cancellation of several festival days to weather. Additionally, the Company's sales and recognition of revenue from sponsorships did not meet our expectations, which we consider primarily a timing issue. However, we remain very pleased with the quality and loyalty of our sponsors and marketing partners,

> as reflected by their willingness to renew, and in some cases expand, their partnerships, and we are confident in our potential to secure additional sponsorships. While our financial performance was impacted by external factors, we are making several significant changes this quarter to address the lower than anticipated operating results. Additionally, although fourth quarter results are expected to benefit from insurance settlements and the finalization of a new marketing agreement, the 2015 full year financial results will not meet our prior expectations. Going forward, and notwithstanding the ongoing sales process, our teams remain focused on operations.

184. On November 9, 2015, Albert Fried published an analyst report commenting on the financial results and summarizing its key conclusions about SFX. Specifically, the report noted as follows:

> We think by the end of 2015 SFXE will cease to be a public company as the current CEO will acquire remaining SFXE shares.
>
> SFXE reported 3Q15 results which were significantly below Wall Street estimates.
>
> Revenue per ticket sold was also poor. [] We note management on several occasions told investors that SFXE has $76 million in contracted EBITDA which to date has not materialized. Moreover, despite having many opportunities to do so, management never updated guidance.
>
> SFXE appears to be influx as hopefully the board will take steps to finalize a credible sale if possible.

185. After these revelations, shares of SFX declined from an opening price on November 10, 2015 of $0.89 per share to close at $0.70 per share. Shares of SFX continued to decline thereafter closing at $0.70 per share on November 11, 2015.

186. Although the market finally saw through the charade and disbelieved Sillerman's false assurances concerning the Company's circumstances, the market still credited the possibility that Sillerman's New Proposal might still be consummated.

**Sillerman Withdraws the New Proposal—The Class Period Ends**

187. On November 17, 2015, Sillerman delivered a letter to the Board withdrawing his New Proposal finally and fully revealing that he would not and could not purchase the Company in accordance with his offers. No longer crediting any additional value to SFX based on Sillerman's offers and implied valuations of the Company, shares of SFX declined from an opening price on November 17, 2015 of $0.55 per share to close at $0.44 per share.

188. The truth that was finally revealed to the market was summarized in a November 30, 2015 article published on *SeekingAlpha.com*, wherein it reported that "investors seem to have lost confidence that there will be a solution for the company's ongoing problems anytime soon." "SFXE has a cash problem. In other words, the company has to deal with a continuing shortage of cash. Although the company secured some additional financing in September, this additional money is far from enough to start restructuring and build a sustainable future." "The option of Sillerman taking the company private is still on the table, but the market clearly considers chan[c]es for the offer to succeed very limited. Apart from the required money to take over the shares, Sillerman also needs to find lenders who are willing to ensure and even exten[d] existing credit lines in order to survive the upcoming quarters." "I'm pessimistic SFX Entertainment will be able to overcome the current financial problems."

**Additional Indicia Of Scienter**

189. This does not appear to be Sillerman's first attempt to manipulate a company he owns/controls with an impossible bid without obtainable financing. Sillerman twice made what appeared to be bad faith bids to take-private his entertainment company, CKX. Sillerman's first attempt was announced on June 1, 2007, with a purchase price of $13.75. But, as with SFX, Sillerman did not have the financing to consummate the deal— not when he proposed the deal,

nor when it was announced. What followed was a year and a half of murky disclosure by CKX as the deal was repeatedly delayed because of Sillerman's failure to obtain and close financing. Sillerman had initially agreed with the CKX board of directors that he would obtain financing for the buyout within 60 days from the time the acquisition was announced. And again, like here, Sillerman missed the deadline. Months later, on November 8, 2007, Sillerman purported to deliver signed financing letters but the terms of those letters were never disclosed to shareholders. It was then reported that the financing amount he was able to obtain was presumably insufficient to pay for the buyout.

