UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

GUEVOURA FUND,

               Plaintiff,

        -against-

ROBERT F. X. SILLERMAN, D. GEOFFREY
ARMSTRONG, JOHN MILLER, MICHAEL
JOHN MEYER, and SFX
ENTERTAINMENT, INC.,

               Defendants.

--------------------------------------------------------------- x

No. 15-cv-7192 (CM)

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: _____ |

**MEMORANDUM DECISION AND ORDER
DENYING DEFENDANTS' MOTIONS TO DISMISS**

McMahon, C.J.:

The central issue in this putative class action is whether Robert F. X. Sillerman, the founder, Chief Executive Officer ("CEO"), and largest shareholder of the now-bankrupt SFX Entertainment, Inc. ("SFX" or "the Company"), fraudulently offered to purchase the Company, without any intention of consummating the transaction, for the sole purpose of keeping the Company afloat long enough for it to renegotiate its debt obligations and report improved financial results. Lead Plaintiff Guevoura Fund Ltd. ("Plaintiff" or "Guevoura"), on behalf of itself and similarly situated investors, brings claims against Sillerman, the Company, and several members of its board of directors under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 issued thereunder, contending that Defendants used sham offers to manipulate the price of SFX common stock and issued false and/or misleading statements representing that Sillerman was willing and able to consummate the transaction.

Now before the Court are SFX's, Sillerman's, and the director defendants' motions to dismiss Plaintiff's Consolidated Amended Class Action Complaint (the "Complaint") for failure to state a claim. For the reasons stated below, Sillerman's and the director defendants' motions to dismiss the Complaint are denied. Because the claims against the Company are stayed during the pendency of its bankruptcy proceedings, its motion cannot be decided at this time; it is administratively closed pending the outcome of the bankruptcy.

## BACKGROUND

The following facts — taken from the Consolidated Complaint, documents referenced therein, and matters of which the Court can take judicial notice — are assumed to be true for purposes of this motion, and are viewed in the light most favorable to Plaintiff as the non-moving party. *See, e.g., Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

SFX is a publicly traded company incorporated in Delaware with executive offices in New York City. (Cons. Am. Class Action Compl. (Dkt. No. 61) ("CC") ¶ 19.) It produces and promotes electronic music culture ("EMC") music festivals and events, generating revenue from the sale of tickets, merchandising, and other related services. (CC ¶¶ 2, 19.) Though SFX was only formed in June 2012, its initial public offering ("IPO") took place on October 10, 2013, barely one year later. The company has grown quickly via acquisitions and business partnerships. (*Id.* ¶ 19.) Sillerman, who owns about 40% of SFX's outstanding stock, allegedly helped the Company finance its growth by guaranteeing some of its debt.[1] (*Id.* ¶¶ 3, 19.) Despite — or perhaps, because of — this rapid growth, SFX has never been profitable.

---

[1] As an Example, Plaintiffs state that SFX disclosed in Amendment No. 7 to Form S-1, filed October 2, 2013, that the Company's First Lien Term Loan Facility of $75 million was guaranteed by Sillerman. (CC ¶ 37.)

*A. Events Surrounding the "Initial Offer"*

On February 25, 2015, shortly before SFX released its fourth quarter and full-year 2014 financial results, Sillerman announced that he would offer to acquire all of SFX's outstanding common stock for $4.75 per share (the "Initial Offer") — a substantial premium over SFX's share price at the time of $3.70. (*Id.* ¶ 8.) The Initial Offer generated a great deal of excitement among investors and stock analysts. SFX's share price rose to $4.79 on unusually heavy trading, and Imperial Capital LLC ("Imperial") noted in a report analyzing the deal that the Initial Offer "shows that there is value in this company." (*Id.* ¶ 83.) Another analyst, Albert Fried & Company LLC ("Albert Fried"), estimated that there was a "70% probability" of Sillerman's offer being accepted, a "25% probability" of a better offer's being accepted, and a "5% probability" that no deal would occur. Because it believed a deal was so certain, Albert Fried concluded that the soon-to-be released financial results, for the quarter and year ended December 31, 2014, were "less important than body language on the proposed deal." (*Id.* ¶¶ 83, 85.) Stifel Financial Corp. ("Stifel") reported that it was keeping its price target "above the bid price under the view that the Special Committee of the Board may push for a higher bid." (*Id.* ¶ 92.)

