**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUEVOURA FUND LTD., On Behalf of Itself and All Others Similarly Situated, **Plaintiff,** v. ROBERT F.X. SILLERMAN, D. GEOFFREY ARMSTRONG, JOHN MILLER and MICHAEL JOHN MEYER, **Defendants.** | **Case No. 1:15-cv-07192-CM** **Case No. 1:18-cv-09784-CM** |

**DECLARATION OF DAVID A.P. BROWER IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS NOTICE, FINAL APPROVAL OF THE PROPOSED SETTLEMENT, FINAL APPROVAL OF THE PROPOSED PLAN OF ALLOCATION, AND LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES AND FEES AND EXPENSES OF THE LEAD PLAINTIFF**

I, David A.P. Brower, hereby declare under penalty of perjury as follows:

1.      I am a Managing Director of the law firm of Brower Piven, A Professional Corporation ("Brower Piven").  My firm was appointed Lead Counsel in this Action for Lead Plaintiff and the Class ("Lead Counsel").[1]

2.      I submit this Declaration pursuant to Rule 23 of the Federal Rules of Civil Procedure in support of Lead Plaintiff's motions for (a) final approval of the forms and methods for providing notice to the Class; (b) final approval of the proposed Settlement; and (c) final approval of the proposed Plan of Allocation.  This Declaration is also submitted in support of Lead Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses, and an award to Lead Plaintiff for its time and expenses directly related to its representation of the Class.

3.      My firm has worked actively on this litigation under my direction since its inception.  As such, I have personal knowledge of the matters described below and am competent to testify thereto.  Further, Lowenstein Sandler LLP ("Lowenstein"), at my request and under my supervision, assisted in the bankruptcy aspects of this litigation, as described below.

4.      This Declaration is intended to provide the Court with a summary of the proceedings in this Action and the basis upon which Lead Plaintiff and Lead Counsel highly recommend approval of the Settlement, the Plan of Allocation and the requested award of attorneys' fees and reimbursement of expenses.  This Declaration does not, however, seek to

---

[1] Unless otherwise indicated, the definitions used in the Stipulation and Agreement of Settlement, dated April 30, 2019 ("Stipulation"), attached as Exhibit 1 to the Notice of Motion For: (1) Preliminary Approval Of Settlement; (2) Approval Of Notice To The Class; And (3) Scheduling Of A Final Approval Hearing, Dkt. No. 186, are the same as those used herein.

comprehensively detail over three and a half years of hard-fought litigation, but rather provides the Court with highlights of the events leading to the resulting Settlement.

## PRELIMINARY STATEMENT

5.      As this Court is aware, this case has a long and tortured history.  It has been litigated for almost three and a half years through agreement on the final form of the Stipulation and the associated exhibits on April 30, 2019.  The multiple bankruptcy filings and proceedings added another level of difficulty to this litigation.  The Settlement represents an excellent recovery for SFX Entertainment, Inc.'s ("SFX" or the "Company") common stock purchasers who were at a substantial risk of receiving a smaller recovery or, indeed, no recovery at all, through continued litigation.  At every stage of the Action, counsel for the Director Defendants asserted aggressive defenses and expressed the belief that the Class could not prevail on the claims asserted, and that Lead Plaintiff could not prove or recover damages in the magnitude that it sought, if at all.  The Settlement was not achieved until Lead Plaintiff, among other things: (a) conducted an extensive factual investigation; (b) prepared a detailed consolidated amended complaint; (c) reviewed and analyzed thousands of pages of documents from the Director Defendants and the various SFX entities, as well as over half a million documents from various third-parties Lead Plaintiff subpoenaed; (d) consulted with well-respected experts on economics, finance and damages; and (e) prepared for and attended multiple mediation sessions, as well as participated in numerous informal negotiations between the parties and the other constituencies seeking to recover from the Director Defendants without the mediators.

6.      Substantial investigation, discovery, consultations, and legal research informed Lead Plaintiff that, while it believed its case was meritorious, there were dangers that had to be carefully evaluated in determining what course was in the best interests of the Class – *i.e.*, whether to settle and on what terms, or continue to litigate.

7.     As set forth in further detail below, despite the fact that Lead Counsel believe Lead Plaintiff's allegations and claims were supported by legal authority and the evidence discovered to date, this Action presented many uncertainties with respect to Lead Plaintiff's ability to ultimately prevail or, more importantly, recover more than is offered by the Settlement. These risks include, but are not limited to, amassing sufficient evidence through discovery to defeat the Director Defendants' inevitable motions for summary judgment; demonstrating, by a preponderance of the evidence to the trier of fact, that the Director Defendants made misrepresentations of fact; credibly demonstrating the amount of damages caused by the alleged misleading statements; sustaining a judgment at trial through the inevitable appellate process; and recovering on any judgment beyond the limits of the (by then substantially or completely depleted) directors' and officers' ("D&O") insurance policies or from Defendant Robert F.X. Sillerman ("Sillerman"), SFX's former chief executive officer and the main focus of the Action, through his bankruptcy proceedings.

8.     In addition to the factual and legal obstacles to success on the merits was the certainty that further litigation would require the expenditure of enormous amounts of time and expense to complete merits and expert discovery at the very fast pace ordered by the Court, litigate pre-trial motions, try the case and succeed on the ultimate appellate proceedings that would have followed the trial no matter what the verdict might have been.  As stated, all of this was more complicated due to the bankruptcy proceedings.  Weighed against these risks was the achievement of an immediate $6.75 million cash Settlement as part of the Director Defendants' Contribution and a contingent $750,000 Sillerman Contribution.   The exact amount of the Settlement Fund is, under the terms of the Stipulation, dependent on the Sillerman Bankruptcy proceeding and the timing (if ever) of Sillerman's payment of the Sillerman Contribution, or portion(s) of the Sillerman Contribution.

9.      In accordance with the Court's July 30, 2019 Order Granting Preliminary Approval of Proposed Settlement and Providing for Notice to the Class ("Preliminary Approval Order"; Dkt. No. 191), 10,988 Notices were mailed to potential Class Members as of October 8, 2019, and the Publication Notice was published three separate times over *PR Newswire* on August 30, September 6, September 13, 2019.  *See* Declaration of Luiggy Segura Regarding (A) Mailing of Notice of Proposed Settlement of Class Action and Proof of Claim and Release Form; (B) Publication of Summary Notice; and (C) Report on Requests for Exclusion Received, dated October 9, 2019, the Court-appointed Claims Administrator in this case ("Segura Declaration" or "Segura Decl.") at ¶¶9, 10, annexed as Exhibit 1 to the Appendix of Exhibits to this Declaration (the "Appendix"), submitted herewith.

10.     The Stipulation (and its exhibits), the Notice, a Proof of Claim and Release form and a selection of other important documents were posted on a website maintained by JND (www.SFXSecuritiesLitigation.com).  Segura Decl. at ¶12.  Both notices described, in detail, *inter alia*, the Settlement; the likely recoveries for Class Members; the reasons for the Settlement, the Plan of Allocation; the maximum amount of attorneys' fees and litigation expenses that Lead Counsel would seek; that Lead Plaintiff may seek an award of reasonable costs and expenses directly relating to its representation of the Class; Class Members' rights; and the procedures and deadlines for exercising those rights.  Thus, the notice program fully complied with the Court's Preliminary Approval Order, was the best notice practicable under the circumstances and met the requirements of FED. R. CIV. P. 23(c), (e), and (h), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and due process.  In response to the extensive notice program, as of the date of this Declaration, no objections or requests for

exclusion from the Class have been received.[2]

11.     Further, I submit that the Plan of Allocation is fair and reasonable, and should be approved by the Court. The Plan of Allocation was developed with assistance from Lead Plaintiff's financial and damages expert, Dr. Zachary Nye. *See* Declaration of Zachary Nye, Ph.D in Support of the Proposed Settlement and Plan of Allocation, dated October 9, 2019 ("Nye Declaration" or "Nye Decl."), Appendix, Ex. 2.  The proposed Plan of Allocation distributes, *pro rata*, the Net Settlement Fund to Class Members based on their respective most likely per share recoverable damages at trial based on the dates of their purchase and sale transactions in SFX common stock, and, therefore, is both fair and equitable.  *See* Nye Decl. at ¶34.

12.     Although the deadline for objections to the Plan of Allocation does not expire until November 12, 2019, to date, no objections to the Plan of Allocation have been received.

13.     In addition, I submit that the requested fee of 33 1/3% of the Director Defendants' Contribution, or $2,250,000.00, and 33 1/3% of the Sillerman Contribution, or portion(s) of the Sillerman Contribution paid, if or when paid into the Settlement Fund, and the request for reimbursement of litigation expenses in the amount of $248,214.01 should be approved as fair and reasonable.  The requested fee is consistent with awards made in other, similar securities class action cases under the percentage-of-the-recovery methodology and substantially less than awards under the lodestar/multiplier methodology used by the courts in making such awards. The requested fee is also appropriate to compensate Lead Counsel for, *inter alia*, the amount of Class Members' damages recovered in the Action, the contingent nature of Lead Counsel's representation, the quality of that representation, and the risk undertaken at inception.

---

[2]  The deadline to opt-out or file objections is November 12, 2019.  Accordingly, as provided by the Preliminary Approval Order, Lead Plaintiff will file supplemental papers fourteen (14) business days prior to the Settlement Hearing scheduled for December 13, 2019 to address any objections and/or opt-outs as necessary.

14.     Although the deadline for objections to the request for attorneys' fees does not expire until November 12, 2019, to date, no objections to the fee request have been received.

15.     Likewise, I submit the expenses incurred to achieve the Settlement were necessary to the successful resolution of this Action for the Class and are extremely reasonable in the context of complex class action securities litigation. Notably, the expenses requested are extremely below the maximum amount Lead Counsel indicated they might seek in reimbursement of expenses in the Notice.  Nevertheless, as of the date of this Declaration, there have been no objections to the request for reimbursement of expenses.

16.     Finally, the request of the institutional Lead Plaintiff, the Guevoura Fund Ltd ("Guevoura") for the time and expenses of its directors and employees in connection with its prosecution of the claims in this case of $10,000 is fair and reasonable.  The Lead Plaintiff's employees, *inter alia*, actively assisted in the case supervising Lead Counsel and complying with Guevoura's discovery obligations.  Declaration of Guevoura Fund Ltd. at ¶¶2-4 (Appendix, Ex. 6). As demonstrated below, the amount requested is modest compared to awards in other PSLRA cases, and Lead Counsel believes it is fair, reasonable, and justified.

## BACKGROUND

### Procedural Background

17.     This federal securities class action was filed on September 11, 2015.  *Gutman v. SFX Entertainment, Inc., et al*., No. 1:15-07192-CM, Dkt. No. 1.

18.     On November 6, 2015, nearly two months after the commencement of the Action and four days before the November 10, 2015 lead plaintiff motion deadline pursuant to 15 U.S.C §78u-4(a)(3)(A)(i)(II), utilizing a substantially similar complaint, Wilfrid Aubrey LLC ("Wilfrid Aubrey") filed an individual action, *Wilfrid v. SFX Entertainment, Inc., et al.,* No. 1:15-08774-CM ("*Wilfrid* Action"), asserting claims under Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, as well as claims under New York common law for fraud and negligent misrepresentation. *Wilfred* Action, Dkt. No. 1.