190. Subsequently, as Sillerman did here, he revised his offer price twice. On May 27, 2008, the cash component of the buyout price was reduced a final time, to $12 a share, and the final date after which either party could terminate the transaction for any reason, was also extended to October 31, 2008. Like here, the (false) assumption was that this would provide Sillerman enough leeway to complete his financing for the buyout. Instead, on November 1, 2008, 17 months after the buyout was announced, the offer was terminated. According to CKX's Form 10-K, filed with the SEC on March 10, 2009, at about the time Sillerman withdrew his purported revised bid, shares of CKX traded at a low of $2.49 per share.

**PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

191. Throughout the Class Period, Plaintiff and the members of the Class justifiably expected the Defendants to disclose material information in connection with the offering and sale of the Company's stock. Plaintiff and the members of the Class would not have purchased the Company's stock at artificially inflated prices if Defendants had disclosed all material information. Thus, reliance by Plaintiff and the Class members should be presumed with respect

to Defendants' false and misleading statements and the failure to disclose material information necessary to make the statement made not misleading.

192. Throughout the Class Period, the Company's stock traded in an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the prices of the Company's stock.

193. The following facts demonstrate that the market for SFX's common stock was efficient at all time during the Class Period: (a) SFX's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market; (b) as a regulated issuer, SFX filed periodic public reports with the SEC; (c) SFX regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (d) SFX was followed by a number of securities analysts employed who wrote reports that were distributed to the sales force and customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

194. As a result of the foregoing, the market for SFX common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the stock price. Plaintiff and the other Class members relied on the integrity of the market price for the Company's stock and are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

195. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired SFX common stock during the period between February 25, 2015 and November 17, 2015, inclusive, and who were damaged thereby (the Class). Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest.

196. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SFX's common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are tens of thousands of members in the proposed Class who are geographically dispersed throughout the United States. Members of the Class may be identified from records maintained by SFX or its transfer agent and may be notified of the pendency of this action by mail, using the form(s) of notice customarily used in securities class actions.

197. Plaintiff's claims are typical of the claims of the members of the Class, because all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

198. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

199. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the numerous questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about SFX and Sillerman's ability to consummated his offer to buy the Company;

(c) whether Defendants engaged in manipulative or deceptive conduct;

(d) whether Defendants acted with scienter;

(f) whether reliance upon Defendants' alleged false and misleading statements can be presumed pursuant to the fraud-on-the-market doctrine;

(e) whether and to what extent the market price of SFX's stock was controlled or artificially inflated during the Class Period as a result of Defendants' violations of the securities laws; and

(f) to what extent the members of the Class have sustained damages resulting from Defendants' violations of the federal securities laws and the proper measure of damages.

200. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for many members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**LOSS CAUSATION/ECONOMIC LOSS**

201. During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted to state material facts necessary to make the statements made

not misleading and engaged in a scheme to deceive and manipulate the market and a course of conduct that artificially inflated or controlled the price of SFX common stock and operated as a fraud or deceit on Class Period purchasers of SFX common stock by materially misrepresenting Defendant Sillerman's intent to purchase all of the outstanding common stock of SFX he did not already own when they knew that he did not have and nor could he obtain the financing necessary to consummate the Merger Agreement and/or that he did not intend to consummate the transactions as proposed. As Defendants' manipulation, misrepresentations and fraudulent conduct became apparent to the market, the price of SFX's common stock fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of SFX common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

202. Defendants' false and misleading statements had the intended effect and caused SFX's stock to trade at artificially inflated levels throughout the Class Period.

## NO SAFE HARBOR

203. SFX's "safe harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

204. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to Defendants' intentional manipulative scheme and any of the false and misleading statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made and/or were in actuality statements of then-present fact.

205. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

206. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission (Against All Defendants)

207. Plaintiff repeats and realleges each and every allegation contained in the Foregoing paragraphs as if fully set forth herein.

208. This Count is asserted against all Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

209. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, employed manipulative and deceptive practices while engaged in a scheme to defraud and made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading and engaged in acts and practices, and in a course of conducted which operated as a fraud and deceit upon the purchasers of the Company's common stock and in an effort to maintain artificially high market prices for SFX common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

210. Defendants' manipulative and deceptive practices and false and misleading statements and omissions were intended to, and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the other members of the Class; (ii) artificially inflate and maintain the market for and market price of the Company's stock; and (iii) cause Plaintiff and the other members of the Class to purchase the Company's stock at inflated prices.