On March 10, 2015, SFX announced that it would name three non-management directors, defendants John Miller, Michael Meyer, and D. Geoffrey Armstrong (collectively, the "Director Defendants"), to a special committee (the "Special Committee") that would independently evaluate the Sillerman's Initial Offer and consider alternatives to the proposed transaction. (*Id.* ¶ 10.) Sillerman stated that he would assist the Special Committee and that he would support an alternative sale, if the Special Committee decided to explore that option. (*Id.* ¶ 78.) Plaintiff alleges that though the Special Committee was ostensibly "independent," all three of the Special Committee Defendants were "Sillerman cronies," hand-picked by him to serve on the Board.

3

They had "known Sillerman for years and ha[d] held officer and/or director positions at other entities founded or controlled by Sillerman." (CC ¶ 12.) Each also had "significant prior business relationships with Sillerman or Sillerman controlled entities." (*Id.*)

On March 13, 2015, the Company issued a press release announcing its financial results for the quarter and year ended December 31, 2014 — and, for the first time, issuing guidance for the upcoming year. (*Id.* ¶¶ 86-87.) The Company reported losses of $131 million, or $1.49 per share, for the year ended 2014 and a loss of $41.1 million, or $0.46 per share, for the quarter. The Company also announced that pro forma festival attendance in the fourth quarter fell 8.7% overall despite an increase in the number of festivals held — a jump from 16 in 2013 to 24 in 2014 — and 18.5% for festivals that been held in the fourth quarters of both 2013 and 2014 (*Id.* ¶ 87.) The Company projected that "full year 2015 revenues are expected to be in excess of $500.0 million with adjusted EBITDA of $60.0 million to $70.0 million" — a substantial increase over the full year 2014 revenue of $386.2 million (a small increase over full year 2013 revenue of $356.7 million) and an adjusted EBITDA loss of $3.4 million. (*Id.* ¶¶ 86, 88.)

SFX's share price fell over 10% in the days following the release of the Company's financial results. Nonetheless, many analysts remained nonplussed. (*Id.* ¶ 89.) Analysts Jefferies and Rhino Trading Partners LLC reported that, despite the 2014 financial results, "the proposed go private offer [] should provide [near term] support for the stock," and that "SFXE's numbers are poised for a turnaround. We've always credited Sillerman as being a savy [sic] businessman. We believe he is getting the company on the cheap though it is not readily visible from the numbers." (*Id.* ¶¶ 93-94.) Albert Fried reported that the "2015 guidance enhances management's ability to gain the financing and investor equity support necessary to make founder Bob Sillerman's $4.75 a share bid work" and the financial website, *SeekingAlpha.com*, observed that

4

the guidance was "a milestone that could imply that heavy investment will now give way to financial delivery." (*Id.* ¶¶ 91, 95.)

Shortly after releasing its financial results, the Company did several things to shore up its finances, most of which required Sillerman or entities affiliated with Sillerman to guarantee SFX's loans. On March 16, 2015, SFX announced that it had renegotiated certain terms of a revolving credit line (the "New Credit Agreement"), eliminating certain covenants that had restricted SFX to a maximum total leverage ratio and a minimum interest coverage ratio and had mandated incurrence testing (the "Second Amendment"). (*Id.* ¶ 96.) The amended terms required SFX to secure collateral from SIC, an entity controlled by Sillerman, before borrowing or requesting letters of credit under the New Credit Agreement. Specifically, SIC had to deposit an amount equal to 105% of the amount of the loan or letter of credit into a deposit account subject to a first priority lien. SFX also announced that, in accordance with these terms, SFX had entered into a commitment letter with SIC, pursuant to which SIC committed to collateralize any credit extension under SFX's credit facility in an aggregate amount up to $31.5 million. (*Id.* ¶ 97.) SFX shares declined from $4.18 per share to $3.99 on March 17, 2015 following the announcement of the deal. (*Id.* ¶ 98.)

On June 18, 2015, SFX agreed to sell 2.305 million shares to Wolverine Flagship Find Trading ("Wolverine") and Virtual Point Holdings ("Virtual Point") for $10 million. The deal again featured a guarantee by entities owned or controlled by Sillerman; the deal gave Wolverine and Virtual Point the right to sell to Sillerman all or a portion of the shares they had acquired to him at a price of $5.25 per share in cash.[2] (*Id.* ¶ at 118.) Separately, the Company sold 1.04

---

[2] Two companies owned or controlled by Sillerman bought back the shares sold to Virtual Point on July 31, 2015, and negotiated the termination of the put right. (*Id.* ¶ 119.)

5

million shares for $5 million, or $4.82 per share, to a company controlled by Sillerman. (*Id.* ¶ 120.)