19.     As required by the PSLRA, on September 11, 2015, Mr. Gutman published notice over a national business-oriented wire service (*PRNewswire*) advising members of the proposed class that a securities class action was filed and that investors had 60 days (until November 10, 2015) in which to move for appointment as lead plaintiff. *See* 15 U.S.C. §78u-4 (a)(3)(A)(i).

20.     On November 10, 2015, five movants filed motions for appointment as lead plaintiff and lead counsel, including: (1) Guevoura, Dkt. Nos. 33-35; (2) Mr. Gutman, Dkt. Nos. 22-24; (3) David Chan, Dkt. Nos. 25-26; (4) Phillip Alfeld, Jr., Dkt. Nos. 27-29; and (5) Rong Liu ("Mr. Liu"), Dkt. Nos. 30-32. Each of the movants other than Mr. Liu and Guevoura subsequently withdrew their motions and/or acknowledged that they do not possess the largest interest in the relief sought in the Action (*i.e.*, they are not the presumptive lead plaintiff). Dkt. Nos. 38, 39, and 44.

21.     On November 20, 2015, Wilfrid Global Opportunity Fund LP ("Wilfrid") filed a purported amended complaint in the *Wilfrid* Action, amending the initial complaint by: (1) substituting Wilfrid Aubrey, the sole named plaintiff, with Wilfrid; and (2) amending the allegations such that instead of being asserted individually on behalf of Wilfrid Aubrey, the claims were asserted by Wilfrid on behalf of a putative class. *Wilfred* Action, Dkt. No. 15.

22.     On November 23, 2015, Wilfrid filed a motion to consolidate the Gutman Action with the *Wilfrid* Action. Wilfrid also filed an opposition to the lead plaintiff motions, Dkt. No. 42, wherein it argued that each of the timely competing lead plaintiff motions should be denied since Wilfrid is "the most adequate plaintiff." However, Wilfrid never made a motion, timely of otherwise, requesting appointment as lead plaintiff.

23.     Abbey Spanier, LLP ("Abbey") filed the first-class action in this litigation for plaintiff Mr. Gutman.   Abbey subsequently filed a lead plaintiff motion with Mr. Gutman. During the briefing on the lead plaintiff motions, on November 23, 2015, Abbey filed an opposition on behalf of Wilfrid and filed a complaint in the *Wilfred* Action.  Dkt. Nos. 42, 42-2. On November 24, 2015, Mr. Gutman filed his response, supporting Wilfred's appointment, Dkt. No. 44; Mr. Liu filed his opposition, Dkt. Nos. 45-46; and Guevoura filed its opposition to Mr. Lui and Wilfred.  Dkt. No. 49. Abbey then withdrew Mr. Gutman from the running as lead plaintiff in favor of Wilfred.

24.     On December 4, 2015, the Court requested additional information from Mr. Lui regarding his trades, Dkt. No. 50, which he submitted on December 6, 2015.  Dkt. Nos. 56-57. That day, Guevoura also filed its reply to the lead plaintiff motions.  Dkt. Nos. 51-53.  On the same day, the Court requested additional information from Guevoura regarding its damage analysis, Dkt. No. 54, which it submitted on December 6, 2015.  Dkt. No. 55.

25.     On December 7, 2015, Wilfred filed its memorandum in further support of its appointment.  Dkt. No. 58.  The next day, December 8, 2015, pursuant to the PSLRA, the Court consolidated the two pending actions alleging similar claims, appointed Guevoura as Lead Plaintiff, and approved Lead Plaintiff's selection of Brower Piven as Lead Counsel.  *See* Dkt. No. 60.  Following the Court's appointment of Lead Plaintiff and Lead Counsel, Lead Counsel commenced an extensive investigation of the claims in the Action.

26.     The factual investigation included an analysis of the publicly available information about SFX.  Among other things, Lead Plaintiff obtained and reviewed SFX's SEC filings, press releases, news reports, and analyst reports relevant to the claims and defenses. Lead Counsel analyzed this and other extensive information for inclusion in the amended complaint.

27.    Lead Counsel also consulted with financial experts concerning the calculation of the potential amounts of recoverable damages during the Class Period, as well as issues concerning loss causation and the Director Defendants' potential defenses to Lead Plaintiff's Class-wide damages estimates.  Lead Counsel was aware that pleading and ultimately proving loss causation and damages would feature prominently in this litigation due to the novel nature of the claims in the context of a potential going-private transaction, and required input from market and financial experts.

28.    On December 9, 2015, the Court entered a scheduling order setting the schedule for the filing of the consolidated amended complaint, for the Director Defendants to answer, move or otherwise respond to the consolidated amended complaint, for Lead Plaintiff to oppose any motion to dismiss, and for the Director Defendants to reply to Lead Plaintiff's opposition. Dkt. No. 59.

29.    On December 23, 2015, Lead Plaintiff filed a Consolidated Amended Class Action Complaint (the "Complaint"), which is the operative pleading.  Dkt. No. 61.  The Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Complaint alleges that, during the Class Period, the Director Defendants, in particular Defendant Sillerman, engaged in a scheme to manipulate the market for SFX common stock in connection with purported proposals by Defendant Sillerman to buy SFX that he had no intention of pursuing, and by issuing materially false and misleading statements in furtherance of that illicit scheme.

30.    On January 22, 2016, the Director Defendants and SFX filed their motions to dismiss the Complaint.  Dkt. Nos. 68-69, 73-75, 78-80.  In their motions to dismiss, they argued that Lead Plaintiff does not allege that the Director Defendants made misrepresentations or omissions of material information and that Lead Plaintiff did not adequately plead scienter.

Defendant Sillerman argued that his statements were protected under the safe harbor and bespeaks caution doctrines, Lead Plaintiff did not plead that any statements were false when made, and that the Complaint fails to adequately allege scienter.  On March 4, 2016, Lead Plaintiff opposed the Director Defendants' motions to dismiss, including by arguing that the Director Defendants engaged in manipulation, false and/or misleading statements were made, the statements are not protected, and pointed to numerous indicia of scienter.  Dkt. No. 100.  On March 17, 2016, the Director Defendants filed their replies to Lead Plaintiff's opposition.  Dkt. Nos. 101-03.

31.     In the interim, on February 1, 2016, SFX filed a petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code ("SFX Bankruptcy Proceeding") in the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court"), and on February 2, 2016, the Court in this Action entered a memo endorsement with respect to SFX's suggestion of bankruptcy acknowledging that all proceedings against SFX were stayed pursuant to 11 U.S.C. §362.  Dkt. No. 90.

32.     On February 2, 2016, the Director Defendants filed a letter motion to stay the Action as to them, Dkt. No. 89, which Lead Plaintiff opposed on February 8, 2016.  Dkt. No. 91.  The Director Defendants filed their reply to Lead Plaintiff's opposition on February 10, 2016.  Dkt. No. 92.  On February 10, 2016, the Court denied the Director Defendants' motion to stay.  Dkt. No. 93.

33.     On February 24, 2016, SFX filed a complaint in the Delaware Bankruptcy Court, commencing an adversary proceeding styled, *SFX Entertainment Inc., et al. v. Guevoura Fund Ltd.*, on behalf of itself and all others similarly situated, Case No. 16-50078-MFW (Bankr. D. Del.) (the "Adversary Proceeding"), seeking to extend the automatic stay to the non-debtor defendants, who are the Director Defendants in the Action.  Adversary Proceeding, Dkt. No. 1.

34.     On March 2, 2016, Abbey filed a non-class state court action in New York Supreme Court. *See Altimeo Invesissement, Altimeo Optimum, Edward S. Gutman, The Merger Fund, The Merger Fund VI, WCM Alternatives, Event Driven Fund, and WCM Master Trust v. Robert F.X. Sillerman, D. Geoff Armstrong, John Miller, Michael John Meyer, Andrew N. Bazos, Joseph R. Rascoff, Edward Simon and Pasquale Manocchia*, Index No. 651084/2016 (N.Y. Sup. Ct. N.Y. Co.) ("Opt-Out Action").[3]

35.     On April 4, 2016, Lead Plaintiff filed an objection in the Delaware Bankruptcy Court to extending the automatic stay.  Adversary Proceeding, Dkt. No. 14.  The objection argued that the Delaware Bankruptcy Court lacks jurisdiction to order the automatic stay against the non-debtor defendants and that the extraordinary injunctive relief requested is not warranted. The reply in support of the stay was filed on April 14, 2016.  Adversary Proceeding, Dkt. No. 17.

36.     On April 18, 2016, the Delaware Bankruptcy Court entered an Order adjourning the hearing to consider this relief until after such time as either: (i) the motions to dismiss in this Action were denied in whole or in part; or (ii) the motions to dismiss were granted, but such determination is reversed on appeal.  *See* Adversary Proceeding, Dkt. No. 18.

37.     On May 15, 2016, Lead Plaintiff filed two proofs of claim in the SFX Bankruptcy Proceeding, one for Lead Plaintiff and the Class against SFX in an unliquidated amount and one for Lead Plaintiff individually against SFX in an unliquidated amount. *See* SFX Bankruptcy Proceeding, Dkt. No. 937, at ¶10.

38.     On July 26, 2016, SFX filed a Joint Plan of Reorganization of SFX Entertainment, Inc., et al. under Chapter 11 of the Bankruptcy Code (the "SFX Plan") and the corresponding

---

[3] The Opt-Out Action was the subject of a pending motion to dismiss in New York Supreme Court.  However, in light of the membership of the named-plaintiff in the Opt-Out Action in this Action, Justice Charles E. Ramos of the Supreme Court of the State of New York, New York County stayed the Opt-Out Action pending the determination of class certification in this Action.

disclosure statement. *See* SFX Bankruptcy Proceeding, Dkt. Nos. 847-48. The SFX Plan defined the subordinated claims (which are impaired, deemed to reject the Plan and are not entitled to vote) to include the claims of Lead Plaintiff and the Class in Action.

39.     On August 9, 2016, SFX filed the Motion of the Debtors for Entry of an Order (I) Approving the Disclosure Statement, (II) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Plan, (III) Approving Forms of Notices and Ballots, (IV) Establishing Notice and Objection Procedures in Respect Thereof, (V) Setting Confirmation Hearing and Related Deadlines and (VI) Granting Related Relief in the SFX Bankruptcy Proceeding. Dkt. No. 895. Lead Plaintiff filed a limited objection on August 23, 2016, Dkt. No. 937, to address certain discrete issues with the Plan and Disclosure Statement, including that the Disclosure Statement needed to clarify the scope of the third-party releases, should not enjoin Lead Plaintiff and the Class from seeking post-confirmation discovery, and should provide information regarding post-confirmation preservation of documents. Lead Plaintiff's main concerns and the reason for the objection was that if its claims were discharged without the Plan being amended to satisfy its concerns, it could potentially not get access to SFX's Class Period documents, making litigation of the case against the remaining Director Defendants far more difficult. Further, Lead Plaintiff had to make sure that the D&O insurance would not be treated as an asset of the SFX bankruptcy estate.