211. During the Class Period, Defendants employed manipulative and deceptive practices and made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

212. Defendants had actual knowledge of the manipulative and deceptive practices and the misrepresentations and omission of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth from the investing public and to support the artificially inflated prices of the Company's common stock.

213. As described above, Defendants engaged in the manipulative and deceptive practices and made the materially false and misleading statements knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased SFX stock during the Class Period.

214. Defendants' manipulative and deceptive practices and materially false and misleading statements were made in connection with the purchase or sale of the Company's stock.

215. In ignorance of the manipulative and deceptive conduct and false and misleading nature of the Company's and the Defendants' materially false and misleading statements, and relying directly or indirectly on those statements and/or upon the integrity of the market price for SFX stock, Plaintiff and the other members of the Class purchased SFX stock at artificially inflated prices during the Class Period.

216. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SFX common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for SFX common stock had been artificially inflated by Defendants' fraudulent course of conduct.

217. The market price for SFX stock declined materially upon the public disclosure of the manipulative and deceptive practices and facts that had previously been misrepresented or omitted by SFX and the Defendants, as described above.

218. Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of SFX stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

219. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiff for damages suffered in connection with Plaintiff's transactions in SFX's common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act<br>(Against the Individual Defendants)

220. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

221. This Count is asserted against Defendants under Section 20(a) of the Exchange Act.

222. As alleged above, SFX violated Section 10(b) and Rule 10b-5, promulgated thereunder, by making false and misleading statements in connection with the purchase or sale of securities. This fraudulent conduct was undertaken with scienter because SFX is charged with the knowledge and scienter of Defendants and others who knew of or recklessly disregarded the falsity of the Company's statements and of the fraudulent nature of its scheme.

223. Defendants were controlling persons of SFX within the meaning of Section 20(a) of the Exchange Act by reason of their positions as senior executive officers and/or directors of SFX, their ability to approve the content and issuance of SFX's public statements, and their control over SFX's day-to-day operations. The individual Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of the Company as set forth herein. Each Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein, and exercised the same.

224. Defendants prepared, signed, and/or approved the Company's press releases and SEC filings that contained material false and misleading statements or omitted material facts and that were issued in furtherance of the manipulative and deceptive scheme. They were provided with or had unrestricted access to copies of those statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be made.

225. Defendants did not act in good faith in connection with the conduct at issue in this claim.

226. Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that the Company's public statements were materially false or misleading, or omitted material information, or they acted with reckless disregard for the truth.

227. By virtue of their positions as controlling persons of SFX, Defendants are jointly and severally liable to Plaintiff pursuant to Section 20(a) of the Exchange Act for SFX's violations of Section 10(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Defendants, as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as the class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of and the other members of the Class against all of the Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein;

C. Awarding Plaintiff and the Class their fees and expenses incurred in this action, including attorneys' fees and expert fees;

D. Awarding Plaintiff and other members of the Class prejudgment interest and/or opportunity cost damages; and

E. Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 23, 2015

**BROWER PIVEN**
A Professional Corporation

*/s/ David A.P. Brower*
David A.P. Brower
Daniel Kuznicki
475 Park Avenue South, 33rd Floor
New York, New York 10016
Telephone: (212) 501-9000
Facsimile: (212) 501-0300
Email: brower@browerpiven.com
Email: kuznicki@browerpiven.com

**BROWER PIVEN**
A Professional Corporation
Charles J. Piven
1925 Old Valley Road
Stevenson, MD 21153
Telephone: (410) 332-0030
Facsimile: (410) 685-1300
Email: piven@browerpiven.com

*Counsel for Lead Plaintiff Guevoura Fund Ltd. and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Consolidated Amended Class Action Complaint was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as nonregistered participants on December 23, 2015.

*/s/ David A.P. Brower*
David A.P. Brower