Finally, on July 7, 2015, SFX renegotiated an agreement that had obligated it to make earn-out payments based on the Company's 2014 performance (the "React Agreement"). Pursuant to the amended agreement (the "React Amendment"), the cash portion of the earn-out payments were spread out over a nine-month period ending March 2016 and the Company was no longer required to keep a portion of the payments in escrow. Again, Sillerman personally guaranteed some portion — $7 million — of the Company's obligation. (*Id.* ¶ 121.)

Amid this flurry of activity, SFX announced that its Board of Directors approved the engagement of a new accounting firm, BDO USA, LLP, to replace Ernst & Young LLP ("E&Y") as the Company's outside public accounting firm. On an earnings call following the release of the Company's first quarter 2015 financial statement an analyst suggested that the change was due to E&Y's insistence that the Company "expense a lot of items that might otherwise have been capitalized and thus were impairing its balance sheet." (*Id.* ¶ 99.)

SFX reported revenue of $52.2 million from the first quarter of 2015, a 56.6% increase over the first quarter of 2014, and a net loss of $41.6 million, or $0.46 per share, also an improvement over the $56.0 million, or $0.65 per share, loss in the first quarter of 2014. (*Id.* ¶ 100.) The Company also reported a pro forma adjusted EBITDA loss of $10.6 million. The Company stated that the first quarter of the year was typically the Company's slowest quarter, since it produced fewer festivals and generated less revenue. Attendance and revenue grew 1.2% across five festivals that were held in the first quarter of 2014 and 2015. The Company adjusted its 2015 guidance slightly, saying that it projected 2015 revenue of $500 million and pro forma adjusted EBITDA between $55.0 and $65.0 million. (*Id.* ¶ 100.) The Company also disclosed

6

that it had cash and cash equivalents of $45.7 million on hand, and that it had drawn an aggregate amount of $18.3 million from its revolving credit line, with $11.7 million still available. (*Id.* ¶¶ 100-101.) It also reported that it may "be required to make earn-out, capital calls or similar payments of up to $25.0 million in cash during the second and third quarters of 2015 pursuant to the terms of applicable agreements." (*Id.* ¶ 100.)

### B. *Events Surrounding the Collapse of Sillerman's Initial Offer*

On May 26, 2015, the Company announced that it had signed an agreement (the "Merger Agreement") with SFXE Acquisition LLC, an affiliate of an entity controlled by Sillerman, and its subsidiary, SFXE Merger Sub Inc., pursuant to which Sillerman would acquire all of SFX's outstanding common shares for $5.25 per share. The Merger Agreement valued the Company at $774 million. (*Id.* ¶ 11.) It also provided that the Company could "initiate, solicit and encourage any alternative acquisition proposals from third parties, provide nonpublic information to such third parties and participate in discussions and negotiations with such third parties regarding alternative acquisition proposals" from the date it was signed until July 10, 2015 (the "Go-Shop" Period). Sillerman was to be granted access to the material details of any competing bid and a right to match the offer. (*Id.* ¶ 106.)

At the end of the Go-Shop Period, the Special Committee could request that Sillerman, within ten days, provide it with fully executed debt and/or equity commitment letters or similar agreements describing the terms and conditions for the financing of the deal. (*Id.* ¶ 108.) If Sillerman failed to do so, the Special Committee was entitled to terminate the deal and collect a termination fee of $7.8 million, payable in SFX shares valued at $5.25 per share. (*Id.* ¶ 111.) The Special Committee unanimously determined that the transaction was fair to the Company's

7

shareholders and recommended that the Board of Directors approve the Merger Agreement. (*Id.* ¶ 12.)

The day after the Company's announcement, Moody's Investors Service ("Moody's") issued a press release stating that it had placed SFX on a review for a credit downgrade. (*Id.* ¶ 115.) In response, Sillerman issued a press release affirming that the proposed acquisition was to be financed on an all-equity basis and stating that he had agreed to vote his shares in favor of any superior proposal that has a value of at least 2.5% more than his highest offer. (*Id.* ¶ 116.) Analysts again appeared to take bad news in stride; *SeekingAlpha.com* reported, mere days after Moody's announcement, that in light of the Merger Agreement, it would "not discuss the operating fundamentals of the business in further detail as they are now irrelevant." (*Id.* ¶ 113.)