40.     On September 12, 2016, by Memorandum Decision and Order, the Court denied, in their entirety, the motions to dismiss the Complaint. Dkt. No. 104.

41.     On October 26, 2016, Defendant Sillerman and the other Director Defendants filed their Answers to the Complaint. Dkt. Nos. 107, 108. In their answers, all of the Defendants denied all the allegations of wrongdoing and asserted defenses to Lead Plaintiff's claims.

42.     On September 30, 2016, SFX filed an amended Joint Plan of Reorganization of

SFX Entertainment, Inc., et al. under Chapter 11 of the Bankruptcy Code and the corresponding disclosure statement (the "SFX Amended Plan").  Dkt. Nos. 1078-79.  On November 4, 2016, Lead Plaintiff filed a limited objection to the confirmation of the SFX Amended Plan.  *See* Dkt. No. 1233.  Lead Plaintiff sought a revision of the release and injunction portion of the SFX Amended Plan and a clarification of the causes of action.  Further, Lead Plaintiff noted that SFX's attempt to deem the subordinated claims as settled, cancelled, extinguished and discharged was improper.  Lead Plaintiff's terms were finally agreed to by SFX after the briefing and negotiations with SFX bankruptcy counsel.

43.     On November 15, 2016, the SFX Amended Plan, with the concessions sought by Lead Plaintiff, was confirmed, SFX Bankruptcy Proceeding, Dkt. No. 1293, and became effective on December 2, 2016.  *See* Dkt. No. 1342. SFX emerged from Chapter 11 bankruptcy as a privately-owned company.

44.     A litigation trustee (the "SFX Litigation Trustee") was appointed in connection with the confirmed SFX Amended Plan for the purpose of pursuing certain claims of SFX against various parties outside of the bankruptcy proceedings, primarily against Defendant Sillerman.

45.     Following preliminary settlement discussions, in early 2017, the parties determined to engage in non-binding mediation with the assistance of former U.S. District Judge Layn R. Phillips, which also included the parties in the Opt-Out Action and the SFX Litigation Trustee.  The parties exchanged detailed mediation statements setting forth their respective positions on liability and damages.  An all-day (almost 12 hour) mediation session occurred on April 18, 2017.  Not only did each claimant participating in the mediation need to demonstrate the value of their respective claims, the Director Defendants' liability for those claims, and rebut the Director Defendants' defenses to those claims, but each claimant had to compete with the

other claimants to demonstrate their claims were stronger and more valuable than those of the other claimants given the universal perception that, other than the D&O insurance coverage and Sillerman's asserts, there was no other meaningful sources of recovery for any of the competing claimants. While the parties made progress toward resolution of the various claims during the mediation, no settlement was reached during the mediation.  After the mediation, the parties continued to work with Judge Phillips, who engaged for several weeks in individual discussions with representatives of each the competing claimants to seek a resolution.

46.     Several weeks later, after numerous telephonic discussions, a preliminary agreement was reached by the Lead Plaintiff, the SFX Litigation Trustee and Abbey to accept $16 million in total to settle all claims of the three constituencies.  At the time, although the parties were aware that Defendant Sillerman was making a personal contribution to the proposed global settlement amount, Lead Plaintiff was unaware of the amount.

47.     It was further preliminarily agreed that the $16 million would be divided between this Action and the Opt-Out Action, collectively, and the SFX Litigation Trustee in the amounts of $10 million and $6 million. The next hurdle was that Abbey refused to agree to an allocation of the $10 million to its clients consistent with the proportion their recoverable damages represented to the recoverable damages of the Class as a whole and insisted on a larger allocation to its clients.  Abbey also insisted on an active participation in this Action's settlement process and administration. Abbey also indicated he would not submit, for the purposes of the attorneys' fees, expenses or allocation between this Action and Abbey's clients, to the jurisdiction of this Court without guarantees from the Court, in advance, that it would approve any arrangement reached between Lead Plaintiff and Abbey. Those conditions were not acceptable to Lead Plaintiff.  Notably, at that point in time, the Class in the Action had yet to be certified and the

time for Abbey's clients to opt-out of the Class or become passive absent Class Members had not yet occurred.

48.    For several months, Lead Plaintiff and Abbey engaged in negotiations to resolve these issues. Later, counsel for the Director Defendants acted as a middleman to assist in those negotiations. As discussed above, prior to the Sillerman Bankruptcy Proceeding (discussed below), the parties had preliminarily agreed to a settlement of $16 million, with Defendant Sillerman providing $2.5 million of that amount. The balance of $13.5 million was to be paid by the D&O insurance policies. The D&O insurance coverage was and is a wasting asset as it pays legal fees of the Director Defendants as well as providing coverage for the claims asserted in the Action (and the Opt-Out Action and the SFX Litigation Trustee's alleged claims). The Director Defendants were not making any personal contributions to the proposed settlement.

49.    Although the parties were extremely close to a resolution, their efforts ended when certain creditors filed an involuntary petition under Chapter 7 of the Bankruptcy Code against Sillerman on December 26, 2017.  *See* No. 1:18-cv-09784-CM docket, Dkt. No. 1 at ¶14. Sillerman responded by moving to convert his case to one under Chapter 11 of the Bankruptcy Code, which conversion occurred on March 1, 2018.  *Id.*

50.    Given Sillerman's contribution was a *sine qua non* of the preliminary settlement reached, his bankruptcy made further negotiation of the allocation of the preliminary settlement futile.  Lead Counsel believes that, while the Sillerman involuntary bankruptcy filing was unfortunate, its timing was fortuitous, as the parties got word of the bankruptcy at a time when their negotiations over the allocation were all but completed. Lead Counsel believes that if the Settlement had gone through at or about the time the total settlement amount was originally agreed-upon, and Sillerman was put into bankruptcy when he was, it would have created a debacle, because the class notice would have gone out with inaccurate information regarding the

settlement amount (as Sillerman would not and could not at that point actually pay), but the final fairness hearing would not have occurred and even if it had, Sillerman's bankruptcy would have preempted the final judgment regarding any settlement in which he was a substantial contributor. Because Sillerman was in bankruptcy, any settlement agreement had to be approved by the Bankruptcy Court.  Most important, the D&O insurers could not contribute to the Settlement until Defendant Sillerman released them, and that release was approved by the Bankruptcy Court. Lead Plaintiff (as well as the other claimants) would, in all likelihood, have withdrawn from the settlement, leaving the Class confused, wasting the Court's time, and increasing the costs to all parties.

51.     On June 16, 2018, Sillerman filed the Debtor's Motion, Pursuant to Sections 105 And 1121(d) of the Bankruptcy Code, for an Order Extending the Exclusive Periods Within Which He May File a Plan of Reorganization and Solicit Acceptances Thereto Sillerman Bankruptcy Proceeding, Dkt. No. 88 ("Exclusivity Motion"). Sillerman sought an extension of the exclusivity period through and including October 29, 2018.

52.     On June 19, 2018, Lead Plaintiff timely filed a complaint commencing an adversary proceeding (the "Non-Dischargeability Action") in the Sillerman Bankruptcy Proceeding, *see* No. 1:18-cv-09784-CM docket, Dkt. No. 1 at ¶17 (discussing the adversary complaint), seeking, *inter alia*, a determination that Sillerman's indebtedness to Lead Plaintiff and the Class constitutes a non-dischargeable debt pursuant to 11 U.S.C. §523 in that Sillerman's liability to Lead Plaintiff and the Class is grounded in violations of the federal securities laws. Under the Bankruptcy Code, federal securities claims are not dischargeable.  *See* 11 U.S.C. §523. Neither Abbey nor the SFX Litigation Trustee filed non-dischargeability actions.

53.     On July 10, 2018, Lead Plaintiff filed a reservation of rights with respect to the Exclusivity Motion.  *See* Sillerman Bankruptcy Proceeding, Dkt. No. 92.  Although not an

objection, Lead Plaintiff stated his concern with the progress of the Sillerman Bankruptcy Proceeding and questioned the veracity of Sillerman's representations with regard to his assets and their value.

54.     On September 25, 2018, Lead Plaintiff filed proofs of claim in the Sillerman Bankruptcy Proceeding on behalf of itself and the Class (contingent and unliquidated proofs of claim).

55.     On October 24, 2018, Lead Plaintiff filed a motion in the Court to withdraw the bankruptcy reference with regard to the Non-Dischargeability Action, which Sillerman opposed. *See* Non-Dischargeability Action, Dkt. No. 1.  On October 30, 2018, Sillerman filed an answer to the complaint in the Non-Dischargeability Action denying all allegations of wrongdoing and asserting defenses to Lead Plaintiff's claims asserted on behalf of itself and the Class.   On December 3, 2018, the Court granted Lead Plaintiff's motion to withdraw the bankruptcy reference in the Non-Dischargeability Action.  *See id.*, Dkt.

56.     On December 7, 2018, Lead Plaintiff joined in the arguments and positions set forth in the various objections regarding the Exclusivity Motion, for the same concerns as explained above.  *See* Sillerman Bankruptcy Proceeding, Dkt. No. 152.

57.     In the interim, this Court scheduled a pretrial conference for December 20, 2018. Following a lengthy conference with this Court on December 20, 2018 attended by Lead Counsel and Sillerman's bankruptcy counsel, on December 21, 2018, this Court entered an order consolidating this Action and the Non-Dischargeability Action, and set a fast-paced pretrial discovery schedule that contemplated trial of both actions in September 2019.  Dkt. No. 137 ("Scheduling Order").

58.     In light of the expedited schedule to complete discovery and try this Action set by this Court, and its certain impact in quickly reducing the D&O insurance coverage, counsel for

the Director Defendants contacted Lead Counsel to discuss the possibility of re-opening settlement discussions. However, purportedly due to claimed costs incurred by the D&O insurance carriers since mid-2017, counsel for the Director Defendants informed the various claimants that the D&O insurance carriers had decided to reduce the amount of their proposed contribution to $12,850,000. As Lead Plaintiff later learned, the allocation between the D&O insurance carriers and Sillerman had been $13.5 million and $2.5 million, respectively.

59. Pursuant to the Scheduling Order, on January 7, 2019, the Director Defendants served their first request for production of documents and their notice of deposition for Lead Plaintiff. On January 14, 2019, Lead Plaintiff responded and objected to the Director Defendants' first request for the production of documents and discussed the scheduling of Lead Plaintiff's deposition with counsel for the Director Defendants. Lead Plaintiff also subsequently produced all non-objectionable, non-privileged documents in its possession or which it initially provided to its counsel responsive to the Director Defendants' document requests.

60. Following up on their revived preliminary settlement discussions, on January 11, 2019, the parties sent a letter to Magistrate Judge Ona T. Wang requesting a mediation conference, Dkt. No. 144, which was scheduled for February 25, 2019. Magistrate Wang was referred the case on December 21, 2018 for discovery and settlement supervision. Dkt. No. 136.