On July 10, 2015, the Go-Shop Period expired without the Company's accepting a competing offer. That day, Sillerman sent an email to SFX employees informing them that he and the Special Committee had extended the Go-Shop period by two weeks. (*Id.* ¶ 124.) According to a press release issued by the Company, the extension would "permit interested bidders and financing sources additional time to evaluate their proposals." (*Id.* ¶ 133.) An amendment to the Merger Agreement formalizing the extension suspended Sillerman's right to match a competing offer and committed Sillerman and his affiliates to voting in favor of any offer that exceeded the terms of his offer. (*Id.* ¶¶ 126-27.)

SFX shares fell nearly 8% in the week following the announcement; by mid-July, SFX shares had lost 23% of their value since the Initial Offer was announced — a reflection of investors' "confusion with SFX's finances and health" following the "various financing and cash infusion transactions," according to a July 17, 2015 Forbes.com article. (*Id.* ¶ 129.) On July 19,

8

2015, Sillerman again reiterated his commitment to consummate the transaction, which caused a short-lived rally in the Company's stock price. (*Id.* ¶ 130.)

When the extended Go-Shop period expired on July 27, 2015, the Company issued a press release stating that, while the Special Committee had "received several indications of interest regarding the potential acquisition of various components of the Company's business," no third party contacted by its financial advisers had provided the Company "with a proposal or offer regarding an alternative acquisition proposal." (*Id.* ¶ 133.) The press release stated that it expected the Sillerman transaction to close during the fourth quarter of 2015. SFX shares declined sharply, closing at $3.12 per share on July 28, 2015. (*Id.*) Three days later, the Company announced that the Special Committee had formally requested that Sillerman provide it with commitment letters related to financing the transaction by August 13, 2015, as required under the amended Merger Agreement. (*Id.* ¶ 134.) Sillerman failed to deliver the commitment letters. SFX's share price continued to fall precipitously — opening on August 14, 2015 at $1.91 and closing at $1.31. (*Id.* ¶ 136.)

Between July 28 and August 14, 2015, the Company's stock price had lost over a third of its value amid indications that the Company's finances were unraveling. After the markets closed for trading on July 31, 2015, Sillerman disclosed that Virtual Point had sold its 1,152,605 shares of SFX back to an entity controlled by Sillerman for approximately $4.34 per share — less than the $5.25 per share it was entitled under the June 18, 2015 agreement. (*Id.* ¶ 136.) On August 5, 2015, several news outlets reported that Beatport, an SFX asset, had frozen royalty payments to labels, only to backtrack following an uproar. (*Id.* ¶ 136.) On August 10, 2015, SFX reported second quarter earnings. Among other things, the Company reported that the growth in quarterly expenses outpaced the growth in revenue (61% and 48.3%, respectively). It made no mention of

9

the previously issued 2015 guidance. A *Forbes.com* article published the same day noted that "profits and cash flow continue to be elusive for the company" and that SFX's "rising revenues aren't generating profits, or even a narrowing of losses or cash burn." (*Id.* ¶ 140.) *The New York Times*, among others, said that SFX's financial maneuvers were raising eyebrows. (*Id.*) Bloomberg, *SeekingAlpha.com*, and others reported that Sillerman had likely "materially changed" his $5.25 bid.

On August 14, 2015, the Special Committee announced that though Sillerman "continues to be interested in taking the Company private, either alone or with one or more strategic partners," he was no longer interested in buying the shares at $5.25. With the concurrence of Sillerman, the Company "authorized the continued exploration of strategic alternatives for the Company, including the sale of all or substantially all of the Company's assets in whole or in part" through October 2, 2015. (*Id.* ¶ 145.)

The Company formally terminated its proposed sale to Sillerman on August 17, 2015, giving Sillerman until October 2, 2015 to pay the $7.8 million termination fee. SFX shares lost more than 74% of their value in the five days following the announcement, despite a statement, issued by Sillerman, indicating his intention to provide a revised offer for the Company's outstanding shares. (*Id.* ¶ 152.)

Despite this news, SFX announced on September 17, 2015 that it had secured $60 million in new financing — $30 million of which was committed by an entity controlled by Sillerman[3] — and had refinancing its existing $30 million revolving credit facility. (*Id.* ¶ 167.) In a press

---

[3] Plaintiff alleges that Sillerman used SIC's commitment to induce funds managed by Allianz to purchase $30 million in stock. (*Id.* ¶¶ 169, 171-72.) SIC eventually defaulted on the second half of its $30 commitment, as the Company revealed in a November 4, 2015 press release. (*Id.* ¶ 181.)

release, Sillerman stated that "This round of financing from these sophisticated investors reflects a level of confidence and provides growth capital to support many of the exciting new initiatives SFX is undertaking." (*Id.*)

SFX continued its search for a buyer, but in vain. On October 1, 2015, SFX announced that the Special Committee had set an initial bid deadline of October 14, 2015 for third-parties to submit their proposals to acquire the entire Company *or* assets not central to the Company's core business. (*Id.* ¶ 174.) On October 16, 2015, the Company announced in a filing that it had received a non-binding revised offer from Sillerman to purchase SFX's outstanding stock $3.25 per share. The stock had opened on that day at $1.04 per share; it closed 45 % higher, at $1.51 per share.