61. On January 10, 2019, the Bankruptcy Court entered a scheduling order, Sillerman Bankruptcy Proceeding, Dkt. No. 174, whereby it ordered each creditor interested in serving on an official committee of unsecured creditors to submit to the United States Trustee ("UST") an application for membership on an official committee of unsecured creditors by January 14, 2019. Lead Plaintiff submitted its completed questionnaire by the deadline, so it could more actively participate in the Sillerman Bankruptcy Proceeding and protect the interests of the Class. However, prior to the deadline, the UST formed the committee and appointed two members. *Id.*

at Dkt. No. 177.  After being contacted by Lead Plaintiff, UST confirmed it was still accepting applications, but Lead Plaintiff was never appointed to the committee.

62.      Pursuant to the Scheduling Order, on January 18, 2019, Lead Plaintiff filed its motion for class certification, appointment of a class representative and appointment of class counsel.  *See* Dkt. Nos. 150-52.  Following expedited class discovery, including Lead Plaintiff's document production, submission of its market expert's report, and the deposition of Guevoura's representative who traveled to New York from Europe, on February 4, 2019, by stipulation of the parties (which was filed on February 1, 2019, Dkt. No. 161), the Court certified the Class, appointed Lead Plaintiff as the Class representative and my firm as Class Counsel.  *See* Dkt. No. 164.

63.      During this period, the parties also negotiated a confidentiality agreement and submitted it to the Court for approval. On January 22, 2019, the Court entered the Confidentiality Agreement and Stipulated Protective Order. Dkt. No. 156.

64.      On January 23, 2019, Lead Plaintiff filed a statement in connection with the SFX Litigation Trustee's request to be appointed to the Official Committee of Unsecured Creditors (Sillerman Bankruptcy Proceeding, Dkt. No. 182).  *Id.* at Dkt. No. 186.  Lead Plaintiff reiterated its desire to be on the committee.

65.      On January 25, 2019, Lead Plaintiff served its amended Fed. R. Civ. P. 26(a) Initial Disclosures (all of the parties' original initial disclosures were served on December 16, 2016). On the same day, the Director Defendants served their amended Fed. R. Civ. P. 26(a) Initial Disclosures.  Sillerman served his amended Fed. R. Civ. P. 26(a) Initial Disclosures on January 30, 2019.   Also, on January 25, 2019, Lead Plaintiff served its first request for production of documents to Sillerman, as well as to the other Director Defendants.  In addition, Lead Counsel contacted counsel for the reorganized SFX and began the process of obtaining

SFX's relevant Class Period documents as contemplated by the concessions SFX had agreed to in connection with the SFX Amended Plan.  On February 25, 2019, the Director Defendants responded to Lead Plaintiff's first request for the production of documents, and Defendant Sillerman responded on February 28, 2019.  On January 25, 2019, Lead Plaintiff also served subpoenas on SFX Litigation Trust, the Affiliated Reorganized Debtors of the Reorganized SFX Entertainment, Inc., and the Reorganized SFX Entertainment, Inc.  On February 4, 2019, Lead Plaintiff provided search terms to Livestyle F/K/A Reorganized SFX Entertainment, Inc. for it to provide the documents in its possession.

66.    On January 31, 2019, Lead Plaintiff objected to Defendant Sillerman's third request to extend the exclusivity period for the same reasons as explained above.  Sillerman Bankruptcy Proceeding, Dkt. No. 200.

67.    On February 1, 2019, Magistrate Judge Wang ordered a mediation session before her scheduled for February 25, 2019. Prior to the conference, Lead Plaintiff sent a letter to Magistrate Judge Wang explaining the details of the status of the case and the hurdles to settlement to date, which are explained above.  Dkt. No. 170.

68.    On February 8, 2019, the Director Defendants served their second request for the production of documents on Lead Plaintiff.  On March 4, 2019, Lead Plaintiff responded to the Director Defendants' second request for the production of documents.

69.    Throughout the discovery process, Lead Plaintiff received ten-of-thousands of pages of documents from various SFX entities and the Director Defendants.  Lead Counsel also subpoenaed numerous third parties for relevant documents, met and conferred with representatives of the third-parties, and began to review the over half a million of pages of documents provided in total.

70.    Following entry the Class Certification Order, on February 12, 2019, Lead

Plaintiff filed the Consent Motion Regarding Procedures and Forms for Providing Notices of the Pendency of Class Action, Dkt. No. 166, which provided for notice to the Class and special notice and advanced deadlines for Abbey's clients ("Opt-Out Plaintiffs") to formally opt out of the now certified Class to pursue their own claims and/or their own settlement in New York State Court. Lead Plaintiff believed at this point in time that Abbey's clients' claims had significantly diminished since the Sillerman Bankruptcy Proceeding because their clients failed to timely file a non-dischargeability action in the Sillerman Bankruptcy Proceeding, and, thus, their clients had potentially abandoned the majority of their claims in the Opt-Out Action, which would have been ultimately discharged in the Sillerman Bankruptcy Proceeding.  Abbey had also taken no discovery (nor could it as its case was stayed).  Abbey had also failed to make arrangements, as did the Lead Plaintiff in the Action, to preserve and obtain SFX's documents relevant to the claims in the Action (and the Opt-Out Action) in the SFX Bankruptcy Proceedings, thereby, rendering the ability of their clients to prove their claims, to say the least, far more difficult than for Lead Plaintiff in this Action.

71.     On February 13, 2019, the Court entered the Order Approving Notice and Summary Notice of the Pendency of Class Action, dated February 13, 2019 ("Notice Order"). Dkt. No. 169.   In accordance with the deadline and procedures set forth in the Notice Order, the Opt-Out Plaintiffs opted out of the Class.

72.     On February 25, 2019, the parties participated in a lengthy settlement conference with Magistrate Judge Wang in which Magistrate Judge Wang met with each of the groups of claimants, the Director Defendants and Sillerman separately. In the course of the mediation, the Director Defendants confirmed that the D&O insurance carrier had agreed to restore the amount it had offered in the settlement in mid-2017.  Sillerman offered, subject to bankruptcy court approval, an allowed claim in the amount of $2.5 million (i.e., the amount of his original cash

contribution to the preliminary settlement in mid-2017), and the release of his co-defendants and the D&O insurance carriers. After some deliberation, Magistrate Judge Wang made a mediator's recommendation that the Class and the SFX Trustee receive $13.5 million in cash from the D&O insurance coverage, and Abbey receive the full value (whatever that might be) generated through the Sillerman Bankruptcy Proceedings on the $2.5 million allowed claim Sillerman was contributing.  The parties were given until March 11, 2019 to advise Magistrate Judge Wang confidentiality whether her proposal was acceptable to each group of claimants.

73.    The parties had a number of telephone calls and electronic communications over the course of the next two weeks concerning the Magistrate Judge's proposal, which, as expected, Abbey would not accept. After seeking and receiving an extension to report the status of the settlement to Magistrate Judge Wang, Dkt. No. 173, on March 12, 2019, the parties reached an allocation of the consideration available among themselves, which includes the Class receiving $6.75 million in cash from the D&O insurance and $750,000 from the Sillerman allowed claim, the SFX Litigation Trustee receiving $5.25 million in cash from the D&O insurance and $750,000 from the Sillerman allowed claim, and the Opt-Out Plaintiffs receiving $1.5 million in cash from the D&O insurance and $1 million from the Sillerman allowed claim.

74.    On March 13, 2019, after a telephonic status conference with Magistrate Judge Wang, in which Lead Counsel presented the proposed allocation of the proposed settlements and made recommendations to the Magistrate Judge as to timing for various necessary steps involving the drafting of the implementing documentation, as well as proceedings in the Sillerman Bankruptcy Court and this Court, the Magistrate Judge stayed the case, so the parties could finalize the Settlement.  Dkt. No. 174.  The stay was extended to April 15, 2019, Dkt. No. 175, and then again to April 30, 2019 following a telephonic status conference with Magistrate Judge Wang.  Dkt. No. 178.

75.     On April 30, 2019, the Stipulation was filed with the Court.  The terms of the global settlement were the product of endless negotiations, which required expertise from bankruptcy counsel for all parties, as Sillerman had to seek permission from the Bankruptcy Court in the Sillerman Bankruptcy Proceeding, pursuant to Rule 9019 (the "9019 Motion") of the Federal Rules of Bankruptcy Procedure, to give releases set forth in the Stipulation of the Released Defendants' Claims, to give releases in favor of the D&O insurance carriers, and to take all actions necessary to effectuate the transactions contemplated by the Settlement and to agree to the Sillerman Contribution

76.     On April 30, 2019, pursuant to Lead Plaintiff's letter motion requesting a stay until Sillerman could file the 9019 Motion, and for the Bankruptcy Court to issue the 9019 Order and for the appeal period to expire, Dkt. No. 179, Magistrate Judge Wang stayed the Action until July 1, 2019.  Dkt. No. 181.

77.     After extensive negotiations between all parties and Sillerman's counsel, on May 6, 2019, the 9019 Motion was filed.  Sillerman Bankruptcy Proceeding, Dkt. No. 302.  An objection to the 9019 Motion was received from the Official Committee of Unsecured Creditors in the Sillerman Bankruptcy Proceedings (the "Committee"), and on June 6, 2019, Lead Plaintiff reported to Magistrate Judge Wang that a hearing was scheduled for June 12, 2019 in the Bankruptcy Court on the 9019 Motion.  Dkt. No. 184.  The Committee objected because it argued that the Settlement singled out the Debtor's estate for unfair and inequitable treatment of the Debtor's co-defendants (Sillerman Bankruptcy Proceeding, Dkt. No. 335).  The objection was partially withdrawn on June 10, 2019 after an explanation of the Settlement by the parties. Sillerman Bankruptcy Proceeding, Dkt. No. 340.  On June 10, 2019, Lead Plaintiff filed a reply to the objection.  *Id.*, Dkt. No. 342. The reply argued that the objection was misplaced and should be overruled, as the Settlement presents an opportunity for Sillerman to resolve hundreds

23

of millions of dollars in potential claims and preserve value in the estate for the rest of the creditors.

78.     The hearing was held before the Honorable Mary Kay Vyskocil, United States Bankruptcy Judge in the Sillerman Bankruptcy Proceedings on June 12, 2019.   Based on discussions with the committee's counsel and Lead Plaintiff's reply to the objection, the Committee withdrew its objection based on some language changes to the proposed 9019 Order. In addition, the U.S. Trustee appeared at the hearing and requested to review any final version of the 9019 Order presented to the Bankruptcy Court for entry.   Finally, the Bankruptcy Judge requested certain modifications to the proposed 9019 Order clarifying the limited scope of Bankruptcy Court's approval of the agreements of Sillerman under the Stipulation and the exclusive jurisdiction of this Court to grant final approval of the overall Settlement itself.

79.     Thereafter, the parties met-and-conferred to make the changes requested by the Bankruptcy Court.  The version of the proposed 9019 Order agreed-upon by the parties was also provided to the Committee and the U.S. Trustee before filing it with the Bankruptcy Court and those parties indicated no objection to the revised version of the 9019 Order.