On October 22, 2015, eight days after the expiration of that period, the Special Committee announced that it had received indications of interests from parties interested in acquiring the Company, including Sillerman. The Company was not otherwise forthcoming with either the terms of these proposed deals or the identities of the other buyers.

On November 9, 2015, SFX released its financial results for the quarter ended June 30, 2015. In light of the Company's continued losses, the Company disclosed that "the 2015 full year financial results will not meet our prior expectations." (*Id.* ¶¶ 182-83.) Shares fell from $0.89 to $0.70 per share on November 10, 2015. (*Id.* ¶ 185.)

On November 17, 2015, Sillerman delivered a letter to the Board withdrawing his October proposal. SFX shares declined from an opening price on November 17, 2015 of $0.55 per share to close at $0.44 per share. (*Id.* ¶ 187.) By the time the Complaint was filed, on December 23, 2015, SFX stock was trading at about $0.30 per share.

11

### C. Procedural History

On September 11, 2015, an SFX investor, Edward S. Gutman, filed a class action complaint against SFX, Sillerman, and the Director Defendants. (Dkt. No. 1.) On December 8, 2015, the Court appointed Guevoura lead plaintiff and consolidated the case with a second action filed by Wilfrid Global Opportunity Fund. (Dkt. No. 60.) Geuvoura filed an amended consolidate class action complaint — the operative complaint in this action — on December 23, 2015.

The gravamen of Plaintiff's Complaint is that Sillerman, facing a precipitous decline in the Company's share price and desperate to salvage the value of his large equity stake in the Company, made the Initial Offer, as well as those that followed, for the sole purpose of forestalling the collapse in SFX's stock price. According to Plaintiff, Sillerman hoped that the offer would distract the market from the Company's poor 2014 financial results and focus it, instead, on the valuation implicated by the proposed deal, thus biding the Company time to renegotiate its debt obligations, refinance its debt, raise additional capital, and buy the Company time to demonstrate the earnings that the market expected. (*See* CC ¶¶ 8-9, 76.)

The Complaint asserts claims for securities fraud under Section 10(b), and Rule 10b-5 promulgated thereunder, against all the Defendants (Count 1) and control person liability under Section 20(a) against Sillerman and the Director Defendants (Count 2). Plaintiff's Section 10(b) allegations assert two theories of liability under Rule 10b-5: (1) that Defendants "employed manipulative and deceptive practices while engaged in a scheme to defraud" by issuing and pretending to entertain Sillerman's sham offers to purchase the Company — a violation of Rule 10b-5(a) — and (2) that they "made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading" in furtherance of that

scheme — a violation of Rule 10b-5(b). With regard to the second theory of liability, Plaintiff specifically alleges that:

- Sillerman's statements that (1) he intended to consummate a transaction to take SFX private, (2) he intended to finance the transaction using cash, and (3) his offers represented a "substantial premium to current price" were false and fraudulent, since Sillerman knew, or should have known, that he would not be able to consummate the transaction. (CC ¶¶ 79-80, 130.)

- The Company's 2015 guidance, issued in March 2015 and May 2015, was false and misleading because Defendants knew or recklessly disregarded the fact that SFX would not reach its guidance because SFX's "debt was increasing, margins were decreasing, it was running out of money and its borrowing options were limited."

- The Special Committee's recommendation that the Board approve the Merger Agreement and its representation that the deal was fair, was false and misleading because the Special Committee knew or recklessly disregarded the fact that Sillerman did not intend to consummate the transaction and could not obtain the financing necessary to buy the outstanding shares.

On February 1, 2016, SFX filed a petition for bankruptcy protection under Title 11 of the Bankruptcy Code. (Dkt. No. 88.) As a result, the claims against SFX were automatically stayed, pursuant to Section 362 of the Bankruptcy Code. On February 2, 2016, Sillerman and the Director Defendants requested that the claims against them be stayed as well, pending resolution of the Company bankruptcy action. (Dkt. No. 89.) On February 9, 2016, the Court denied that request, explaining that it was for the Bankruptcy Court in the first instance to determine whether to extend the automatic stay to individual defendants. (Dkt. No. 93.) Plaintiffs did not ask that

13

the Bankruptcy Court do so. The court was asked to, and did, put off deciding the motion in the hope that the matter could be resolved. It was not.