80.     On June 26, 2019, the Bankruptcy Court in the Sillerman Bankruptcy Proceeding entered an Order granting the 9019 Motion and authorizing Sillerman to give the releases set forth in Stipulation as to the Released Defendants' Claims, to give releases in favor of the Insurance Carriers, to take all actions necessary to effectuate the transactions contemplated by the Settlement, and to make the Sillerman Contribution.   On June 27, 2019, Lead Plaintiff reported to Magistrate Judge Wang that the 9019 Motion was granted.  Dkt. No. 185.

81.     On July 18, 2019, Lead Plaintiff filed the Notice of Motion For: (1) Preliminary Approval of Settlement; (2) Approval of Notice to The Class; and (4) Scheduling of a Final Hearing ("Preliminary Approval Motion"; Dkt. No. 186); Lead Plaintiff's Memorandum of Law

24

in Support of Preliminary Approval Motion (Dkt. No. 187); and the Declaration of David A.P. Brower in Support of Preliminary Approval Motion (Dkt. No. 188), which included, as Exhibit 1, the Stipulation, which attached Exhibit A: The [Proposed] Preliminary Approval Order (Order"); Exhibit A-1: The [Proposed] Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Expenses, and Final Settlement Hearing; Exhibit A-2: The [Proposed] Proof of Claim and Release form; Exhibit A-3: The [Proposed] Summary Publication Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees, and Final Settlement Hearing; Exhibit B: 9019 Order; and Exhibit C: The [Proposed] Final Judgment and Order of Dismissal. Lead Plaintiff also submitted a letter describing the documents. Dkt. No. 188.

82.     On July 30, 2019, pursuant to the District Court's request, Lead Plaintiff filed a letter with a schedule of all pertinent dates for the settlement approval process. Dkt. No. 189. Thereafter, the Court entered the Preliminary Approval Order.   Dkt. No. 191.  The Preliminary Approval Order (a) amended the Class definition; (b) approved the forms, methods and timing for providing the Notice, the Publication Notice and the Proof of Claim form to Class members; (c) appointed the claims administrator; (d) set the deadlines for Class members to request exclusion from the Class, object to the Settlement, Plan of Allocation and/or Lead Counsel's request for an award of attorneys' fees and reimbursement of expenses and/or to personally appear or appear through counsel; (e) scheduled the final fairness hearing for December 13, 2019 ("Final Approval Hearing"); and (f) set the deadlines for the submission of papers in support of, and opposition to, the matters that will be heard at the Final Approval Hearing.

83.     On September 16, 2019, Sillerman filed his most recent plan of reorganization and a proposed disclosure statement.  *See* Sillerman Bankruptcy Proceeding, Dkt. Nos. 454-55.

84.     On October 8, 2019, in response to a motion by the Committee, after full briefing and argument, the Bankruptcy Judge in the Sillerman Bankruptcy Proceedings appointed a

trustee to oversee those proceedings.  *See* Memorandum Opinion and Order Granting Motion to Appoint A Chapter 11 Trustee, dated October 8, 2019, Sillerman Bankruptcy Proceeding, Dkt. No. 505 (describing in detail the past proceedings in the Sillerman Bankruptcy and the reasons for the Bankruptcy Court's determination to relieve Sillerman as the debtor-in-possession).

85.     Thus, as made clear in the Notice to the Class, it is not clear what will actually occur in the Sillerman Bankruptcy Proceedings, and, there is no guarantee that the Sillerman Contribution or any portions of it will be paid (or the timing of the payment).

**Notice to the Class**

86.     Lead Counsel was judicious in its selection of JND Legal Administration ("JND"), the Court-appointed Claims Administrator in this Action.  Lead Counsel only selected JND as the proposed claims administrator after assuring itself that JND's bid reflected the most aggressive and efficient proposal among the administrators considered by Lead Counsel.

87.     Lead Counsel orchestrated a competitive bidding process among the potential claims administrators and only selected JND after carefully reviewing and negotiating, line by line, each component of the claims administration process delineated in the bids received by Lead Counsel.

88.     As demonstrated by the Segura Declaration, the notice program directed by the Court has been fully completed.  An aggregate 10,998 copies of the detailed long form Notices and Proof of Claim forms were mailed to potential Class Members.

89.     As in most securities class actions, many Class Members are beneficial purchasers whose common stock is held in "street name" – *i.e.*, the common stock is purchased by brokerage firms, banks, institutions and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers.  JND also maintains a proprietary database with the names and addresses of the largest and most common U.S. nominees ("Nominee Database").  The

Notice, under the heading "Special Notice to Securities Brokers and Other Nominees," directed all those who purchased SFX common stock during the Class Period for the beneficial interest of a person or organization other than themselves, within seven (7) days of receipt of the Notice, to either (a) provide to the Claims Administrator the name and last known address of each person or entity for whom or which they purchased SFX common stock during such time period or (b) request additional copies of the Notice and the Proof of Claim form, which would be provided to them free of charge, and within seven (7) days mail the Notice and Proof of Claim form directly to the beneficial owners. Segura Decl. at ¶3.

90. Through October 8, 2019, JND has mailed an additional 2,950 Claim Packets to potential Class Members whose names and addresses were received from individuals or nominees requesting that a Claim Packet be mailed to such persons, and mailed another 3,663 Claim Packets to nominees who requested Claim Packets to forward to their customers. Segura Decl. at ¶¶8-9.

91. JND established a toll-free telephone number for potential Class members to call and obtain information. This system became operational on or about August 20, 2019. Segura Decl. at ¶11. JND also maintains a website where important documents related to this case are posted, www.SFXSecuritiesLitigation.com. The papers in support of Lead Plaintiff's motion for approval of the Settlement, Plan of Allocation, and the forms and methods for providing notice to the Class, and Lead Counsel's request for an award of attorneys' fees and reimbursement of litigation expenses will also be posted on that website after the papers are filed with the Court.

92. Pursuant to the Preliminary Approval Order, JND had the Publication Notice sent out over *PR Newswire* on August 30, 2019, September 6, 2019, and September 13, 2019. *See* Segura Decl. at ¶10.

93. The Notice provides, *inter alia*: (1) the detailed terms of the Settlement and the

27

releases that would be exchanged; (2) summarized the history of the litigation; (3) described the parties and the Class; (4) discussed the settlement negotiations; (5) discussed Lead Plaintiff's consultant's estimates of recoverable damages at trial; (6) detailed the Plan of Allocation; (7) detailed the percentage and per share recoveries to Class Members based on the dates of their purchases and sales, if any, of SFX common stock during the Class Period; (8) detailed the maximum amount that Lead Counsel would seek in attorneys' fees and in reimbursement of expenses for prosecuting the Action, and stated that Lead Plaintiff may seek an award for its direct representation of the Class; (9) described Class Members' right to request exclusion from the Class or appear through personal counsel of their choosing and/or to object to the Settlement, Plan of Allocation and/or request for attorneys' fees and reimbursement of expenses; (10) specified the deadlines for asserting these rights and procedures for doing so; (11) provided addresses, a toll-free telephone number and a website where Class Members could obtain additional information; and (12) informed Class Members when Lead Plaintiff and Lead Counsel's papers in support of the proposed Settlement, Plan of Allocation and request for attorneys' fees and expenses will be filed with the Court and available for their inspection.

94.    The Notice also provided the "statement of plaintiffs' recovery," as required by the PSLRA, which states that Class Members' average per share recovery will be $0.37 per share if the Sillerman Contribution is not paid and $0.41 per share if the Sillerman Contribution is paid, it identified the attorneys and provided their addresses, it provided information on how to contact Lead Counsel's representatives to obtain additional information, and it contained a brief description of the reasons why the parties are proposing the Settlement. The Notice, however, also points out that the "average per share recovery" is not necessarily reflective of Class Members' actual likely recoveries from the Settlement and provides more accurate per share figures in the Plan of Allocation detailed in the Notice.  Indeed, as detailed below, Lead Counsel,

with the assistance of their damages consultant, provided step-by-step formulas for Class Members to calculate their own, individual Recognized Loss by reference to the Plan of Allocation.

95.     All objections to the Settlement, the Plan of Allocation and the request for fees and expenses, and all requests for exclusion from the Class (other than the Opt-out Plaintiffs who had previously opted-out in a timely manner pursuant to the directions in this Court's Notice Order), are required to be filed no later than November 12, 2019.  Thus, as provided by the Preliminary Approval Order, Lead Plaintiff's papers in support of the Settlement, the Plan of Allocation and their application for an award of attorneys' fees and reimbursement of expenses will be filed with the Court and available on the website more than a month before the objection and opt-out date.

96.     As of the date of this Declaration, there are no objections concerning the Settlement, the Plan of Allocation, or request for attorneys' fee and expenses, and no requests for exclusion have been received from putative Class Members.

**Claims Processing**

97.     The Plan of Allocation set forth in the long form Notice also details the procedures that will be followed to process claims made by Class Members. In order to receive a share of the distribution of the proceeds from the Settlement, a member of the Class must be an "Authorized Claimant."  An Authorized Claimant is a Class Member who: (a) purchased SFX common stock during the Class Period, (b) meets the further qualifications set out below, and (c) submits a valid and properly documented Proof of Claim form that accompanies the Notice in a timely manner as set out in the Notice.

98.     Class Members will be able to substantiate their claims with any of the following forms of evidence: brokerage firm confirmation slips; monthly account statements; or such other

third-party documents that Lead Counsel and the Director Defendants' counsel, in their discretion, mutually agree are sufficiently reliable and verifiable.

99.    As discussed above, with each copy of the Notice disseminated to potential members of the Class, a copy of the Proof of Claim in the form approved by the Court was included.  As provided by the Preliminary Approval Order, the deadline for submitting Proofs of Claim is December 27, 2019.

100.    Additionally, it is the experience of Lead Counsel and the Claims Administrator that members of similar classes do not submit proofs of claim until (and, often, shortly after) the claims filing deadline.  Further, such deadline may be extended by the Court.

## THE RESULTS ACHIEVED

101.    The proposed Settlement will provide a substantial monetary benefit to the Class of $6.75 million as part of the Director Defendants' Contribution, and a $750,000 Sillerman Contribution (or portions of it) if ever paid, as described in the Stipulation.

102.    As discussed above, based on Lead Plaintiff's damages expert's estimate of the best possible recovery for the Class on all claims at trial, the Settlement reflects an overall 57% recovery of Class Members' total aggregate compensable damages of $11.85 million (excluding the Sillerman Contribution).  That figure assumes a 100% participation rate by Class Members and does not take into account any risks of non-payment through continued litigation based on either the typical risks inherent in any complex securities fraud litigation, or the unique aspects of this Action given the various bankruptcies and limited sources of recovery.

103.    Notably, aggregate damages awards are not typically awarded at trial in securities class actions. Rather, following the trial of a federal securities class action, prior to entry of judgment against defendants, a claims process must be conducted to identify class members and for those class members to prove the amount of their claim.  While all of Lead Plaintiff's

damages and recovery estimates assume a 100% participation rate, in any class action, not all of those who can make claims do. Nevertheless, here, Class Members will share in the total of the Net Settlement Fund regardless of the number or amount of claims actually received.  Therefore, while the Settlement in the aggregate represents an already high recovery of approximately 57% of Class Members' maximum compensable damages (excluding the Sillerman Contribution), in actuality, before attorneys' fees and expenses, based on the actual amount of claims that are made, the Settlement is likely to represent a significantly higher percentage of Class Members' damages.