## DISCUSSION

Sillerman and the Director Defendants move to dismiss Plaintiffs' Section 10(b) and Section 20(a) claims on three grounds. (*See* Dkt. Nos. 68, 73, 78.) First, they contend that the Complaint fails to allege that Sillerman or the Director Defendants made any misrepresentation of omission of material facts. Second, they argue that the Complaint fails to allege with the requisite particularity that Sillerman or the Director Defendants acted with scienter. Third, they assert that the Complaint fails to allege either a primary violation of the securities laws or that the Outside Directors had any control over the alleged primary violators. Though Defendants failed to address Plaintiff's manipulation claims in their briefs in support of their motions to dismiss, the Director Defendants argue in their reply brief that Plaintiff failed to allege that the Defendants engaged in any manipulative market activity.

## I.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A complaint should be dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

Generally, in deciding a motion to dismiss, the Court must accept all factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499,

14

510 (2d Cir. 2007). However, "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007). A complaint alleging securities fraud — whether by market manipulation or false or misleading statements — must meet the pleading requirements of Rule 9(b), which requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

A complaint alleging securities fraud must also meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). Under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each act or omission. 15 U.S.C. § 78u–4. "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration in original).

## II. The Motions to Dismiss the Section 10(b) Claims Are Denied

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). In "proscribing the use of a 'manipulative or deceptive device or contrivance,'" Section

15

10(b) "prohibits not only material misstatements but also manipulative acts." *ATSI*, 493 F.3d at 99 (citation omitted). To plead a claim based on manipulative acts, a plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101 (citations omitted).

Unlike most fraud cases "where at least some aspects of the time, place, and other details of a defendant's activity are within the knowledge of the plaintiff as a matter of course . . . market manipulation claims present circumstances in which the mechanism of the scheme is likely to be unknown to the plaintiffs." *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1290–91 (S.D.N.Y. 1996). For that reason, "the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim" at the early stages of litigation. *ATSI*, 493 F.3d at 102. To satisfy Rule 9(b), the complaint "must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the role of the defendants," *id.*, however it may do so "in broad strokes" at the motion to dismiss state, *In re Bech Sec. Litig.*, 928 F. Supp. at 1291.

Sillerman's brief does not directly address Plaintiff's market manipulation theory. The Director Defendants' reply brief disputes two elements of Plaintiff's manipulation claim: that Defendants engaged in a manipulative act and that they did so with scienter.

We turn first to the threshold question of whether Plaintiff has alleged the existence of a manipulative act. A "manipulative act" under Section 10(b) "is virtually a term of art." *ATSI*, 493 F.3d at 99. It refers to "practices, such as wash sales, matched orders, or rigged prices, that are intended to misled investors by artificially affecting market activity," specifically, by "deceiving investors as to how other market participants have valued a security." *Id.* at 99-100 (quoting

*Santa Fe Indus. v. Green*, 430 U.S. 462, 476-77 (1977)) (internal quotations omitted). "The deception arises from the fact that investors are misled to believe that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.* at 100 (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)). In identifying whether a transaction is a manipulative act, courts ask whether the transaction sends a false pricing signal to the market. *Id.*

At this junction, Plaintiff needs only to allege, with particularity, "the nature, purpose, and effect of the fraudulent conduct and the role of the defendants." *Id.* Plaintiff has met its burden by alleging facts suggesting that Sillerman and the Director Defendants mislead the market into believing that he intended to consummate a deal to purchase outstanding SFX common stock.

By all indications, Sillerman's actions expressed a strong interest in purchasing the Company. After first announcing the February 25, 2015 Initial Offer to acquire SFX's outstanding common stock for $4.75 per share, Sillerman (1) signed the May 26, 2015 Merger Agreement, containing a revised offer to purchase SFX's outstanding common stock for $5.25 per share, (2) periodically issued assurances that he would finance the proposed acquisition on an all-equity basis, (3) and made a revised, though non-binding, offer on October 16, 2015 to acquire SFX's outstanding common stock for $3.25 per share.

These actions *signaled to the market* that Sillerman saw significant value in SFX. And because Sillerman was known as a savvy business mogul within the entertainment industry, his faith in the Company was interpreted as evidence that SFX was in fact valuable, even if that value was not yet reflected in the Company's financial reports. Following the Initial Offer, for instance, analysts predicted that SFX's "numbers" must be "poised for a turnaround," despite the

17

Company's disappointing financial report, and stated — allegedly without much reason — that Sillerman was "getting the company on the cheap, though it is not readily visible from the numbers." (*Id.* ¶¶ 93-94.)