104.    Based on consultations over the years with financial experts, claims administrators, and Lead Counsel's own experience, typical institutional investor claim rates in securities class actions are approximately 90% and individual investor claim rates are approximately 30%.  From about the beginning of the Class Period through approximately the commencement date of the Action, institutions held approximately 70% of SFX's public float (*i.e.*, shares outstanding less insider holdings), while individuals held approximately 30%. Applying these estimates to the total aggregate damages of approximately $11.85 million, institutions and individuals are projected to claim approximately $7.46 million and $1.07 million, respectively, or collectively $8.53 million. Thus, applying the approximated holdings and estimated claim rates, the Settlement Fund represents, on a projected claims-made basis, a recovery of approximately 79% of total damages claimed (excluding the Sillerman Contribution and before payment of attorneys' fees and expenses), without consideration of any of the risks attendant to success on the merits.

105.    In any event, whether viewed on a gross basis or on a likely claims-made basis, the result achieved for the Class in this litigation is extraordinary.

## THE SETTLEMENT WARRANTS APPROVAL

106.    The proposed Settlement is the result of years of difficult litigation and protracted settlement negotiations highly experienced counsel who concluded that the Settlement is in the best interests of the Class.

107.    The following factors have been cited by the Second Circuit as the pertinent criteria for evaluating the fairness of a proposed Settlement: (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).  Based on an analysis of each of these factors, the Settlement before the Court is, without doubt, fair, reasonable and adequate and should be approved.

### The Complexity, Expense, and Likely Duration of the Litigation

108.    An analysis of the first *Grinnell* factor, the complexity, expense and likely duration of the litigation, supports the Settlement.  Virtually all securities actions are inherently complex, and this Action was no different.

109.    Lead Counsel considered the substantial time and expense that would be involved in continuing to prosecute the Action through trial and the inevitable post-trial motions and appellate proceedings. Simply completing the pre-trial proceedings would have involved considerable additional discovery; taking dozens of depositions; defense of the depositions; preparation of complex expert reports and discovery of the expert witnesses; the negotiation and

completion of a complex and voluminous pre-trial order; and extensive briefing on motions for summary judgment, motions to strike experts and other motions *in limine* likely to be made by Lead Plaintiff and by the Director Defendants. All of this had to be done on an accelerated basis due to tight deadlines set at various times by the Court. Given the complex nature of the case and the numerous persons with knowledge of discreet aspects of the case, trial of the Action would be extremely complex and likely take weeks, if not months, to complete. Additionally, this Action was severely complicated by the various bankruptcy proceedings involving SFX and Sillerman.

### The Reaction of the Class to the Settlement

110.    As noted above, in total, 10,988 Notices describing the nature and procedural history of the Action, and the terms of the Settlement, have, to date, been disseminated by first-class U.S. mail to potential Class Members. In addition, the Publication Notice was transmitted over *PR Newswire* on three separate, staggered days. Although the deadline for objecting to the Settlement or seeking exclusion from the Class has not yet passed, to date, no Class Member has objected to approval of the Settlement and no potential Class Member has sought exclusion. Nor, for that matter, has any potential Class Member contacted Lead Counsel to complain about the Settlement.

### The Stage of the Proceedings and Discovery Completed

111.    At the commencement of the Action, Lead Counsel conducted an extensive investigation relating to Lead Plaintiff's claims in the Action, including the: (i) review and analysis of filings made by, and/or concerning, the Director Defendants with the SEC; and (ii) review and analysis of wire and press releases, public statements, news articles, and other publications disseminated by, and/or concerning, the Director Defendants.

112.    Additionally, Lead Counsel obtained and reviewed large quantities of relevant

non-public documents from SFX (as a result of Lead Plaintiff's arrangement with SFX's bankruptcy counsel in connection with confirmation of the Amended SFX Plan) and numerous third-parties, including, *inter alia*, Barclays Bank PLC, Blackstone Group L.P., Deutsche Bank A.G., Fried, Frank, Harris, Shriver & Jacobson LLP, Jefferies Financial Group Inc., Moelis & Company LLC, Sony Music Entertainment Inc., and LiveStyle.

113.    Lead Plaintiff also conducted extensive discovery relevant to the Class Members' claims and the reasonableness of the Settlement.  Further, to assist with the prosecution and analysis of this case, Lead Counsel also consulted with well-respected consultants and experts concerning the calculation of the potential amounts of recoverable damages during the Class Period, as well as issues concerning loss causation and the Director Defendants' potential defenses to Lead Plaintiff's Class-wide damages estimates. Lead Counsel also consulted with consultants about various legal obstacles throughout the case, including during the class certification stage.

114.    As a result of all of the foregoing, Lead Counsel was well-prepared to negotiate from a position of strength and knowledge to reach the settlement in principle, and to enter into the final Stipulation.

**The Risks of Establishing Liability and Damages**

115.    While Lead Plaintiff is confident in the strength of its case, the Director Defendants were just as confident that Lead Plaintiff would not succeed, at least in part, on the merits.  It can be said, however, without gainsay that Lead Plaintiff faced considerable risks to success in this Action.   In achieving the Settlement, Lead Counsel carefully considered numerous factors, including, but not limited to, the complexity, expense and delay inherent in continued prosecution of the Action through the pretrial, trial and appeal phases, including trying to obtain additional discovery and depositions; Lead Plaintiff's difficult burden of proof on

34

damages; the risks of maintaining the entire Class throughout the litigation; the uncertainties of the outcome of a trial before a jury; the likelihood and vagaries of appellate proceedings; the maximum amount Lead Plaintiff could reasonably expect to recover at trial; the delay that would likely be incurred in obtaining a recovery for the Class; the risks inherent in the Sillerman Bankruptcy Proceeding and his ability to block any settlement with the other Director Defendants due to the fact that his release was required before the D&O insurance carriers could pay out to settle on behalf of any defendant in this Action; and the substantial and immediate monetary benefit provided by the Settlement to the Class.  Lead Plaintiff evaluated these factors only after extensive factual investigation and legal analysis that enabled Lead Plaintiff to assess the strengths and weaknesses of its claims.

116.    As a result of Lead Plaintiff's factual and legal research and analysis, as well as the Settlement negotiations, Lead Plaintiff was able to identify many of the arguments and issues that would likely have been raised in the course of continued litigation against the Director Defendants.  Although Lead Counsel would forcefully argue the merits of Lead Plaintiff's claims at trial, the Director Defendants could have offered potentially effective arguments of their own in their defense to Lead Plaintiff's claims.

117.    If the Action had continued, Lead Plaintiff faced substantial challenges in later stages of litigation in proving that the Director Defendants made false material misrepresentations or omitted to disclose material information in connection with Defendant Sillerman's offers in violation of the Exchange Act.  Indeed, the Director Defendants argued that the Complaint only alleges that the Director Defendants, acting as a Special Committee, made a single alleged false statement to investors – that they unanimously determined that the transaction was fair to SFX's stockholders, and because the Complaint fails to allege that any particular director "prepared any securities filing, made any public announcement, or otherwise

disclosed any information to investors – as opposed to the Special Committee's alleged recommendation made 'to the Board,'" Lead Plaintiff fails to meet its burden to demonstrate a false statement.  *See* Dkt. No. 69 at 5.  It was also further argued that the Complaint "is entirely devoid of allegations that the Outside Directors acted with scienter." *Id.* at 8.

118.    The Directors Defendants also argued that discovery would show that the Directors Defendants reasonably relied on expert advice in evaluating Sillerman's offers. In sum, the Director Defendants would likely argue and could convince a jury that they acted without scienter and that they were as duped by Sillerman as the rest of SFX's investors.  In that case, the Class would be forced to look solely for a recovery to Sillerman, which as discussed above, would not have resulted in a greater recovery for the Class than is provided by the Settlement and, indeed, if the case were required to continue to a litigated resolution, it is certain, there would have been less (if any) coverage left from the D&O insurance policies than the Class is receiving now.

119.    Further, there is no doubt that both sides would have had to present complex and nuanced information to a jury that would include a "battle of the experts" on complex issues surrounding securities disclosure requirements and damages calculations, which the parties did not agree on. Likewise, the issue of damages would have degenerated into a "battle of experts," and whose experts the jury would believe is a risk not practically measurable in advance of trial. Thus, Lead Plaintiff was at risk that the jury might not resolve the "battle of experts" over causation and damages in favor of the Class.

**The Risk of Maintaining the Class Action Through the Trial**

120.    The risk of maintaining the class through the trial is also a factor that weighed heavily in Lead Plaintiff's decision to settle the Action.  Lead Counsel was confident under existing law that the Class would remain as certified through trial and the appellate process.

Nevertheless, as with any class decision, the outcome of an appellate review is not pre-ordained. Here, the Director Defendants "reserved their rights to seek alternation or amendment" to the class certification order, Dkt. No. 164 at ¶10, and did not waive any "substantive defenses, objections or arguments or otherwise that could be asserted at a summary judgment motion, in a Daubert motion, at trial, or at any other stage of th[e] litigation." *Id.* at ¶11.

### The Ability of the Director Defendants to Withstand a Greater Judgment

121. The Settlement Amount may be considered in the context of the collectability of a greater judgment.

122. The D&O insurance coverage is a wasting asset as it pays legal fees of the Director Defendants, as well as providing coverage for the claims asserted in the Action. By continuing with the expedited schedule set by the Court, each day that the Action was not settled would take away money available for the Class for settlement. For example, according to the Scheduling Order, depositions would have had to have started in March, as Lead Plaintiff had to depose ten witnesses before May 17, 2019; Lead Plaintiff would have had to produce expert reports by April 5, 2019; the Director Defendants had to depose experts from May 20, 2019 until June 5, 2019; the Director Defendants had to produce export reports by April 19, 2019; and Lead Plaintiff would have to depose the Director Defendants' experts between May 20, 2019 and June 5, 2019. Scheduling Order at 3.

123. Moreover, the Action was complicated by the SFX and Sillerman bankruptcies. Indeed, as the Bankruptcy Court's October 8, 2019 order appointing a trustee to take over the Sillerman Bankruptcy Proceeding makes clear, there is a serious doubt that Sillerman will ever be able to pay the Sillerman Contribution, not to mention a larger post-trial judgement.

124. Finally, the Opt-Out Plaintiffs and the SFX Litigation Trustee had to be paid from the D&O insurance as well. Lead Plaintiff negated some of the risk that the Opt-Out Plaintiffs or

the SFX Litigation Trustee could receive a judgment first through their prosecution of their claims, which would have potentially exhausted the available sources of payment to the Class before this Action reached judgment.

125.    And, notwithstanding any of the above, even if the Class could recover a larger judgment after trial, the additional delay through trial, post-trial motions, the appellate process and completion of the Sillerman Bankruptcy Proceedings could deny the Class any recovery (even assuming victory at every step and collectability) for years.