Moreover, by making an offer that valued the Company at $774 million, Sillerman effectively mooted any discussion of the Company's fundamentals. In the eyes of many analysts, the only relevant factor for investors to consider were the terms of the deal and the likelihood of its success — or as one analyst put it, "the body language on the proposed deal." (*See* CC ¶¶ 83, 85.) Accordingly, analysts spent much of 2015 ignoring all indications that the Company was in a poor financial state. In one particularly stark example, *SeekingAlpha.com* reported that the Company's "operating fundamentals . . . are now irrelevant" mere days after Moody's announced that it was reviewing the Company's credit rating, which under normal circumstances would be a significant red flag for investors. By shifting focus away the usual metrics for valuing shares — namely, the Company's financial results — Sillerman's offer effectively warped the market for SFX stock.

This fact is clearly reflected in the Company's share price; every time Sillerman announced or reaffirmed his interest in taking the Company private, SFX's stock price rose significantly, or, at least, declined far less than it otherwise would. For instance, SFX stock rose from $3.70 to $4.79 following Sillerman's Initial Offer (CC ¶ 8) and from $4.12 to $4.94 following the announcement of the Merger Agreement (CC ¶ 110). Though SFX share price dipped after the Company's announced its financial results and the terms of its refinancing, Sillerman's statements affirming that the proposed acquisition was to be financed on an all-equity basis and, later, that he had submitted a revised offer for SFX shares blunted the significant fall in the Company's stock price that would otherwise have taken place.

Of course, had Sillerman truly intended to follow-through with his offer, his actions would not have violated federal securities laws. However, Plaintiffs have alleged facts that, when viewed holistically in the light most favorable for Plaintiff, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), give rise to the inference that Sillerman had no intention of consummating any deal. According to Plaintiff, Sillerman structured the transaction to make backing out easy; the termination fee was modest and could be paid using Sillerman's SFX shares valued at $5.25 a share, which was well above the share price when the Merger Agreement was signed. Also, Sillerman was not obligated to prove that he could finance the transaction until after the completion of a Go-Shop period. Sillerman indicated early on that he would defer to a bidder whose offer was only 2.5% above his own. And, most tellingly, Sillerman *twice* declined to consummate the transaction at the expiration of a Go-Shop period, despite indications that there were no other interested buyers and the Company was his, if he wanted it. These allegations, viewed collectively, are enough to suggest that Sillerman did not intend to purchase the Company, despite signaling to the market that he would do so.

These allegations are also enough to give rise to a strong inference of scienter. "A strong inference of fraudulent intent may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 Fed. Appx. 26, 27-28 (2d Cir. 2014). To plead scienter through motive and opportunity, Plaintiffs must allege that Defendants "benefitted in some concrete way and personal way from the purported fraud." *ECA Local*, 553 F.3d at 198 (quoting *Novak v. Kasaks*, 216 F. 300, 307-08 (2d Cir. 2000). However, "Motives that are common to most

19

corporate offices, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive.'" *Id.*

Plaintiff has also met its burden of alleging that Sillerman had motive to manipulate the market for SFX stock. Sillerman was the Company's largest shareholder, and he served to gain personally from his plan to distract the market from the Company's poor financial performance. Moreover, he had a strong motive to keep the Company afloat, since he allegedly had personally guaranteed a loan facility available to the Company before making the Initial Offer. (CC ¶ 37.) Furthermore, over the course of 2015, entities he owned or controlled grew increasingly intertwined with SFX. As a result, *after* using these entities to help the Company refinance and renegotiating its debt, Sillerman had a strong incentive to continue indicating to the public — as he did — that he was going to consummate the transaction.

Plaintiff's allegations are also sufficient to sustain claims against the Director Defendants, who allegedly (1) represented to the market that Sillerman's Initial Offer was fair to the Company's shareholders and recommended that the Company approve the Merger Agreement, (2) extended the Go-Shop period to give Sillerman cover, (3) indicated in July and October 2015 that the Special Committee had received indications of interest from third-parties regarding purchasing components of the Company's business, (4) and delayed demanding Sillerman provide the Special Committee with financing commitment letters and payment of the termination fee. Plaintiff has met its burden to the greatest possible extent with regard to the specific actions of the Director Defendants, given the impossibility of gaining access to facts within the sole purview of Defendants.