**The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation**

126.    The range of reasonableness of the Settlement Fund in light of the best possible recovery and the attendant risks in litigation, was critical in Lead Counsel's decision to settle the Action and weighs strongly in support of the Settlement.  Here, the Class is receiving at least a 57% recovery (not even including the Sillerman Contribution) to settle their claims, a significant result for the Class both in absolute terms and when viewed in light of avoiding the risks of further litigation, the various bankruptcy proceeding, the wasting D&O insurance, and that the available insurance proceeds had to be split among the Class, the SFX Litigation Trustee, and the Opt-Out Plaintiffs.

*      *      *

127.    In sum, through extensive analysis and negotiation, the parties compromised their differences and reached the agreement that is embodied in the Stipulation.  In view of the Settlement that has been recovered for the Class, the sharply contested factual and legal issues (both as to liability and damages), and the uncertainties and enormous costs and delays inherent in continuing the litigation, Lead Counsel believes the Settlement to be an excellent result and urge its approval by the Court.

## THE PLAN OF ALLOCATION

128.    As set forth in the Notice, Lead Counsel prepared the Plan of Allocation (in consultation with Dr. Nye) for the distribution of the proceeds of the Settlement.  The objective of the proposed Plan of Allocation is to distribute equitably the net proceeds of the Settlement to those Class Members who suffered losses as a result of the alleged misrepresentations and omissions.  Thus, the proposed division of the proceeds of the Settlement among claiming Class Members is based upon the formula that results in Lead Plaintiff's best possible damages assuming success on the merits for all claims of the Class Members.  Since the proposed allocation reflects the best possible damages theory that Lead Counsel believes could have been proffered at trial, Lead Counsel submits that the Plan of Allocation is eminently fair, reasonable, and equitable.

129.    The Plan of Allocation, which is fully set forth in Section IX of the Notice, *see* Segura., Ex. A, provides for the calculation of "Recognized Losses" for those Class Members who file timely and properly completed Proof of Claim forms ("Authorized Claimants").  In sum, the calculation of Recognized Loss, which is step-by-step set forth in the Notice, is based on the dates and prices SFX common stock was purchased; and whether those shares were sold, and if sold, when and for what price.  Class Members will be eligible to participate in the distribution only to the extent they had a net loss on their overall transactions in SFX common stock shares during the Class Period.  If a Class Member had a net gain from his/her overall transactions in SFX common stock during the Class Period, the value of the Recognized Loss will be zero.

130.    An Authorized Claimant's total Recognized Loss is the sum total of his, her or its per share Recognized Loss for each share of SFX common stock purchased during the Class Period.  For purposes of determining whether a Claimant has a Recognized Loss, purchases,

acquisitions, and sales of like ordinary shares will first be matched on a First In/First Out basis. To the extent that a calculation of a per share Recognized Loss results in zero or a negative number, that number shall be set to zero.

131.    For all purposes, the transaction date and not the settlement date shall be used as the date for determining eligibility to file a claim. The covering purchase of a "short" sale is not an eligible purchase.

132.    Finally, under the Plan of Allocation, if the sum total of Recognized Losses of all Authorized Claimants who are entitled to receive payment out of the Net Settlement Fund is greater than the Net Settlement Fund, each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's Recognized Loss bears to the total of the Recognized Loss of all Authorized Claimants (*i.e.*, on a *pro rata* basis). Class Members who do not file acceptable Proofs of Claim will not share in the settlement proceeds. Class Members who do not file an acceptable Proof of Claim and do not opt-out of the Class will nevertheless be bound by the judgment and the Settlement. Distributions will be made to Authorized Claimants after all claims have been processed and after the Court approves the final calculations and distributions to be made to Class Members.

133.    The Plan of Allocation reflects the same formula that would have been applied by Lead Counsel to determine per share and aggregate damages at trial and is the same formula that Lead Plaintiff would have proposed to the Court for a post-trial Class claims process if Lead Plaintiff had succeeded on the merits. As such, the proposed Plain of Allocation reflects the same methodology for calculating Class Members' claims as would have been used if there was no settlement and a recovery to the Class.

134.    As noted above, although the deadline has not yet passed, Lead Counsel has not received any objections to the Plan of Allocation to date. If any objections are received by the

deadline, Lead Counsel will address any additional issues resulting from the objections in Lead Plaintiff's supplemental papers.

135.    Accordingly, Lead Counsel believe that this method of allocation has a reasonable and rationale basis and is fair, reasonable and equitable and therefore, warrants the Court's approval.

## LEAD COUNSEL'S REQUEST FOR AN AWARD OF ATTORNEYS' FEES

136.    Lead Counsel respectfully request an award of one third (33 1/3%) of the Director Defendants' Contribution and one third (33 1/3%) of the Sillerman Contribution (if and when any portion is paid), plus interest earned on that amount at the same rate as earned by the Settlement Fund from the time of the award to the time of payment.

137.    Lead Counsel believe that this request is consistent with established precedent in this District and throughout the Second Circuit, as well as in federal courts throughout the country, as fees equal to and greater than the requested percentage have been awarded in securities class actions to Lead Counsel working on a contingent fee basis and obtaining a common fund for the benefit of the class.

138.    Moreover, a cross-check of the lodestar amply supports the attorneys' fee request. Lead Counsel devoted 2955.55 hours prosecuting this Action equal to a lodestar of $2,272,905.25 from its inception through October 11, 2019.  Thus, the requested fee award represents a negative multiplier and a ***discount*** of Lead Counsel's lodestar.

139.    Further, at Lead Counsel's direction, Lowenstein, Lead Plaintiff's bankruptcy counsel, reports devoting 877.40 hours related to the bankruptcy aspects of the Action, including in the SFX and Sillerman Bankruptcy Proceedings, which Lowenstein indicates would equal a lodestar of $666,295.00 from February 25, 2016 through October 4, 2019 ($15,000 of the

41

lodestar was subtracted from the total as it was paid as part of an initial retainer paid by Lead Counsel). *See* Exhibit 4 to Appendix. Lead Counsel will, thus, need to compensate Lowenstein from their fee award as well for the value of its contribution to achieving the benefits obtained in this Action

140. Although most district courts in the Second Circuit apply the "percentage of the fund" method over the "lodestar" method when determining awards of attorneys' fees in common fund recoveries, Lead Counsel are presenting the information necessary for the Court to use either method for its analysis. Regardless of which fee calculation method is applied, district courts in the Second Circuit also consider the factors enumerated in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000), when determining an award of attorneys' fees. The six *Goldberger* factors are: (1) the time and labor expended by counsel, (2) the magnitude and complexities of the litigation, (3) the risk of the litigation, (4) the quality of representation, (5) the requested fee in relation to the settlement, and (6) public policy considerations. Lead Counsel respectfully submit that an analysis of these criteria demonstrates that the requested fee is abundantly fair and reasonable.

141. In addition, although the *Goldberger* factors do not specifically include the reaction of the class to the fee request, courts in the Second Circuit universally consider the class' reaction when deciding whether to award the requested fee. The Notice disseminated to the Class advised recipients of the fee that Lead Counsel would seek and the maximum amount of expenses that would be requested. To date, not a single objection to Lead Counsel's request for an award of attorneys' fees has been received.

**The Magnitude, Complexities, and the Risk of The Litigation**

142. The magnitude, complexities and the risk of the litigation is described in detail above.

143.    Moreover, Lead Counsel prosecuted this case on a fully contingent basis, committed their own resources, and litigated it without any compensation or guarantee of success.   As set forth in detail above, at the outset, the attorneys representing Lead Plaintiff understood they were embarking on a difficult, complex, expensive and lengthy case.   Lead Counsel understood that the Director Defendants would (and, in fact, did) retain highly experienced large corporate defense firms to mount a vigorous defense, and that there was no guarantee of ever being compensated for the anticipated enormous investment of time and money the case would require.

144.    Undertaking a federal securities action on a contingency is, itself, a high-risk endeavor, with a majority of such cases being dismissed at the pleading stage.   Indeed, according to a NERA Economics Consulting, in 2016 "[f]or the first time since passage of the PSLRA, more cases were dismissed than settled – in fact, almost a third more cases were dismissed than settled. *See* Stephan Boettrich & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2016 Full-Year Review*, NERA Economic Consulting, Jan. 23, 2017, at p. 24.

145.    There are numerous cases in which Lead Counsel, in contingent fee cases such as this, after expenditures of thousands of hours, have received no compensation whatsoever. Counsel know from personal experience that despite the most vigorous and competent of efforts, a law firm's success in contingent litigation such as this is never assured – and that many able plaintiffs' law firms have suffered major defeats after years of litigation (and after expending tens of millions of dollars of time and money) without receiving any compensation at all for their efforts.   However, the Director Defendants and their counsel know that Lead Counsel were prepared and willing to go to trial, which permits meaningful settlement in actions such as this.

146.    Notwithstanding the tremendous risks faced in pursuing this Action, Lead Counsel undertook this Action on a fully contingent basis.   Had Lead Plaintiff not prevailed or

43

achieved a favorable settlement in the Action, Lead Counsel would have sustained a substantial financial loss.

147.   It would also be wrong to ignore the responsibility undertaken by Lead Counsel in agreeing to represent the Class in the Action in terms of foregoing other potential employment during the litigation to assure sufficient resources were dedicated to the prosecution of this Action.  Another factor is the attorney's loss of the use of the money invested during the course of the litigation.  Attorneys representing hourly fee-paying clients are paid immediately, with the money available for investment and the creation of additional revenues.  Such additional revenues are not available to the contingent fee attorney.  Lawsuits such as this Action are exceedingly expensive to litigate.  Outsiders often focus on the gross fees awarded but ignore that those fees are used to fund overhead expenses incurred during the course of many years of litigation, are taxed by federal, state, and local authorities, and, when reduced to a bottom line, are far less imposing to each individual firm involved than the gross fee award might suggest.

**The Quality of the Representation**

148.   The expertise and experience of Lead Counsel is another important factor in setting a fair fee.  As demonstrated by Lead Counsel's firm resume, *see* Exhibit 3 to the Appendix, the attorneys at Brower Piven are experienced and skilled practitioners in the securities litigation field and have a successful track record in securities cases throughout the country – including within this Circuit.

149.   Further, the attorneys at Lowenstein retained for the specialized bankruptcy issues confronted in this litigation are extremely experienced bankruptcy attorneys who assisted Lead Counsel in the various bankruptcy proceedings.  *See* Appendix, Exhibit 4 (Lowenstein Firm Resume).

150.   The quality of the work performed by Lead Counsel in attaining the Settlement

should also be evaluated in light of the quality of the opposition.  Lead Plaintiff was opposed in this case by the highly skilled and respected national firm of Arnold & Porter Kaye Scholer LLP. In the face of this knowledgeable and formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade the Director Defendants to settle.

151.    Moreover, Lead Counsel achieved this outstanding Settlement through their own skill, effort, and initiative.  Lead Counsel received no outside or governmental assistance.  Lead Counsel achieved this result without expending unnecessary time and expenses, or burdening the Court with unnecessary motion practice.

**The Requested Fee Award in Relation to the Settlement**

152.    When determining whether a fee request is reasonable in relation to a settlement amount, the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value.