Plaintiff need not allege the specific roles played by the individual Director Defendants. In *In re Blech Securities Litigation*, for instance, my colleague Judge Sweet held that plaintiffs in

20

a securities class action had adequately pleaded a Section 10(b) claim against two managing directors merely by describing the manipulative acts that had been performed and alleging what role the managing directors generally played in the scheme. 928 F. Supp. at 1291. Though various "Defendants' roles [were] not distinguished from each other," the court held that the "inextricable linkage among them in the management" of the company "excuses such a blurring of roles at this juncture." *Id.*

Here, Plaintiff has described the manipulative act and the Director Defendants' collective role as the Special Committee evaluating the Initial Offer. According to Plaintiffs, the Director Defendants repeatedly extended the Go-Shop period, falsely indicated that other parties were interested in purchasing the Company, and included terms highly favorable to Sillerman in the Merger Agreement. At this juncture, these allegations suffice to plead claims against the Director Defendants.

*    *    *

In sum, Plaintiff has adequately alleged all of the elements of a manipulation claim under Section 10(b). Accordingly, Sillerman and the Director Defendants' motions to dismiss Count 1 of the Complaint are denied.

Because the Complaint can be sustained on Plaintiff's manipulation claim, I need not decide whether Plaintiff has pleaded Section 10(b) liability under a misrepresentation theory.

### III. The Motions to Dismiss the Section 20(a) Claims Are Denied

Section 20(a) holds liable any persons who "control" those found primarily liable under the Exchange Act. *Greebel v. FTP Software, Inc.*, 194 F.3d at 185, 207 (1st Cir. 1999). To state a claim for control person liability, a plaintiff must show: (1) a primary violation by a controlled person, (2) control of the primary violator by the defendant, and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation. *SEC v. First*

21

*Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Defendants contend that Plaintiff has not satisfied any of the three prongs.

Plaintiff's control person claims cannot be dismissed.

First, Plaintiff's allegations, assuming them to be true, are sufficient to establish the Company's primary liability. While it is true that many of the allegations against Sillerman involve his acting in his capacity as a shareholder rather than a CEO, he has alleged facts suggesting that the Company played an active role in Sillerman's market manipulation scheme. For instance, Plaintiff alleges that the Company issued guidance for its 2015 annual financial results at a moment calculated to best help Sillerman refinance and renegotiate the Company's debt. (*See, e.g., id.* ¶¶ 91 (Albert Fried report stated that the "2015 guidance enhances management's ability to gain the financing and investor equity support necessary to make founder Bob Sillerman's $4.75 a share bid work").) Plaintiff also alleges that, to justify extending the Go-Shop period and to give Sillerman more time to execute a turn-around, the Company issued false statements reporting that the Special Committee had received indications of interest from third-parties regarding purchasing components of the Company's business. These allegations suggest that the line between Sillerman's role as CEO of the Company and potential buyer is murky at best.

Second, Plaintiffs have pleaded facts establishing that Sillerman and the Director Defendants were "control persons" — an inquiry that is, in any event, "more appropriately decided on a motion for summary judgment than on a motion to dismiss." *See Degulis v. LXR Biotech., Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996). Sillerman is the Company's CEO, its founder, and its largest shareholder, and entities he owns or controls provided collateral for much of the Company's borrowing during the class period. The Director Defendants served on a

22

Committee that solicited, evaluated, and approved of offers to buy the Company — including the Initial Offer at issue in this case — and allegedly were responsible for statements related to the work of the Special Committee that were made by the Company and that allegedly helped Sillerman execute the manipulative scheme. While the "status of defendants as directors" and officers, "standing alone, is insufficient to establish their control," Plaintiffs have pleaded facts here suggesting that Sillerman and the Director Defendants had the ability to direct the actions of the Company during the course of the class period. *See In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2011) (internal citations omitted).

Finally, Plaintiff has pleaded facts sufficient to show that Sillerman and the Director Defendants may have been culpably involved in the Company's misconduct. For instance, whether or not the Director Defendants themselves made statements falsely alleging that the Special Committee (and thus the Director Defendants) received indications of interest from third-parties — and thus whether they are liable for their falsity as a "maker of the statement" under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) — Plaintiffs have alleges facts suggesting that they were involved in the decision to issue them.

Sillerman's and the Director Defendants' motions to dismiss Count 2 are therefore denied.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaint are denied. The Clerk of the Court is directed to remove Docket Numbers 68, 73, and 78 from the Court's list of pending motions.

Dated: September 12, 2016

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

24