153.    The requested fee in relation to the settlement favors approval of Lead Counsel's fee request.  While the percentage of fees awarded in securities actions have varied substantially, courts in the Second Circuit and around the country have consistently awarded percentage fees to Lead Counsel that were equal to and, indeed, greater than the fee requested by Lead Counsel herein.  Given the significant amount of time that Lead Counsel were required to expend to successfully prosecute this Action, the present request, the fee is reasonable and should be approved.

**The Labor and Time Expended**

154.    The work undertaken by Lead Counsel in prosecuting this case and arriving at this Settlement in the face of substantial risks has been time-consuming and challenging.  Lead Counsel performed a wide range of tasks necessitated by the complexity of both the underlying facts presented by this case and the sophisticated legal issues that naturally arise under the

federal securities laws.  These efforts are detailed above.

155.    The chart below lists the identity and level of each attorney and paraprofessional at Brower Piven who worked on this Action, each of their current billing rates and the number of hours each devoted to this Action.  Attached as Exhibit 3 to the Appendix, the Brower Piven firm resume describes the backgrounds, education and experience of each of the persons listed below. The total hourly charges of Lead Counsel in this Action, on a current basis (*i.e.*, their "lodestars"), is $2,272,905.25 on 2955.55 hours of time.

**Inception through October 11, 2019**

| Name | Status | Rate | Total Hours | Total Lodestar |
|---|---|---|---|---|
| David A.P. Brower | Managing Director | $995.00 | 963.95 | $959,130.25 |
| Charles J. Piven | Managing Director | $900.00 | 252.3 | $227,070.00 |
| Richard Weiss | (Former) Director | $900.00 | 153.7 | $138,330.00 |
| Yelena Trepetin | Associate | $675.00 | 708.2 | $478,035.00 |
| Daniel Kuznicki | (Former) Associate | $600.00 | 653.0 | $391,800.00 |
| Michael Zoldan | Paraprofessional | $350.00 | 224.4 | $78,540.00 |
|  |  |  |  |  |
| **TOTALS:** |  |  | **2955.55** | **$2,272,905.25** |

156.    Lead Counsel maintained daily control and monitoring of the work performed by lawyers and the paraprofessional on this case.  While I, the senior attorney at my firm, personally devoted substantial time to this case, other experienced attorneys at my firm undertook particular tasks appropriate to their levels of expertise, skill and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels.  Throughout the Action, I allocated work assignments among the attorneys at my firm to avoid unnecessary duplication of effort with the goal of providing efficient, low-cost representation to the Class.

157.    Lead Counsel's billing rates are consistent with (and, indeed, lower than) rates charged in the communities in which they practice, including in the New York City and Baltimore legal communities.  Lead Counsel's rates are also commensurate with (and, again,

lower than) rates charged by attorneys of comparable skill, reputation and experience who specialize in the defense of securities fraud litigation.   *See* Exhibit 5 to the Appendix (Declaration of Professor Geoffrey P. Miller, dated December 15, 2017, at ¶¶58-76, submitted as Exhibit C to the Appendix of Exhibits in support of plaintiff's counsel's motion for attorneys' fees *In re Cnova N.V. Sec. Litig*., No. 1:16-00444, Dkt. No. 137-7 (S.D.N.Y.), before Judge Swain).

158.    The resulting lodestar for Lead Counsel, which excludes all time spent on Lead Counsel's request for attorneys' fees and reimbursement of expenses, is $2,272,905.25.   The total requested fee, therefore, yields a negative multiplier and is fair and reasonable based upon the significant risk of the litigation, the results achieved, the time devoted to the Action, the reputation of counsel, awards in similar cases, and the quality of representation in achieving the excellent Settlement before the Court.

159.    Further, as detailed Exhibit 4 to the Appendix, Lowenstein reports devoting significant time to this case on a contingent basis. If their time were included, the lodestar of Plaintiff's Counsel combined would be a very significant negative multiplier of the maximum award Lead Counsel is requesting for all work expended on behalf of the Lead Plaintiff and the Class in this Action.

### Public Policy Considerations

160.    The United States Supreme Court and countless lower courts have repeatedly and consistently recognized that the public has a strong interest in having experienced and able counsel be incentivized to undertake the risky task, on a contingent basis, of privately enforcing the federal securities laws and related regulations designed to protect investors from the pernicious effects of false and misleading statements made in connection with the issuance or subsequent purchase or sale of publicly-traded securities.   The importance of this public policy is

particularly evident in this case. Government authorities (including the SEC) can only bring a certain amount of securities law enforcement actions against companies at a time.

161.    Without any assistance from any government authority, Lead Counsel has recovered a Settlement Fund on behalf of the Class.  Such recoveries – and the complex, difficult and high-risk litigation necessary to achieve them – are only possible if plaintiffs' counsel is ultimately compensated with fees commensurate with the magnitude of the risk they undertook and the results they achieve.

162.    Based upon all of the foregoing, Lead Counsel submit that their fee request is fair and reasonable and should be granted.

### LEAD COUNSEL'S APPLICATION FOR REIMBURSEMENT OF EXPENSES

163.    Lead Counsel also request $248,214.01 as reimbursement of their and Lowenstein's out-of-pocket litigation expenses reasonably and necessarily incurred by them in the prosecution of this Action.

164.    From the beginning of the case, Lead Counsel and Lowenstein were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Lead Counsel and Lowenstein also understood that, even assuming that the case was ultimately successful, an award of expenses would not compensate them for the loss of the use of those funds advanced to prosecute this Action.  Thus, Lead Counsel and Lowenstein were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

165.    The following chart details the expenses incurred by Lead Counsel by category:

| | |
|---|---|
| Lowenstein Sandler LLP (Retainer) | $15,000.00 |
| Phillips ADR (Mediator) | $26,725.69 |
| Stanford Consulting Group (Damages Expert) | $65,356.00 |
| Global Economics Group (Financial Consultant) | $56,592.50 |
| JND (Claims Administrator) | $46,495.42 |
| Veritext (Deposition Services) | $2,410.94 |
| Outside Document Management Services | $3,821.42 |
| Reproduction/Printing | $3,766.50 |
| Special Supplies (binders, tabs, etc.) | $426.25 |
| Messenger/Postage | $501.19 |
| Computer Research/Lexis | $4,229.57 |
| Court Costs/Transcript/Hard Drive | $627.81 |
| Overtime Secretarial Services | $455.00 |
| Travel/Meals/Hotel (including for local transportation and Lead Plaintiff's deposition in NY) | $9,608.98 |
| **Total** | **$236,017.27** |

166.    As the above chart indicates, the expenses incurred are the types typically and necessarily incurred in modern complex business litigation and the types that courts routinely reimburse in securities and antitrust class actions.  These expenses include the cost of experts and consultants; computer research; photocopying; telephone; postal charges; hand delivery charges; charges for transcripts; the mediators' fees; travel expenses, discovery and the mediation; and other similar case-related costs.

167.    The expenses incurred in this Action are reflected on the books and records of Brower Piven. These books and records are prepared from expense vouchers, check records and other primary source materials, and are an accurate record of the expenses incurred. The bills, receipts and other records reflecting the firm's expenses are available for inspection at the Court's request.

168.    Lowenstein's out-of-pocket litigation expenses are $12,196.74. Those expenses include, *inter alia*, messenger and delivery charges, printing and copying, filing fees, meals, legal research, telecommunication, travel and transcript charges. *See* Appendix, Ex. 4.

169.    I believe the total expenses of Lead Counsel and Lowenstein are reasonable and were necessarily incurred in the prosecution of the Action and obtaining the result achieved for the Class.

170.    Moreover, the total requested reimbursement of expenses of $248,214.01 is far less than the limit of Lead Counsel's prospective request of $800,000 set forth in the Notices. Nevertheless, as of the date of this Declaration, no objections have been received to that higher potential reimbursement request disclosed to Class Members.

### AWARD FOR LEAD PLAINTIFF

171.    Further, the time spent by the Lead Plaintiff in managing the case is properly reimbursable from the Settlement Fund.

172.    The Notice informed the Class that Lead Counsel would request an award for Lead Plaintiff directly related to its representation of the Class.

173.    Lead Plaintiff's declaration from Joanne Sene, a director and employee of Guevoura attesting to the approximate amount of time that she and Jeremy Boujnah, also a director (who travelled from Spain to be deposed in New York as the representative of Lead Plaintiff in connection with class discovery by the Director Defendants), spent on behalf of the Class overseeing the status of the case and supervising Lead Counsel, including regularly discussing the case with Lead Counsel and consulting with Lead Counsel with respect to the proposed settlement, as well as performing tasks such as reviewing pleadings and documents, and gathering documentation in response to discovery requests, is attached as Exhibit 6 to the Appendix.

174.    Accordingly, Lead Plaintiff requests a reimbursement in the amount of $10,000.

**JND's Fees and Expenses**

175.    The above described expenses include the initial expenses for the Court-appointed Claims Administrator for providing the Court-ordered Notice to the Settlement Class,

administering claims or ultimately distributing the Settlement Fund.  To date, JND has incurred

fee and costs for, *inter alia*, set-up and preparation costs for the notice and administration;

printing the Notice and Proof of Claim Form; postage; renting lists of names and addresses of

potential members of the Settlement Class for disseminating the Notice; publishing the

Publication Notice; computer programming and processing claims; maintenance of the web site;

and responding to inquiries from potential claimants.  As permitted by the Preliminary Approval

Order, to date, JND has billed $46,495.42 in fees and expenses relating to its services in

connection with providing notice to the Settlement Class and administrating the Settlement.

Lead Counsel has reviewed JND's billings and believe that they are commercially competitive

and that the fees and expenses were reasonably and necessarily incurred and request Court

approval to pay that bill.  A copy of JND's detailed bill is attached as part of Exhibit 1 to the

Appendix.

176.    Lead Counsel believe that JND will have additional fees and expenses as the

settlement administration process progresses, and Lead Counsel will seek Court approval before

making any such payments to JND.

## CONCLUSION

Based on all the factors discussed above, as well as my extensive experience in the

litigation of securities class actions, I believe that the proposed Settlement is fair, reasonable, and

adequate, and should be approved; that the Plan of Allocation of the net proceeds of the

Settlement, which mirrors the formulas Lead Plaintiff would have used at trial to prove Class

Members' damages, is fair and equitable and should be approved; that Lead Counsel's requested

award of attorneys' fees and reimbursement of litigation expenses are fair and reasonable and

should be granted; and the Lead Plaintiff should be granted reimbursement of its reasonable time

expended in representation of the Class.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 11th day of October 2019 at New York, New York.

/s/ *David A.P. Brower*
David A.P. Brower

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2019, I served true and correct copies of the foregoing Declaration of David A.P. Brower In Support of Lead Plaintiff's Motion for Final Approval of Class Notice, Final Approval of the Proposed Settlement, Final Approval of the Proposed Plan of Allocation, and Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and Fees and Expenses of the Lead Plaintiff (with the Appendix of Exhibits) on all counsel by causing copies to be sent by the ECF system.


 */s/ David A.P. Brower*
David A.P. Brower