**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GUEVOURA FUND LTD., On Behalf of
Itself and All Others Similarly Situated,

               Plaintiff,

    v.

ROBERT F.X. SILLERMAN, D. GEOFFREY
ARMSTRONG, JOHN MILLER and
MICHAEL JOHN MEYER,

               Defendants.

**Case No. 1:15-cv-07192-CM**

**Case No. 1:18-cv-09784-CM**

---

### DECISION AND ORDER APPROVING SETTLEMENT AND GRANTING LEAD COUNSEL'S FEE MOTION

Lead Plaintiff Guevoura Fund Ltd. ("Lead Plaintiff" or "Guevoura"), on behalf of itself and the certified Class, seeks final approval of the settlement agreement between the Class and Defendants D. Geoffrey Armstrong, Michael John Myer, and John Miller (collectively, the "Director Defendants"), as well as Defendant Robert F.X. Sillerman. The Settlement comprises two contributions: the Director Defendants' Contribution in the amount of $6.75 million; and the Sillerman Contribution, in the amount of $750,000, to be designated as a general unsecured dischargeable claim in Sillerman's pending bankruptcy proceeding. The Court granted preliminary approval of this settlement on July 30, 2019. (Dkt. No. 191.) For the reasons sets forth below, it now grants final approval.

Class Counsel Brower Piven, A Professional Corporation ("Lead Counsel" or "Brower Piven") seeks attorneys' fees of one third (33 1/3%) of the Director Defendants' Contribution, as well as one-third (33 1/3%) of the Sillerman Contribution, or portions of it, if it is ever paid, as well as reimbursement of $248,214.01 in litigation and interim administration expenses incurred in the prosecution of this Action. Class Counsel also seeks $10,000 as reimbursement on behalf of the Lead

1

Plaintiff for the time certain of its directors and employees devoted to the prosecution of the Action, as authorized by the Private Securities Litigation Reform Act (the "PSLRA"). Those amounts are approved.

## BACKGROUND

**1.**     Procedural History

The first complaint in this consolidated securities fraud class action was filed on September 11, 2015, in the Southern District of New York, styled *Gutman v. SFX Entertainment, Inc., et al.* (15-cv-7192-CM) (the "Gutman Action"). Original plaintiff Edward S. Gutman brought the action against SFX Entertainments, Inc. ("SFX") and certain of its directors for their allegedly false and misleading statements in connection with the proposed acquisition of SFX by Sillerman, SFX's CEO and largest shareholder. (Dkt. No. 13.) The Gutman Action alleged violations of Sections 10(b) and 20(a) of the Exchange Act, as well as SEC Rule 10b-5.

By an order dated December 8, 2015 (Dkt. No. 60), the Court consolidated *Gutman* with another action based on the same facts brought by Wilfrid Global Opportunity Fund LP, then appointed Guevoura as Lead Plaintiff and Brower Piven as Lead Counsel.

On December 23, 2015, Lead Plaintiff filed the Consolidated Amended Class Action Complaint (Dkt. No 61; the "Complaint"), which remains the operative pleading in this case.

On January 22, 2016, all Defendants filed motions to dismiss the Complaint. (Dkt. Nos. 68-69, 73-75, 78-80.) They argued that Lead Plaintiff fails to allege that the individual defendants made misrepresentations or omissions of material information and that Lead Plaintiff did not adequately plead scienter. On March 4, 2016, Lead Plaintiff opposed the Director Defendants' motions to dismiss, including by arguing that the Director Defendants engaged in manipulation, false and/or misleading statements were made, the statements are not protected, and pointed to

numerous indicia of scienter. (Dkt. No. 100.)  On March 17, 2016, the Director Defendants filed their replies to Lead Plaintiff's opposition. (Dkt. Nos. 101-03.)

In the interim, on February 1, 2016, SFX filed a petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("SFX Bankruptcy Proceeding," Case No. 16-10238-MFW (Bankr. D. Del.)).  On February 2, 2016, this Court stayed all proceedings against SFX pursuant to 11 U.S.C. §362 (Dkt. No. 90), but allowed the case against the Director Defendants and Sillerman to proceed (Dkt. No. 93).  Over the next several months, while the motions to dismiss in this action were still pending, Lead Plaintiff intervened in the SFX Bankruptcy Proceeding to preserve its claims against the corporate entity.

On September 12, 2016, by Memorandum Decision and Order, this Court denied Defendants' the motions to dismiss the Complaint. (Dkt. No. 104.)

On October 26, 2016, Defendant Sillerman and the other Director Defendants filed their Answers to the Complaint, denying all allegations of wrongdoing. (Dkt. Nos. 107, 108.)

On April 18, 2017, Lead Plaintiff, Director Defendants, and Sillerman participated in an all-day mediation with the assistance of former U.S. District Judge Layn Phillips.  The mediation also included parties to a related New York state court case, SFX's director and officer ("D&O") liability insurers, as well as the SFX Litigation Trustee, who was appointed by the bankruptcy court pursuant to SFX's plan of reorganization under Chapter 11 of the Bankruptcy Code.  (*See* Dkt. No. 113.)  The parties were unable to reach a global resolution of the related disputes.

On July 27, 2017, Lead Plaintiff voluntarily dismissed SFX from this action pursuant to Federal Rule of Civil Procedure 41, citing certain orders of the Bankruptcy Court.  (Dkt. No. 117.)

During the fall of 2017, both sides informed this Court that the parties were making "significant progress toward a negotiated resolution."  (Dkt. Nos 120, 122; *see also* Dkt. No. 118.)

As a result, the parties postponed an initial conference to set a discovery schedule and pretrial conference date.

On December 26, 2017, a group of judgment creditors initiated an involuntary bankruptcy proceeding against Sillerman (the "Sillerman Bankruptcy Proceeding"). (*See* Dkt. No. 124.) The parties against asked to postpone the initial conference. On Februayr 2, 2018, Sillerman converted that proceeding to a voluntary bankruptcy under Chapter 11. (*See* Dkt. No. 126.)

On June 19, 2018, this Court stayed the entire case "to allow time for Mr. Sillerman's bankruptcy case to proceed," based on the parties' representation that his case, now converted to a voluntary Chapter 11 bankruptcy, had substantially impaired their ability to settle Lead Plaintiff's claims. (Dkt. No. 131.)

The same day, Lead Plaintiff asserted its rights and the rights of the class in a non-dischargeability action against Sillerman in this Court (*see* No. 1:18-cv-09784-CM docket, Dkt. No. 1 at ¶17), seeking, *inter alia*, a determination that Sillerman's indebtedness to Lead Plaintiff and the Class constitutes a non-dischargeable debt pursuant to 11 U.S.C. §523, in that Sillerman's liability to Lead Plaintiff and the Class is grounded in violations of the federal securities laws.

On December 21, 2018 this Court consolidated the non-dischargeability action with the securities fraud case, and set an expedited schedule governing both, with trial to commence in September 2019. (Dkt. No. 137.) The Court also referred all discovery matters to the Honorable Ona T. Wang, U.S.M.J. (Dkt. No. 136.)

In light of the expedited schedule, counsel for the Director Defendants contacted Lead Counsel to discuss the possibility of re-opening settlement discussions.

Pursuant to the scheduling order, on January 7, 2019, the Director Defendants served their first request for production of documents and their notice of deposition for Lead Plaintiff. on

January 11, 2019, the parties sent a letter to Judge Wang requesting a mediation conference, (Dkt. No. 144), which was scheduled for February 25, 2019.

After the parties had exchanged initial responses to written discovery in early 2019, they stipulated to class certification. This Court certified the agreed-upon class on February 4, 2019. (Dkt. No. 164.)

The parties engaged in document discovery throughout January, February, and March of 2019, including the exchange of initial document disclosure and the production of tens-of-thousands of pages on documents. Lead Counsel also subpoenaed numerous third parties for relevant documents, met and conferred with representatives of the third-parties, and began to review the over half a million of pages of documents provided in total. (Dkt. No. 195-1, Declaration of David Brower ("Brower Decl.") ¶ 69.)

On February 25, 2019, the parties participated in a lengthy settlement conference with Magistrate Judge Wang in which Magistrate Judge Wang met with each of the groups of claimants, the Director Defendants and Sillerman separately. The parties were unable to reach agreement at the mediation.

In the weeks that followed, the parties had a number of telephone calls and electronic communications over the course of the next two weeks concerning the Magistrate Judge's proposal, which, as expected, Abbey would not accept. After seeking and receiving an extension to report the status of the settlement to Magistrate Judge Wang, (Dkt. No. 173), on March 12, 2019, the parties reached an allocation of the consideration available among themselves, which includes the Class receiving $6.75 million in cash from the D&O insurance and $750,000 from an allowed claim in the Sillerman Bankruptcy Proceeding (*i.e.*, the settlement now before this Court), the SFX Litigation Trustee receiving $5.25 million in cash from the D&O insurance and $750,000 from the Sillerman allowed claim, and a group of opt-out plaintiffs – who had been represented by the firm

that had brought the Gutman Action (hereinafter, the "Opt-Out Plaintiffs") – receiving $1.5 million in cash from the D&O insurance and $1 million from the Sillerman allowed claim.

To arrive at the settlement, Sillerman had to seek permission from the Bankruptcy Court in the Sillerman Bankruptcy Proceeding, pursuant to Rule 9019 (the "9019 Motion") of the Federal Rules of Bankruptcy Procedure, to give releases set forth in the Stipulation of the Released Defendants' Claims, to give releases in favor of the D&O insurance carriers, and to take all actions necessary to effectuate the transactions contemplated by the Settlement and to agree to the Sillerman Contribution

Judge Wang recognized that each of these steps would slow the resolution of the Action. On March 13, 2019, she stayed the case to give the parties additional time to finalize the Settlement. (Dkt. No. 174.)  The stay was extended to April 15, 2019, (Dkt. No. 175), and then again to April 30, 2019 following a telephonic status conference with Magistrate Judge Wang. (Dkt. No. 178.)

On April 30, 2019, the Settlement Stipulation was filed with the Court.  (Dkt. No. 180.) Pursuant to Lead Plaintiff's letter motion requesting a stay until Sillerman could file the 9019 Motion, and for the Bankruptcy Court to issue the 9019 Order and for the appeal period to expire, (Dkt. No. 179), Magistrate Judge Wang stayed the Action until July 1, 2019. (Dkt. No. 181.)

After extensive negotiations between all parties and Sillerman's counsel, on May 6, 2019, the 9019 Motion was filed. (Sillerman Bankruptcy Proceeding, Dkt. No. 302.)

On June 26, 2019, the Bankruptcy Court in the Sillerman Bankruptcy Proceeding entered an Order granting the 9019 Motion and authorizing Sillerman to give the releases set forth in Stipulation as to the Released Defendants' Claims, to give releases in favor of the Insurance Carriers, to take all actions necessary to effectuate the transactions contemplated by the Settlement,

and to make the Sillerman Contribution. On June 27, 2019, Lead Plaintiff reported to Magistrate Judge Wang that the 9019 Motion was granted. (Dkt. No. 185.)

On July 18, 2019, Lead Plaintiff filed the Notice of Motion For: (1) Preliminary Approval of Settlement; (2) Approval of Notice to The Class; and (4) Scheduling of a Final Hearing ("Preliminary Approval Motion"). (Dkt. No. 186.)

On July 30, 2019, pursuant to this Court's request, Lead Plaintiff filed a letter with a schedule of all pertinent dates for the settlement approval process. (Dkt. No. 189.) Thereafter, the Court entered the motion for Preliminary Approval. (Dkt. No. 191.)

On December 13, 2019, Lead Plaintiff informed the Court that Defendant Sillerman had died the previous month. (Dkt. No. 200.) His passing is not expected to have any effect on the settlement because a trustee has been appointed to oversee the Sillerman Bankruptcy Proceeding on his estate's behalf.

2.     <u>Substantive Allegations</u>

The factual allegations of the Complaint have been summarized and discussed at length in the Court's decision on Defendant's motion to dismiss. *See Guevoura Fund v. Sillerman*, No. 15-cv-7192, 2016 WL 4939372, at *1–*7 (S.D.N.Y. Sept. 12, 2016). In support of its claims, Lead Plaintiff pled that Sillerman made a sham offer to buy the company in a bid to slow the decline of SFX's stock price and distract the markets from both SFX's disappointing 2014 financial performance and its increasing debt levels. (*See* Compl. ¶¶ 8-9, 76.) Even after Sillerman withdrew his initial proposal, SFX's Special Committee, which included the Director Defendants, indicated that other parties were interested in a potential sale based on the company's false and misleading 2015 guidance.

On November 9, 2015, SFX released its financial results for the quarter ended June 30, 2015. In light of the Company's continued losses, the Company disclosed that "the 2015 full year

financial results will not meet our prior expectations." (*Id.* ¶¶ 182-83.) Shares fell from $0.89 to $0.70 per share on November 10, 2015. (*Id.* ¶ 185.) Then, on November 17, 2015, Sillerman delivered a letter to the Board withdrawing his October proposal. SFX shares declined from an opening price on November 17, 2015 of $0.55 per share to close at $0.44 per share. (*Id.* ¶ 187.) By the time the Complaint was filed, on December 23, 2015, SFX stock was trading at about $0.30 per share.

## DISCUSSION

## I. THE MOTION FOR FINAL APPROVAL OF THE SETTLEMENT IS GRANTED.

### A. The Settlement is Fair, Reasonable, and Adequate.

#### 1. Applicable Standard

The settlement of claims brought by a certified class is subject to court approval after reasonable notice and a hearing. *See* Fed. R. Civ P. 23(e)(l)-(2). A court will approve a settlement if it is "fair, adequate, and reasonable, and not a product of collusion." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 116 (2d Cir.2005) (internal quotations omitted).

This determination falls within the Court's sound discretion. *See Joel A. v. Giuliani,* 218 F.3d 132, 139 (2d Cir.2000). In exercising such discretion, a court should be mindful of the "strong judicial policy in favor of settlements." *Wal-Mart,* 396 F.3d at 116 (internal quotations omitted); *see also In re Sumitomo Copper Litig.,* 189 F.R.D. 274, 280 (S.D.N.Y.1999). Moreover, "Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); *see also Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation.").

"Courts determine the fairness of a settlement by looking both at the terms of the settlement and the negotiation process leading up to it." *In re Telik, Inc. Sec. Litig.,* 576 F.Supp.2d 570, 575 (S.D.N.Y.2008); see *Wal–Mart,* 396 F.3d at 116 (citations omitted). With respect to process, a class action settlement enjoys a strong "presumption of fairness" where it is the product of arm's-length negotiations conducted by experienced, capable counsel after meaningful discovery. *See Wal–Mart,* 396 F.3d at 116; *see also City of Providence v. Aeropostale, Inc.,* No. 11 Civ. 7132(CM), 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014); *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 461 (S.D.N.Y.2004); *Chatelain v. Prudential–Bache Sec., Inc.,* 805 F. Supp. 209, 212 (S.D.N.Y.1992). Indeed, "absent evidence of fraud or overreaching, [courts] consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel." *Trief v. Dun & Bradstreet Corp.,* 840 F. Supp. 277, 281 (S.D.N.Y .1993). This is particularly true in complex class actions, where "the courts have long recognized that such litigation 'is notably difficult and notoriously uncertain,' and that compromise is particularly appropriate." *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.,* 718 F. Supp. 1099, 1103 (S.D.N.Y.1989) (internal citations omitted).

With respect to the substantive terms of a settlement, courts in this Circuit analyze the factors set forth in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974), which include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*Wal–Mart,* 396 F.3d at 117 (quoting *Grinnell,* 495 F.2d at 463) (citations omitted)).

In applying the *Grinnell* factors, a court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a "mini-trial" on the action's merit. *See Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1982).

Here, the proposed Settlement is fair, reasonable and adequate when measured under the *Grinnell* factors. Counsel for the parties have thoroughly weighed the strengths and weaknesses of the claims and defenses thereto and, after a formal mediation session and extensive negotiations facilitated by an independent and experienced mediator, have reached an informed compromise.

**2.** <u>The Settlement is Procedurally Fair as it Was Negotiated at Arm's Length and by Lead Plaintiff and Experienced Counsel.</u>

A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations, and great weight is accorded to counsel's recommendation. *See Wal-Mart*, 396 F.3d at 116; *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001); *In re Veeco Instrum. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85629, at *17 (S.D.N.Y. Nov. 7, 2007) ("'A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate if . . . it was the product of arm's-length negotiations conducted by capable counsel, well-experienced in class action litigation'") (internal citations omitted).[11] "Absent fraud or collusion, the Court should be hesitant to substitute its judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 U.S. Dist. LEXIS 57918, at *12 (S.D.N.Y. July 27, 2007). Where "[c]ounsel for plaintiff is able and experienced, particularly in the specific area with which these actions are concerned," in which case counsel's "judgment is entitled to great weight." *In re Michael Milken*, 150 F.R.D. 57, 68 (S.D.N.Y. 1993).

This presumption of fairness and adequacy applies here because the Settlement was reached by highly experienced, fully informed counsel after extensive arm's-length negotiations with the

assistance of well-regarded mediators. The parties attempted to reach a settlement for many months in 2017, before and after an almost twelve-hour mediation before retired Judge Phillips, but those efforts were derailed by Sillerman being forced into involuntary bankruptcy. Only after months of additional litigation, a second mediation with Magistrate Judge Wang and extensive and complicated follow up arm's-length settlement negotiations between the various competing constituencies seeking to make claims on the available D&O insurance coverage, as well as resolving a plethora of difficult bankruptcy issues, was the Settlement finally reached on March 12, 2019. These efforts lead to further negotiations regarding the terms of the stipulations for the Class, the Opt-Out Plaintiffs and the SFX Litigation Trustee, which needed to dovetail in many respects, as well as the form of the Bankruptcy Rule 9019 Order to be presented to the Sillerman Bankruptcy Court. (*See* Brower Decl. at ¶¶45-50, 72-73, 75, 77-80.)

The active involvement of experienced and independent mediators in the negotiation of the Settlement is strong evidence of the absence of any collusion and further supports the presumption of fairness. *See D'Amato*, 236 F.3d at 85 (a mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"); *In re Giant Interactive Grp., Inc.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (commenting positively on the participation of retired Judge Phillips).

There can also be no question that Lead Counsel was fully informed of the strengths and weaknesses of the Class claims (as well as those of the competing constituencies) by the time the Stipulation was executed. Lead Counsel conducted an extensive factual investigation of Lead Plaintiff's claims, had extensive consultations with their economics, financial and damages consultants and experts, conducted discovery, and had discussions between the parties regarding their respective positions, theories, claims, defenses and responses to those claims and defenses throughout the litigation, including during the mediations. Lead Counsel, who have extensive

experience prosecuting complex securities class actions, submit that the Settlement is not only fair, reasonable, and adequate, but an outstanding result. (*See* Brower Decl. at ¶127); *see also In re IMAX Sec. Litig.*, 283 F.R.D. 178, 189 (S.D.N.Y. 2012) ("great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.") (internal quotation marks omitted); *Chatelain*, 805 F. Supp. At 212 ("A substantial factor in determining the fairness of the settlement is the opinion of counsel involved in the settlement.") (citation omitted).

    **3.**    <u>The Settlement Terms are Fair, Reasonable, and Adequate and Satisfy the Second Circuit's *Grinnell* Factors.</u>

    a.    *Continued Litigation would be Complex, Expensive, and Protracted.*

"The expense and possible duration of the litigation should be considered in evaluating the reasonableness of [a] settlement." *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984). *See also In re Gilat Satellite Networks, Ltd.*, No. 02-1510 (CPS), 2007 U.S. Dist. LEXIS 29062, at *36 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to litigate."). Securities class actions are notoriously complex, and this Action was no different.

Although the parties were at the discovery stage, substantial time and expense that would be involved in continuing to prosecute the Action through trial and the inevitable post-trial motions and appellate proceedings. Simply completing the pre-trial proceedings would have involved considerable additional discovery; taking dozens of depositions; defense of the depositions; preparation of complex expert reports and discovery of the expert witnesses; the negotiation and completion of a complex and voluminous pre-trial order; and extensive briefing on motions for summary judgment, motions to strike experts and other motions *in limine* likely to be made by Lead Plaintiff and by the Director Defendants. All of this had to be done on an expedited basis based on the tight deadlines set by the Court. All of the foregoing would have added significantly to

the time and expense of this Action and, even if Lead Plaintiff was ultimately successful, delayed by years any recovery to the Class. (*See* Brower Decl. at ¶¶108-09); *see also In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, MDL No. 1500, 2006 U.S. Dist. LEXIS 17588, at *33 (S.D.N.Y. Apr. 6, 2006) ("Each step of the way, expenses would continue to accumulate, further decreasing the funds available to Class Members.").

### b. *Reaction of the Class to a Settlement*

"'[T]he absence of objectors may itself be taken as evidencing the fairness of a settlement.'" *PaineWebber*, 171 F.R.D. at 126 (citation omitted); *see also In re Veeco*, 2007, U.S. Dist. LEXIS 85629, at *21-*22 (where no objections and one request for exclusion were received, the Court found this fact to show those affected by the settlement had "overwhelmingly endorsed it") (citing *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362-63 (S.D.N.Y. 2002)). In accordance with the procedures established by the Court's Preliminary Approval Order, an extensive notice program was undertaken in this Action and the proposed Settlement was widely disseminated to SFX's Class Period shareholders. The deadline for objections to the Settlement is November 12, 2019. To date, not a single Class Member has objected or sought exclusion. The absence of negative feedback from Class Members evidences an overall favorable response of the Class Members to the Settlement. Thus, this factor strongly supports approval of the Settlement.

### c. *Lead Plaintiff Had Sufficient Information to Make Informed Decisions as to Settlement.*

In evaluating a settlement, "[t]here is no precise formula for what constitutes sufficient evidence to enable the court to analyze intelligently the contested questions of fact. It is clear that the court need not possess evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation." Newberg & Conte, NEWBERG ON CLASS ACTIONS §11.45 (4th ed. 2002); *see also AOL,* 2006 U.S. Dist. LEXIS 17588, at *36-*37 ("The relevant

inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and  the adequacy of the settlement.").

As discussed more fully above and in the Brower Declaration, Lead Counsel conducted an extensive investigation relating to Lead Plaintiff's claims in the Action and also conducted extensive analysis relevant to the Class Members' claims and the reasonableness of the Settlement. Lead Counsel also consulted with well-respected financial experts concerning the calculation of the potential amounts of recoverable damages during the Class Period, as well as issues concerning loss causation and the Director Defendants' potential defenses to Lead Plaintiff's Class-wide damages estimates. (*See* Brower Decl. at ¶¶ 111-14.) Accordingly, Lead Plaintiff and Lead Counsel were as extremely informed regarding the strengths and weaknesses of their claims and the Director Defendants' defenses when the Settlement was reached and that allowed them to balance the benefits of the Settlement with the risk that Lead Plaintiff may not be able to obtain a larger recovery. Thus, this Action had advanced to a stage where the parties certainly "'have a clear view of the strengths and weaknesses of their cases.'" *Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, No. 01-CV-11814 (MP), 2004 U.S. Dist. LEXIS 8608, at *10 (S.D.N.Y. May 14, 2004) (citation omitted); *In re Drexel Burnham Lambert Group Inc.*, 130 B.R. 910, 916 (S.D.N.Y. Aug. 20, 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992)

          d.      *Lead Plaintiffs Faced Significant Risks in Establishing Liability and Damages.*

In assessing the Settlement, the Court should balance the benefits afforded the Class, including the certainty of a recovery, against the continuing risks of litigation. *See Grinnell*, 495 F.2d at 463; *Global Crossing*, 225 F.R.D. at 459; *see also IMAX*, 283 F.R.D. at190. While the Court sustained Lead Plaintiff's claims against the Director Defendants during the motion to dismiss stage, Lead Plaintiff recognized that it faced substantial risks at later stages with respect to proving liability, loss causation and damages. (Brower Decl. at ¶¶115-19.)

Lead Plaintiff believes it would have succeeded on the merits in this Action. That said, it must acknowledge that it faced the risks of failing to establish one or more of the elements of its claim at trial, such as falsity, scienter, loss causation or damages. For instance, proof of scienter is typically a difficult challenge in a securities fraud action. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (To establish liability under Section 10(b), a plaintiff must prove that a defendant acted with *scienter*, which is "a mental state embracing intent to deceive, manipulate, or defraud."); *see also AOL*, 2006 U.S. Dist. LEXIS 17588, at *39 (noting that "the difficulty of establishing liability is a common risk of securities litigation"); *In re Indep. Energy Holdings, PLC*, No. 00-cv-6689, 2003 U.S. Dist. LEXIS 17090, at *11 (S.D.N.Y. Sept. 29, 2003) (noting difficulty of proving scienter).

Lead Plaintiff also faced substantial risk in proving the existence and amount of damages. Lead Plaintiff would have to prove that "each class member's damages (if any) resulted from defendants' alleged misconduct, and the amount of any such damages." *Global Crossing*, 225 F.R.D. at 459. Again, assuming this case survived pre-trial motions and Lead Plaintiff proved liability, the economic issues concerning damages would have been both complex and hotly contested, requiring expert testimony on sophisticated methodologies, with uncertain results. "The

reaction of a jury to such complex expert testimony is highly unpredictable. Expert testimony about damages could rest on many subjective assumptions, any one of which could be rejected by a jury as speculative or unreliable. Conceivably, a jury could find that damages were only a fraction of the amount that Plaintiffs contended." *In re Lloyd's Am. Trust Fund Litig*., No. 96-cv-1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *61-*62 (S.D.N.Y. Nov. 26, 2002).

Furthermore, the courts have repeatedly recognized that a defendant's bankruptcy in securities cases adds substantially to the difficulties and risks facing plaintiff's counsel in achieving a recovery for a class. *See, e.g.*, *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 U.S. Dist. LEXIS 19210, at *48 (E.D. La. Mar. 2, 2009) ("Because plaintiffs faced considerable risk in litigating the damages element of their claim and are limited in their recovery because of OCA's bankruptcy, this factor weighs in favor of settlement"); *In re Delphi Corp. Sec.*, 248 F.R.D. 483, 497 (E.D. Mich. 2008) (considering the company's bankruptcy under the likelihood of success on the merits factor and approving the settlement); *accord Maley*, 186 F. Supp. 2d at 360 (considering and discussing that the settlement negotiations were conducted against the background of a precarious financial condition, including a possible imminent bankruptcy as part of the settlement approval analysis).

Thus, no matter how confident a plaintiff is of victory, prudence and experience counsel that a successful result, particularly one in a complex class action securities case, is never assured, and that consideration should be credited in favor of approval of the Settlement here.

    e.    *Risks of Maintaining Class Action Status Through Trials*

Although the Class has been certified by the Court on consent following the Director Defendants' class discovery, there is no assurance of maintaining it, as certified, through to judgment as a court is expected to re-evaluate the appropriateness of class and its definition at later stages. *See* FED. R. CIV. P. 23(c)(1)(C). *See Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186

(W.D.N.Y. 2005); *Chatelain,* 805 F. Supp. at 214 ("Even if certified, the class [faces] the risk of decertification."). Here, the Director Defendants "reserved their rights to seek alternation or amendment" to the class certification order, Dkt. No. 164 at ¶10, and did not waive any "defenses, objections or arguments" that they could assert at a later time. *Id.* at ¶11. Given the recent changes in the law governing Federal Rule 23 and the PSLRA, the risk always exists that a change in the law could occur that would result in decertification of the Class.

f.     *Ability to Withstand Greater Judgment*

In assessing a proposed settlement, the Court should consider the defendants' ability to withstand a judgment greater than that secured by settlement. *Grinnell*, 495 F.2d at 463. Moreover, "the ability of defendants to pay more, on its own, does not render the settlement unfair." *McBean v. City of New York*, 233 F.R.D. 377, 388 (S.D.N.Y. 2006). Rather, the reasonableness of the Settlement is better analyzed in light of the amount of the Settlement compared to the substantial risks Lead Plaintiff faced in proving liability and damages, and not on whether the Director Defendants could have paid more.

Here, the D&O insurance coverage is a wasting asset as it pays legal fees of the Director Defendants, as well as providing coverage for the claims asserted in the Action. By continuing with the accelerated schedule set by the Court, each day that the Action was not settled would take away money available for the Class for settlement. Moreover, the Action was complicated by the SFX and Sillerman bankruptcies. Finally, the Opt-Out Plaintiffs and the SFX Litigation Trustee had to be paid from the D&O insurance as well to settle (their D&O insurers insisted on all claims being settled at one time. Given these facts, this factor weighs heavily in favor of the Settlement.

g. *The Settlement Amount is in the Range of Reasonableness in Light of the Best Possible Recovery and All the Attendant Risks of Litigation*

The last inquiries under *Grinnell* are whether the Settlement is reasonable in view of (1) the best possible recovery, and (2) the risks of litigating the case on the merits.[1] In analyzing these factors, the adequacy of the amount offered in settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re IMAX*, 283 F.R.D. at 191-92 (quoting *In re Giant*, 279 F.R.D. at 162). Thus, the Court "must examine whether the settlement amount lies within a 'range of reasonableness,' which range reflects 'the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Id.* at 191 (quoting *Wal-Mart*, 396 F.3d at 119); *Newman*, 464 F.2d at 696 (same); *In re Flag Telecom Holdings, Inc.*, No. 02-CV- 3400, 2010 U.S. Dist. LEXIS 119702, at *42 (S.D.N.Y. Nov. 5, 2010); *see also Indep. Energy*, 2003 U.S. Dist. LEXIS 17090, at *13 (noting few cases tried before a jury result in full amount of damages claimed). To do so, a reviewing court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462.

There are numerous risks involved in litigation and they have already been discussed above and are discussed in further detail in the Brower Declaration. In light of these difficulties

---

[1] Courts typically collapse into this inquiry the final two *Grinnell* factors: "the range of reasonableness of the settlement fund in light of the best possible recovery" and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Grinnell*, 495 F.2d at 463. *Accord Global Crossing*, 225 F.R.D. at 460.

and risks specific to this Action, as well as the more typical risks associated with the types of complex legal and factual issues present in securities class actions, the unpredictability of a lengthy and complex trial, and the appellate process that would most likely follow, the fairness of the Settlement is clearly apparent. *See Maley*, 186 F. Supp. 2d at 366 (noting the many obstacles to plaintiff's ability to prevail on the merits).

Furthermore, the Second Circuit has held that "the fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455; *see also Global Crossing,* 225 F.R.D at 455 (same). Here, by contrast, the Settlement represents a large percentage recovery for the Class that is well above any range of reasonableness – a minimum 57% recovery of Class Members' best possible damages – before attorneys' fees and expenses (excluding the Sillerman Contribution), without even taking into consideration the substantial risks the proceeding entailed. (*See* Brower Decl. at ¶126.)  This Court has frequently found percentage recoveries far lower than the recovery here to be within the range of reasonableness for a settlement. *See, e.g., Merryman v. Citigroup, Inc.*, No. 1:15-09185-CM, Order and Final Judgment, Dkt. No. 159 (S.D.N.Y. July 12, 2019) (approving settlement with 21-24% recovery); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-Civ-8557 (CM), 2014 U.S. Dist. LEXIS 177175, at *25 (S.D.N.Y. Dec. 19, 2014) (approving settlement with 36% recovery); *City of Providence*, 2014 U.S. Dist. LEXIS 64517, at *26-*28 (approving settlement in the recovery range of 9.2% to 21% of estimated damages); *In re Veeco,* 2007 U.S. Dist. LEXIS 85629, at *35 (approving settlement with 23.2% recovery); *Maley,* 186 F. Supp. 2d at 365 (approving settlement with 41% recovery).

In considering the reasonableness of the Settlement, the Court should also consider that the Settlement provides for payment to the Class now, rather than a speculative payment potentially many years down the road. *See Global Crossing,* 225 F.R.D. at 461 ("The prompt, guaranteed payment of the settlement money increases the settlement's value in comparison to some speculative payment of a hypothetically larger amount years down the road.") (quotation omitted); *AOL,* 2006 U.S. Dist. LEXIS 17588, at *44 (where a settlement fund is in escrow and earning interest for the class, "the benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery"). Under all of the above circumstances, the Settlement is not only fair, reasonable, and adequate, but an extraordinary result.

**4.**     The Plan of Allocation is Fair, Reasonable, and Adequate.

The goal of the Plan of Allocation is to distribute equitably the Settlement proceeds to the Class Members who suffered economic losses resulting from the Director Defendants' alleged misrepresentations and omissions. "To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized – namely, it must be fair and adequate." *In re Giant*, 279 F.R.D. at 163 (quoting *In re WorldCom, Inc. Sec. Litig*., 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)); *AOL,* 2006 U.S. Dist. LEXIS 17588, at *58. A plan of allocation is fair and reasonable as long as it has a "reasonable, rational basis." *Flag,* 2010 U.S. Dist. LEXIS 119702, at *61 (quotation omitted). Courts have recognized that "the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *PaineWebber*, 171 F.R.D. at 133; *see also Taft v. Ackermans*, No. 02-7951, 2007 U.S. Dist. LEXIS 9144, at *26 (S.D.N.Y. Jan. 31, 2007) ("If the plan of allocation is formulated by ''competent and experienced class counsel, an allocation plan need only have a 'reasonable, rational basis.'").

Moreover, courts give great weight to the opinion of experienced and informed counsel when assessing a proposed plan of allocation as part of a settlement agreement. *See, e.g.*, *Flag*, 2010 U.S. Dist. LEXIS 119702, at *61; *EVCI*, 2007 U.S. Dist. LEXIS 57918, at *33 ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.").

The proposed Plan of Allocation here was developed by Lead Counsel after consultation with their damages expert, based on his work for Lead Plaintiff in this Action and his calculations of compensable damages. (*See* Brower Decl. Ex. 2, Declaration of Zachary Nye, Ph.D. In Support of the Proposed Settlement and Plan of Allocation, dated October 9, 2019 ("Nye Declaration" or "Nye Decl.") at ¶¶34-35 (describing the development of the Plan of Allocation).) The Recognized Loss calculations under the Plan of Allocation are based on the same per share damages calculations that Lead Plaintiff's damages expert determined for the purposes of estimating the maximum amounts of recoverable damages at trial in response to the alleged corrective disclosures. *See* Nye Decl. at ¶35. It, thus, allocates the Settlement proceeds based on the same formulas that Lead Plaintiff would most likely have offered at trial to prove Class Members' damages. *See id.* As such, it is fair and equitable to claiming Class Members. *See Telik*, 576 F. Supp. 2d at 580 ("A reasonable plan may consider the relative strengths and values of different categories of claims."); *see also Curtiss- Wright Corp. v. Helfand*, 687 F. 2d 171, 173-75 (7th Cir. 1982) (permitting an unequal allocation of a class action settlement fund based on different defenses available against different class members) (relying, in part, on *Beecher v. Able, Inc.*, 575 F. 2d 1010 (2d Cir. 1978)).

Notably, in response to the 12,942 Notices mailed to potential Class Members to date, no objections have been received to the Plan of Allocation. Accordingly, for all of the reasons set

forth herein and in the Brower Declaration and the Nye Declaration, the Plan of Allocation is fair and reasonable.

     **5.**    <u>Notice to the Class Satisfied the Requirements of the PSLRA, Federal Rule of Civil Procedure 23, and Due Process.</u>

In connection with the settlement of a federal class action, FED. R. CIV. P. 23(e)(1)(B) requires the Court to direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise. The adequacy of a class action settlement notice is "measured by reasonableness." *Wal-Mart*, 396 F.3d at 113; *Charron v. Pinnacle Group NY LLC*, No. 07 Civ. 6316, 2012 U.S. Dist. LEXIS 79550, at *27 (S.D.N.Y. June 6, 2012) (quoting *Wal-Mart*). As explained below, each of the requirements of FED. R. CIV. P. 23, the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the applicable case law and due process have been followed scrupulously in this case, both as to procedure and content.

     a.    *The Notice Procedure Was Appropriate.*

The Supreme Court has held that notice must be the best practicable under the circumstances including by first class mail where the names and addresses of the beneficiaries of the settlement are available through reasonable efforts. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176-77 (1974) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 318 (1950)). In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the Supreme Court explained the due process requirements for notice:

> The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires

that the named plaintiff at all times adequately represent the interests of the absent class members.

*Id.* at 812 (citations omitted). "Notice need not be perfect" or received by every class member, *In re Merrill Lynch Tyco Res. Sec. Litig.*, 249 F.R.D. 124, 133 (S.D.N.Y. 2008), but need only be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," *Girault v. Supersol*, No. 1:11 Civ. 6835 (PAE), 2012 U.S. Dist. LEXIS 89976, at *7 (S.D.N.Y. June 28, 2012) (quoting FED. R. CIV. P. 23(c)(2)(B)), in order to meet the requirements of FED. R. CIV. P. 23(c), (e) and (h), and due process.

The notice procedure here sought to reach the greatest number of Class Members possible. Pursuant to the Court's Preliminary Approval Order, 10,998 copies of the Notice were mailed to potential Class Members or their nominees as of October 8, 2019. (*See* Brower Decl. Ex. 1, Declaration of Luiggy ("Segura Declaration" or "Segura Decl.").) The Notice also advised brokers, banks and other nominees holding SFX common stock for beneficial holders in "street name" to either provide the Claims Administrator with the names and addresses of the beneficial holders of those ordinary shares to enable the Claims Administrator to mail them the Notice or to obtain sufficient copies themselves to mail to their customers (they would be reimbursed for their reasonable costs associated with delivering copies of the Notice to their customers). (Segura Decl. at ¶4.)

Additionally, a Publication Notice was published over *PRNewswire* on three (3) separate, staggered days (August 30, September 6, September 13, 2019), advising potential Class Members of the Settlement, the Plan of Allocation and request for attorneys' fees and reimbursement of expenses, and advised potential Class Members of how they could obtain a copy of the full Notice, the Proof of Claim form and additional information through the Claims

Administrator's toll-free telephone number. (Segura Decl. at ¶10.) JND also posted information regarding the Settlement on the website, www.SFXSecuritiesLitigation.com, which it designed, implemented and maintains, and also posted downloadable copies of the Stipulation, as well as both the Notice and Proof of Claim and Release form ("Proof of Claim") and other important case documents. (*Id*. at ¶12.)

The deadline for objections to any aspect of the Settlement or requests for exclusion from the Class expires on November 12, 2019. To date, not a single Class Member has filed an objection to the Settlement or requested exclusion from the Class. (Segura Decl. at ¶13; Brower Decl. at ¶10.)

> b.　*The Content of the Notice was Appropriate.*

> i.　<u>Legal Standard</u>

Federal Rule of Civil Procedure 23 requires a class settlement notice to state the following: (a) the nature of the action; (b) the definition of the class certified; (c) the class claims, issues, or defenses; (d) that a class member may enter an appearance through an attorney if the member so desires; (e) that the court will exclude from the class any member who requests exclusion; (f) the time and manner for requesting exclusion; and (g) the binding effect of a class judgment on members under Rule 23(c)(3). Settlement notices under FED. R. CIV. P. 23 do not need to delve into excessive details about the specifics of the settlement and the legal claims of the parties. The case law is generally in accord that settlement notices should be concise and simple, and information can be supplied by incorporation of and/or by reference to accessible settlement- related documents available through other public sources.[2] Indeed, notice is adequate

---

[2] *O'Brien v. National Prop. Analysts Partners,* 739 F. Supp. 896, 901 (S.D.N.Y. 1990) (class notice need only provide "sufficient guidance as to the major terms and areas of agreement to allow class members to make further inquiry, either by examining the full settlement agreement or by appearing at the settlement hearing"); *see also Cannon v. Texas Gulf Sulphur Co*., 55 F.R.D. 308, 313 n.2 (S.D.N.Y. 1972) (notice was sufficient where it

if the average settlement class member understands the terms of the proposed settlement and the options they have. *Charron*, 2012 U.S. Dist. LEXIS 79550, at *27; *Wal-Mart*, 396 F.3d at 114; *In re ML Tyco*, 249 F.R.D. at 133.

As to fee request disclosures, courts in this Circuit have held that, as with the other terms of the settlement, notice need only be "very general" and contain an "an estimation of attorneys' fees and other expenses." *O'Brien*, 739 F. Supp. at 901. Indeed, "notice of settlement often does not contain detailed information about the amount of fees but simply notifies class members of the fee's outside limit." *Powers v. Eichen*, 229 F.3d 1249, 1255 (9th Cir. 2000). These decisions reflect the "expectation . . . that the fees will be set by the court upon consideration of the evidence, including the objections of nonintervening [sic] class members." *Id.* at 1443.

Moreover, FED R. CIV. P. 23(h) provides that:

In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1)      A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2)      A class member, or a party from whom payment is sought, may object to the motion.

(3)      The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4)      The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

FED R. CIV. P. 54(d)(2) provides that:

---

explained what a class member would receive depending on the factors enumerated therein); *Marshall v. Holiday Magic, Inc*., 550 F.2d 1173, 1178 (9th Cir. 1977) ("The aggregate amount available to all claimants was specified and the formula for determining one's recovery was given. Nothing more specific is needed.").

(A)     Claim to Be by Motion. A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.

(B)     Timing and Contents of the Motion. Unless a statute or a court order provides otherwise, the motion must

     (i)     be filed no later than 14 days after the entry of judgment;

     (ii)     specify the judgment and the statute, rule, or other grounds entitling the movant to the award;

     (iii)     state the amount sought or provide a fair estimate of it; and

     (iv)     disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

In accord with FED. R. CIV. P. 23(h)'s requirements, a fee motion must be filed a reasonable time in advance of the time for class members to object to it or request exclusion from the class. Lead Plaintiff's papers in support of the Settlement and Lead Counsel's actual application for an award of attorneys' fees (and the Brower Declaration in support thereof) are being filed on October 11, 2019 – over a month before the deadline for objections and two months before the scheduled hearing on the fairness of the Settlement and Lead Counsel's fee motion. *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F. 3d 988, 995 (9th Cir. 2010) (construing the timing requirement of FED. R. CIV. P. 23(h)). Further, in securities class actions, Congress set forth specific required contents for notices to class members in PSLRA cases regarding fee applications by successful plaintiffs' counsel. *See* 15 U.S.C §78u-4(a)(7).

ii.     <u>The Content of the Notice Was Appropriate.</u>

The Notice here, clearly meets and exceeds all of the requirements as to content for a class notice.[7] The long-form Notice, *inter alia*: (1) details the terms of the Settlement and the releases that would be exchanged; (2) summarizes the history of the litigation; (3) describes the parties and the Class; (4) discusses the settlement negotiations; (5) discusses Lead Plaintiff's

damages estimates of recoverable damages at trial for the Class; (6) details the Plan of Allocation; (7) details the percentage and per share recoveries to Class Members based on the dates of their purchases and sales, if any, of SFX common stock during the Class Period; (8) details the maximum amount that Lead Counsel would seek in attorneys' fees; (9) describes Class Members' right to request exclusion from the Class or appear through personal counsel of their choosing and/or to object to the Settlement, Plan of Allocation and/or request for attorneys' fees and reimbursement of expenses; (10) specifies the deadlines for asserting these rights and procedures for doing so; (11) provides addresses, a toll-free telephone number and a website where Class Members could obtain additional information; and (12) informs Class Members when Lead Plaintiff's and Lead Counsel's papers in support of the proposed Settlement, Plan of Allocation and request for attorneys' fees and expenses will be filed with the Court and available for their inspection.

The Notice also complies with the settlement notice disclosure requirements of the PSLRA regarding the "statement of plaintiffs' recovery," which states that Class Members' average per share recovery will be $0.37 per share if the Sillerman Contribution is not paid and $0.41 if the Sillerman Contribution is paid; it identifies the attorneys and provides their addresses, it provides information on how to contact Lead Counsel's representatives to obtain additional information, and it contains a brief description of the reasons why the parties are proposing the Settlement. *See* §78u-4(a)(7)(A)-(B) and (D)-(E). The Notice, however, also points out that the "average per share recovery" is not necessarily reflective of Class Members' actual likely recoveries from the Settlement and provides more accurate per share figures in the Plan of Allocation detailed in the Notice based on the various scenarios in which Class Members' transactions in SFX common stock may have occurred during the Class Period.

Indeed, Lead Counsel, with the assistance of their damages expert, provided step-by-step formulas for Class Members to calculate their own, individual Recognized Loss by reference to the Plan of Allocation, and the Notice sets forth the full Plan of Allocation to enable Class Members to preliminarily calculate the value of their claims (subject to the caveat in the Notice that claims will be reduced *pro rata* by the amount that all claims in the aggregate exceed the amount of the Net Settlement Fund). *See Holiday Magic*, 550 F.2d at 1178 (overruling objection to class notice that did not provide description of class members' recoveries where the notice contained the plan of distribution of the settlement proceeds).

The Notice also complies with the attorneys' fee disclosure requirements of the PSLRA by: (a) identifying which counsel intend to make an application for attorneys' fees and costs from the fund established by the settlement for the class; (b) stating the maximum amount of fees and costs that will be sought both as a percentage of the whole and on an average per share basis; and (c) providing a brief explanation supporting the attorneys' fees and costs sought. *See* 15 U.S.C. §78u-4(a)(7)(C). That information is both clearly summarized in the summary section at the beginning of the Notice and set forth in more detail in Section XII of the Notice ("Application For Attorneys' Fees And Expenses").

Regarding the requested award of attorneys' fees and expenses, the Notice recites factors, as required by the plain language of the PSLRA, "supporting the fees and costs sought, including that: substantial time has been devoted to the Action, that Lead Counsel has not been reimbursed, that the fees will be used to compensate counsel for their efforts and their risks of representing the Class on a contingent basis, and that the amount is within the range of fees awarded. It also discusses that the Claims Administrator will be paid and provides the maximum cap. *See* Section XII of the Notice. Furthermore, consistent with this Court's approval of the form and content of

the long-form Notice, the Notice contained all other information that the Court required in its Preliminary Approval Order in compliance with 15 U.S.C. §78u-4(a)(7)(F). In sum, the notice to the Class meets, and indeed exceeds, all requirements of FED. R. CIV. P. 23 (c), (e), and (h), 15 U.S.C. § 78u-4(a)(7) of the PSLRA, the applicable case law and due process.

Lead Plaintiff having arranged an acceptable plan of allocation and served adequate notice on all class members, the motion for final approval of the settlement is approved.

## II.      THE FEE AWARD MOTION IS GRANTED.

### A.      The Percentage of the Fund Method is Appropriate Used in This Case.

Where "an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class, as ... in a securities class action litigation, the attorney is entitled to the reasonable value of the services performed in creating that class recovery, as set by the court." *In re Philip Servs. Corp. Sec. Litig.,* No. 98 Civ. 835, 2007 WL 959299, at *1 (S.D.N.Y. Mar. 28, 2007) (internal citations and quotations omitted). As the Second Circuit observed in *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.:*

> Courts may award attorneys' fees in common fund cases under either the "lodestar" method or the "percentage of the fund" method. The lodestar method multiplies hours reasonably expended against a reasonable hourly rate. Courts in their discretion may increase the lodestar by applying a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys.

396 F.3d 96, 121 (2d Cir.2005) (internal citation omitted).

Nonetheless, "[t]he trend among district courts in the Second Circuit is to award fees using the percentage method." *City of Providence,* 2014 WL 1883494, at *11 (citations omitted).[4] The text of the PSLRA also contemplates using the percentage method, as it provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount" recovered for the class. 15 U.S.C. § 78u–4(a)(6) (emphasis added); *In re WorldCom, Inc. Sec. Litig.,* 388 F.Supp.2d 319, 355

(S.D.N.Y.2005) (the PSLRA expressly contemplates that "the percentage method will be used to calculate attorneys' fees in securities fraud class actions"); *Maley,* 186 F.Supp.2d at 370 (by using this language, Congress "indicated a preference for the use of the percentage method" rather than the lodestar method).

District courts' adoption of the percentage of recovery methodology is consistent with national precedent. *See, e.g., Telik,* 576 F.Supp.2d at 586 & n.7 (citing *Maley,* 186 F.Supp.2d at 370 ("[T]here is a strong consensus-both in this Circuit and across the country-in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery."); *In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 127 F.Supp.2d 418, 430 (S.D.N.Y.2001) ("In recent years, a majority of the Circuit courts have approved the percentage-of-the-fund method."). It is also consistent with the PSLRA, which expressly provides that class counsel are entitled to attorneys' fees that represent a "reasonable percentage" of the damages recovered by the class. *Telik,* 576 F.Supp.2d at 586 (citing 15 U.S.C. § 78u–4(a)(6)). "Congress plainly contemplated that percentage-of-recovery would be the primary measure of attorneys' fees awards in federal securities class actions." *Id.*

Consistent with the approach adopted by the *Goldberger* court, the practice of district courts in this Circuit and nationally, and the relevant portions of the federal securities laws, the percentage-of-recovery approach is the appropriate methodology for awarding attorneys' fees in this action.

**B.      The Requested Fee is Fair and Reasonable Under the Percentage Method.**

Lead Counsel is seeking a fee award of 33 1/3% of the total settlement fund.

"In this Circuit, courts routinely award attorneys' fees that run to 30% and even a little more of the amount of the common fund." *Beacon,* 2013 WL 2450960, at *5. Courts in this District have approved percentage-based fee awards comparable to the amount requested

here. *See City of Providence,* 2014 WL 1883494, at *20 (awarding 33% of $15 million settlement); *Fogarazzo v. Lehman Bros. Inc.,* No. 03 Civ. 5194, 2011 WL 671745, *4 (S.D.N.Y. Feb. 23, 2011) (awarding 33.3% of $6.75 million settlement); *In re Giant,* 279 F.R.D. at 165 (awarding 33% of $13 million settlement); *In Van Der Moolen Holding N.V. Sec. Litig,* No. 03 Civ. 8284, slip. op. at 2 (S.D.N.Y. Dec. 7, 2006) (awarding 33 1/3% of $8 million settlement) (ECF No. 45) (Ex. 11); *Maley,* 186 F.Supp.2d at 367–68 (awarding 33 1/3% of $11.5 million settlement and citing two cases which awarded 33 1/3% of the settlement amount); *In re Apac Teleservs., Inc. Sec. Litig.,* No. 97 Civ. 9145, slip op. at 2 (S.D .N.Y. June 29, 2001) (Docket # 54) (awarding 33 1/3% of $21 million settlement); and *Newman v. Caribiner Int'l Inc.,* No. 99 Civ. 2271 (S.D.N.Y. Oct. 25, 2001) (Docket # 31) (awarding 33 1/3 of $15 million settlement); *see also Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar,* No. 06 Civ. 4270, 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (collecting cases awarding over 30% and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit."); *Khait v. Whirlpool Corp.,* No. 06 Civ. 6381, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding 33% of $9.25 million settlement).[3]

### C.     The *Goldberger* Factors Support the Requested Award of Attorneys' Fees.

Regardless of which of the recognized methods the Court applies, courts in the Second Circuit consider traditional criteria that reflect a reasonable fee in common fund cases, including:

---

[3] Courts in other federal jurisdictions similarly have determined that a fee award of 33% or more is reasonable and should be awarded. *See, e.g., Grant Barfuss v. DGSE Companies, Inc., et al.,* No. 12 Civ. 3664 (N.D.Tex. Oct. 21, 2013) (Docket # 59) (awarding 33% of $1.7 million settlement); *In re Pilgrim's Pride Corp. Sec., Litig.,* No. 08 Civ. 419 (E.D.Tex. May 2, 2012) (Docket # 85) (awarding 34% of $1.5 million settlement); *In re Heritage Bond Litig,* No. 02 ML 1475, 2005 WL 1594403, at *23 (C.D. Cal. June 10, 2005) (awarding 33 1/3% of $27.278 million settlement); *In re Corel Corp. Inc. Sec. Litig.,* 293 F.Supp.2d 484, 498 (E.D.Pa.2003) (awarding 1/3% of $7 million settlement); *In re E.W. Blanch Holdings, Inc. Sec. Litig.,* No. 01 Civ. 258, 2003 WL 23335319, at *3 (D. Minn. June 16, 2003) (awarding 33 1/3% of $20 million settlement); *In re Green Tree Fin. Corp. Stock Litig.,* Nos. 97–2666 and 97–2679, slip. op. at 9 (D. Minn. Dec. 18, 2003) (awarding 33 1/3% of $12.45 million settlement) (Docket # 140).

(i) the time and labor expended by counsel; (ii) the risks of the litigation; (iii) the magnitude and complexity of the litigation; (iv) the requested fee in relation to the settlement; (v) the quality of representation; and (vi) public policy considerations. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). Lead Counsel respectfully submit that an analysis of these six *Goldberger* factors, as well as an analysis under the percentage-of-the-fund and lodestar methods, demonstrates that their fee request is reasonable and appropriate and should be approved by the Court in full

    **1.**    <u>Lead Counsel Has Devoted Significant Time and Labor to this Action</u>

The starting point for any lodestar analysis is the calculation of the lodestar -- which is "comprised of the amount of hours devoted by counsel multiplied by the normal, non-contingent hourly billing rate of counsel." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 985 F. Supp. 410, 414 (S.D.N.Y. 1997). In total, as set forth in the lodestar submissions attached to the Brower Declaration, Lead Counsel devoted 2955.55 hours to this Action. (Brower Decl. at ¶155.) Accordingly, the requested fee in this Action not only represents a reasonable percentage of the benefit obtained, but also represents a discount of the lodestar amount. (Brower Decl. at ¶158.)

The Settlement now before the Court is the culmination of over three and a half years of extensive litigation and the many hours of hard work by Plaintiff's Counsel. Lead Counsel secured the Settlement due to the exhaustive efforts they exerted in this matter including, *inter alia*: (i) conducting a factual investigation into the Class' claims that included a review and analysis of information obtained from various public sources; (ii) using the investigation to draft the Consolidated Amended Class Action Complaint (Dkt. No. 61); (iii) successfully opposing the motions to dismiss; (iv) certifying the Class; (v) completing extensive document discovery that ultimately involved the review and organization of tens of thousands of pages of documents produced by the Director Defendants and the various SFX entities, and over half a million of

pages of documents provided in total from third-parties subpoenaed by Lead Counsel; (vi) developing an in-depth understanding of the complex and unique factual issues involved in this Action and in the bankruptcy proceedings; (vii) litigating various substantive motions in the SFX Bankruptcy Proceeding in Delaware Bankruptcy Court where Plaintiff's Counsel obtained valuable concessions as part of SFX's plan of reorganization; (viii) preserving and litigating the Class claims in the Sillerman Bankruptcy Proceedings; and (ix) consulting extensively with consultants and experts in the areas of damages and market efficiency. As noted above, Lead Counsel respectfully direct the Court to the Brower Declaration for the details of Plaintiff's Counsel's efforts.

The negotiations leading up to the Settlement also required exhaustive and accelerated efforts by Lead Counsel. The parties engaged in extended and complicated arm's-length settlement negotiations in July 2017, not only with counsel for the Director Defendants, but with counsel for the SFX litigation Trustee and the Opt-Out Plaintiffs. Those efforts, however, were derailed by then defendant Sillerman being forced into involuntary bankruptcy.

Due to limited financial resources, including due to Sillerman being in bankruptcy and the wasting D&O insurance policies that had to pay for the global settlement (*see* Brower Decl. ¶124), reaching a settlement that would ensure a benefit to the Class required significant time, effort and ingenuity on behalf of all the parties.  Only after a second mediation with Magistrate Judge Ona T. Wang and extensive and complicated follow up arm's-length negotiations, which included bankruptcy counsel for Lead Counsel, the Director Defendants and Sillerman, was the Settlement finally reached on March 12, 2019. (*See* Brower Decl. at ¶¶72-73.)[4]  Absent Lead

---

[4] Furthermore, Lead Counsel will continue to perform legal work on behalf of the Class should the Court approve the proposed Settlement.  Additional resources will be expended assisting Class Members with their Proofs of Claim and related inquiries and working with JND to ensure the

Counsel's experience and skill in securities class action litigation, it would have been a virtually insurmountable task to complete the negotiations and necessary paperwork for a complex settlement of this type.

**2.** Lead Counsel's Hours and Hourly Rates are Reasonable Using the Lodestar Method.

a. The labor dedicated justifies the Attorneys' Fees requested.

The starting point for any lodestar analysis is the calculation of the lodestar -- which is "comprised of the amount of hours devoted by counsel multiplied by the normal, non-contingent hourly billing rate of counsel." *Prudential*, 985 F. Supp. at 414. In total, as set forth in the lodestar submissions attached to the Brower Declaration, Lead Counsel devoted 2955.55 hours to this Action. (Brower Decl. at ¶155.) Accordingly, the requested fee in this Action not only represents a reasonable percentage of the benefit obtained, but also represents a discount of the lodestar amount. (Brower Decl. at ¶158.)

The Settlement now before the Court is the culmination of over three and a half years of extensive litigation and the many hours of hard work by Plaintiff's Counsel. Lead Counsel secured the Settlement due to the exhaustive efforts they exerted in this matter including, *inter alia*: (i) conducting a factual investigation into the Class' claims that included a review and analysis of information obtained from various public sources; (ii) using the investigation to draft the Consolidated Amended Class Action Complaint (Dkt. No. 61); (iii) successfully opposing the motions to dismiss; (iv) certifying the Class; (v) completing extensive document discovery that ultimately involved the review and organization of tens of thousands of pages of documents produced by the Director Defendants and the various SFX entities, and over half a million of

smooth progression of claim processing and moving the Court for a final distribution order.

pages of documents provided in total from third-parties subpoenaed by Lead Counsel; (vi) developing an in-depth understanding of the complex and unique factual issues involved in this Action and in the bankruptcy proceedings; (vii) litigating various substantive motions in the SFX Bankruptcy Proceeding in Delaware Bankruptcy Court where Plaintiff's Counsel obtained valuable concessions as part of SFX's plan of reorganization; (viii) preserving and litigating the Class claims in the Sillerman Bankruptcy Proceedings; and (ix) consulting extensively with consultants and experts in the areas of damages and market efficiency. As noted above, Lead Counsel respectfully direct the Court to the Brower Declaration for the details of Plaintiff's Counsel's efforts.

The negotiations leading up to the Settlement also required exhaustive and accelerated efforts by Lead Counsel. The parties engaged in extended and complicated arm's-length settlement negotiations in July 2017, not only with counsel for the Director Defendants, but with counsel for the SFX litigation Trustee and the Opt-Out Plaintiffs. Those efforts, however, were derailed by Sillerman being forced into involuntary bankruptcy.

Due to limited financial resources, including due to Sillerman being in bankruptcy and the wasting D&O insurance policies that had to pay for the global settlement, (*see* Brower Decl. ¶124), reaching a settlement that would ensure a benefit to the Class required significant time, effort and ingenuity on behalf of all the parties. Only after a second mediation with Magistrate Judge Ona T. Wang and extensive and complicated follow up arm's-length negotiations, which included bankruptcy counsel for Lead Counsel, the Director Defendants and Sillerman, was the Settlement finally reached on March 12, 2019. (*See* Brower Decl. at ¶¶72-73.) Absent Lead Counsel's experience and skill in securities class action litigation, it would have been a virtually

insurmountable task to complete the negotiations and necessary paperwork for a complex settlement of this type.

b.    <u>The rates charged are reasonable.</u>

The second step in the lodestar analysis is to test the reasonableness of the current billing rates charged by plaintiff's counsel. In determining the propriety of the hourly rates charged by counsel in class actions, courts have continually held that the standard is the rate charged in the community where the services were performed for the type of service performed by counsel. *See, e.g., Luciano v. Olsten Corp.*, 109 F.3d 111, 115-16 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'") (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (appropriate rate in performing lodestar analysis is "the rate 'normally charged for similar work by attorneys of like skill in the area,' taking into account factors such as the experience of the attorney performing the work and the type of work performed") (quoting *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir. 1977)).

Lead Counsel's rates are entirely reasonable and courts in this Circuit have repeatedly approved attorneys' fees for Lead Counsel here based on their billing rates. *See, e.g.*, *In re Cnova N.V. Sec. Litig.*, No. 1:16-00444, Final Judgment and Order of Dismissal, Dkt. No. 148 (S.D.N.Y. Mar. 20, 2018) (Swain, J.); *Landmen Partners Inc. v. Blackstone Grp. L.P.*, No. 08-CV-03601-HB-FM, 2013 U.S. Dist. LEXIS 190908, at *9 (S.D.N.Y. Dec. 18, 2013) (Baer, J.); *The Pennsylvania Avenue Funds v. INYX Inc. et al.*, 1:08-cv-06857 (PKC), Final Order and Judgment, Dkt. No. 299 (S.D.N.Y. May 4, 2012) (Castel, J.); *Freudenberg v. E*Trade Fin. Corp.*, No. 07-8538, Final Judgment and Order of Dismissal, Dkt. No. 154 (S.D.N.Y. Oct. 22, 2012) (Oetken, J.). *see also* Exhibit 5 to Appendix (Declaration of Professor Geoffrey P. Miller,

36

dated December 15, 2017, at ¶¶58-76, submitted in *In re Cnova N.V. Sec. Litig.*).  Further, courts

in this District and around the country have repeatedly found rates charged by Lead Counsel in

class actions that are comparable to this Action to be reasonable given the nature of such work

and the risks associated with financing class actions for long periods of time -- in this case, over

three and a half years.

c.    The application of a negative multiplier.

Courts have continually recognized that, in instances where a lodestar analysis is

employed to calculate attorneys' fees or used as a "cross check" for a percentage of recovery

analysis, counsel may be entitled to a "multiplier" of their lodestar rate to compensate them for

the risk assumed by them, the quality of their work and the result achieved for the class.[5]

Accordingly, multipliers of between three and four times a successful plaintiff's counsel's

lodestar have been routinely awarded in this Circuit.  *See, e.g.*, *Maley*, 186 F. Supp. 2d at 369

(awarding fee equal to 4.65 multiplier, which was "well within range awarded by courts in this

Circuit and courts throughout the country"); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187

F.R.D. 465, 489 (S.D.N.Y. 1998) (approving multiplier of 3.97 and noting that "'[i]n recent

years multipliers of between 3 and 4.5 have become common'") (citation omitted); *EVCI*, 2007

U.S. Dist. LEXIS 57918, at *56 (2.48 multiplier "is within the range found to be reasonable").

Here, Lead Counsel devoted 2,955.55 hours to this Action, equaling $2,272,905.25 in

billable time.  As a result, Lead Counsel's request amounts to less than the straight time spent on

this case, without any augmentation, for Lead Counsel's time alone.  Brower Decl. at ¶¶155.  In

other words, Lead Counsel's request for attorneys' fees reflects a discount on the time Lead

---

[5] *See, e.g.*, *Goldberger*, 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement.") (citation omitted); *see also Prudential*, 985 F. Supp. at 414.

Counsel actually spent litigating the matter and requires the application of a ***negative multiplier*** to the lodestar. Further, as detailed Exhibit 4 to the Appendix, Lowenstein reports devoting significant time to this case on a contingent basis. If their time were included, the combined lodestar of Plaintiff's Counsel would be a very significant negative multiplier of the maximum award Lead Counsel is requesting for all work expended on behalf of the Lead Plaintiff and the Class in this Action. This fact militates very in favor of the reasonableness of the fee request, particularly in light of the fact that courts generally grant fees with positive multipliers to reflect the complexity and risks undertaken by class counsel.

Courts have repeatedly recognized that the reasonableness of the fee request under the percentage method is reinforced where, as here, "the percentage fee would represent a negative multiplier of the lodestar." *In re Blech Sec. Litig.*, 94 CIV. 7696 (RWS), 2000 WL 661680, at \*5 (S.D.N.Y. May 19, 2000); *see also Spann v. AOL Time Warner,* No. 02 Civ. 8238DLC, 2005 WL 1330937, at \*8-\*9 (S.D.N.Y. June 7, 2005) (approving attorneys' fees of one-third of the settlement fund where "Lead Counsel's lodestar amount exceed[ed] by several thousand dollars the amount of fees requested as part of the Settlement Agreement"). Indeed, "the fact that any reasonable fee would necessarily represent a negative multiplier of the lodestar supports an award at the higher end of the spectrum." *In re Sterling & Foster, Inc. Sec. Litig.*, 238 F. Supp. 2d 480, 490 (E.D.N.Y. 2002) (quoting *Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*, No. 96 Civ. 0583, 2002 WL 1315603, at \*2 (S.D.N.Y. June 17, 2002)); *Nilson v. York County*, 400 F. Supp. 2d 266, 271 (D. Me. 2005) ("When the lodestar cross-check shows that the percentage fee is lower than the fee the lawyers have accrued on a time-and-service basis, it is relatively easy to support a percentage-based fee."). Thus, the lodestar approach also clearly demonstrates that Plaintiff's Counsel's fee request is reasonable.

### 3. The Complexity, Duration, and Magnitude of the Litigation Weigh in Favor of Approval

This case, like virtually all securities actions, was inherently complex. *See In re Gilat Satellite Networks, Ltd.*, CV-02-1510 (CPS), 2007 U.S. Dist. LEXIS 29062, at *36 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to litigate."); *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005) (evaluating complexity of securities class actions in comparison to other securities fraud class actions). Furthermore, absent the Settlement, Class Members may not benefit from a recovery, if any, for years. When taking into consideration the risks of a trial and the inevitable appeals that would have followed, *see In re Bristol-Myers Squibb*, 361 F. Supp. 2d at 234, coupled with the bankruptcy issues and proceedings that this case was subject to, *see Maley*, 186 F. Supp. 2d at 360 (discussing the imminent bankruptcy as part of the complexity of the litigation analysis for the award of attorneys' fees); *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2009 U.S. Dist. LEXIS 19210, at *67 (E.D. La. Mar. 2, 2009) ("This case was further complicated by OCA's bankruptcy, for which Lead Counsel had to retain separate bankruptcy counsel"); *In re Delphi Corp. Sec.*, 248 F.R.D. 483, 503 (E.D. Mich. 2008); *In re Harrah's Entm't*, No.95-3925, 1998 U.S. Dist. LEXIS 18774, at *15-*16 (E.D. La. Nov. 24, 1998), Lead Counsel's ability to tackle a case of substantial magnitude and complexity and produce a highly beneficial result for the Class fully supports the requested fee.

### 4. The Risks of the Litigation Warrant Approval

The Second Circuit has identified "the risk of success as 'perhaps the foremost' factor to be considered in determining [a reasonable award of attorneys' fees]." *Goldberger*, 209 F.3d at 54; *In re Telik*, 576 F. Supp. 2d at 592 ("Courts have repeatedly recognized 'that the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award to Lead

Counsel in class actions."). Here, Lead Counsel faced significant risks to obtaining a recovery for the Class or collecting upon such a recovery if the Action continued, and, thus, receive no payment for their efforts.

### (1)    *The Risk to Establishing Liability and Damages*

As in any securities litigation, Lead Plaintiff faced risks at later stages of litigation, including at trial and on appeal of prevailing on his securities fraud claims. *See In re Michael Milken & Assoc. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (when evaluating securities class action settlements, courts have long recognized such litigation to be "'notably difficult and notoriously uncertain'") (quoting *Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973)). Further, while Lead Counsel were confident that they would ultimately prevail on the merits, the risk of non-collectability of a judgment greater than the Settlement was very real.

### (2)    *The Risk of Contingent Litigation*

Lead Counsel also undertook this Action over three and a half years ago on an entirely contingent fee basis, assuming the risks of surviving dispositive motions, obtaining class certification, proving falsity, scienter, loss causation and damages, and litigating the Action through trial and likely appeals. *See In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 432-33 (S.D.N.Y. 2001) ("[It is] appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award.") (citing *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987)); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 747 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("Numerous cases have recognized that the attorneys' contingent fee risk is an important factor in determining the fee award.").

Lead Counsel understood from the outset that they were embarking on a complex, and potentially expensive and lengthy litigation, which would require the investment of thousands of hours of attorney time, with no guarantee of ever being compensated for their investment of such

time and money.  Lead Counsel understood that the Director Defendant, in particular Sillerman, would (and, in fact, did) vigorously defend this Action, Brower Decl. at ¶¶143-47, as well as his rights in the Bankruptcy Court.

In undertaking this risk, Lead Counsel were obligated to ensure that sufficient attorney resources were dedicated to the prosecution of this Action.  Moreover, Lead Counsel has not been compensated for any of their time or expenses during the time the Action has been pending. Despite the risk of receiving no payment if their efforts proved futile, Lead Counsel alone advanced over two million dollars of time and expenses in litigating the Class' claims. *See In re Tyco Int'l, Ltd. Sec. Litig.*, 535 F. Supp. 2d at 268 (noting that "had [Lead Counsel] lost on summary judgment or fallen short of establishing liability at trial, they would have lost the [hundreds of thousands] of dollars in expenses and all of the attorney time that they collectively invested in the case"); *Maley*, 186 F. Supp. 2d at 372 ("Class Counsel undertook a substantial risk in absolute non-payment in prosecuting this action, for which they should be adequately compensated.").

In addition to advancing litigation expenses and paying their not insubstantial overhead required to provide the Class with the services of up-to-date modern law firms, Lead Counsel was mindful that in numerous cases, class counsel working on a contingent basis, such as this, have expended thousands of hours only to receive no compensation.  There have been many hard-fought lawsuits where, because of (i) the discovery of facts unknown when the case was commenced, (ii) changes in the law while the case was pending, or (iii) decisions of judges or juries following a trial on the merits, that excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.  Losses such as these are exceedingly expensive.

Thus, there existed a demonstrable risk that Plaintiff's Counsel would invest substantial efforts and receive nothing, and this factor counsels strongly in favor of the fee request.

     **5.**    The Quality of Representation Favors Approval of Lead Counsel's Fees

In evaluating the "quality of representation," courts in the Second Circuit have "review[ed] the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008). Lead Counsel, Brower Piven, practices extensively in the highly complex field of representative shareholder and securities litigation and has successfully litigated these types of actions in courts throughout the country. The experience of Lead Counsel is set forth in Exhibit 3 to the Appendix. Although circumstances in this case significantly changed during its course due to the SFX and Sillerman bankruptcies, Lead Counsel continued to vigorously prosecute the case even as the sources of recovery dwindled. In a similarly difficult case, United States District Judge P. Kevin Castel of this Court remarked regarding Brower Piven where the court awarded fees in the amount of one-third of the Class recovery:

> I have considered the experience of plaintiff's counsel. Mr. Brower of Brower Piven has done a remarkable job in this case. It has not been easy going for him, it hasn't been easy going for the defendants, nor has this been the easiest case for the Court. But he has stayed with it, and I suspect that it may have been the kind of case that there may have been days and hours where class counsel wondered whether from a personal standpoint the best decision was to take on the case. I can readily understand why that might be the case; yet, as a fiduciary having signed on, there is, thereafter, no choice but to bring the ship into port one way or another and ride it to conclusion, and Mr. Brower has done that.

*The Pennsylvania Avenue Funds v. INYX Inc. et al.*, 1:08-cv-06857 (PKC), Transcript of Proceedings on May 4, 2012 (Dkt. No. 300). Lead Counsel pressed this case no less vigorously.

Additionally, the attorneys who worked on this case at Lowenstein are highly experienced bankruptcy specialists, whose qualifications are detailed in Exhibit 4 to the

Appendix, and their involvement on behalf of the Lead Plaintiff was necessary to lead Plaintiff's ability to successfully navigate the SFX and Sillerman Bankruptcy Proceedings.

6.  <u>The Requested Fee in Relation to the Settlement is Reasonable.</u>

Regardless of which method a court uses to award attorneys' fees, the award must be reasonable under the circumstances of the particular case. *See Goldberger,* 209 F.3d at 47. The Supreme Court has held that an appropriate fee is intended to approximate what counsel would receive if they were bargaining for the services in the marketplace. *See Missouri v. Jenkins,* 491 U.S. 274, 285–86 (1989). As discussed above (*see supra* Section II.A), the 33 1/3% fee requested by Lead Counsel in this Action is consistent with percentage fees awarded in this Circuit and nationwide for comparable recoveries. Indeed, this Court has previously granted one-third of the recovery in attorneys' fees in securities class actions. *See, e.g.*, *Merryman v. Citigroup, Inc.*, No. 1:15-09185-CM, Order Awarding Attorneys' Fees and Reimbursement of Litigation Expenses, Dkt. No. 163 (S.D.N.Y. July 12, 2019) (33 1/3%); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-Civ-8557 (CM), 2014 U.S. Dist. LEXIS 177175, at *46 (S.D.N.Y. Dec. 19, 2014) (33 1/3%); *City of Providence v. Aéropostale, Inc.*, No. 11-7132, 2014 U.S. Dist. LEXIS 64517, at *39 (S.D.N.Y. May 9, 2014) (33%); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 374 (S.D.N.Y. 2002) (33 1/3%).

7.  <u>Public Policy Considerations</u>

The Second Circuit has also held that "public policy considerations" should be afforded weight when determining the fee awarded to plaintiffs' counsel in class actions. *See Flag Telecom*, 2010 U.S. Dist. LEXIS 119702, at *83 ("[p]ublic policy concerns favor the award of reasonable attorneys' fees in class action securities litigation); *ML Funds*, 2007 U.S. Dist. LEXIS 9450, at *69 (same). Private lawsuits, such as this, serve to further the objective of the federal securities laws to protect investors and consumers against fraud and other deceptive practices.

43

*Eltman v. Grandma Lee's, Inc.*, No. 82 Civ. 1912, 1986 U.S. Dist. LEXIS 24902, at *25 (E.D.N.Y. May 28, 1986); *see also Bateman Eichler*, 472 U.S. at 310 (holding that lawsuits brought by investors provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action'") (citations omitted); *Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered.").

The Second Circuit has taken into account the social and economic value of class actions and the need to encourage counsel to undertake such litigation. *See, e.g., Alpine Pharmacy v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973). As a practical matter, class actions can be maintained only if competent counsel can be obtained to prosecute them. This will occur if courts award reasonable and adequate compensation for their services where successful results are achieved. As former Chief Judge Brieant stated in *Union Carbide*, 724 F. Supp. at 169:

> [a] large segment of the public might be denied a remedy for violations of the securities laws if contingent fees awarded by the courts did not fairly compensate counsel for the services provided and the risks undertaken.

Here, the Settlement was achieved despite the absence of any assistance from the government agencies. Thus, Lead Counsel's willingness to assume the risks of this litigation resulted in the *only* recovery for the Class. *See In re Priceline.com, Inc. Sec. Litig.*, No. 00 Civ. 1884 (AVC), 2007 U.S. Dist. LEXIS 52538, at *17 (D. Conn. July 20, 2007) ("the award of the percentage requested here will encourage enforcement of the securities laws and support attorneys' decisions to take these types of cases on a contingent fee basis").

Indeed, for most Class Members, this Action was the only hope of obtaining compensation for the losses they suffered as a result of the allegations here, so a class action was

the most efficient manner in which to prosecute the claims of Class Members. Thus, public policy favors granting Lead Counsel's request for fees.

### B. Absence of Objections to the Fee Request Further Demonstrates  is Reasonable

As discussed in the accompanying Brower Declaration, 12,942 copies of the Notice were disseminated to potential Class members and the Publication Notice was published on three staggered occasions over the leading national business newswires.  The notice described the fee request in detail.  The Notice also indicated that all Class Members had the right to object to the fee request and when and how to lodge any such objection.  The deadline for objections is November 12, 2019.  To date, no object to the fee request has been received.  The lack of objections, in this day and age, is not only remarkable, but militates in favor of approval of the Fees as requested.

### III. LEAD COUNSEL'S REQUEST FOR REIMBURSEMENT IS GRANTED.

Plaintiff's Counsel also request reimbursement of their out-of-pocket expenses, in the amount of $248,213.01, incurred in connection with the prosecution of the Action on behalf of the Class.  It is well established that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class.  *See, e.g., Teachers' Ret. Sys.*, 2004 WL 1087261, at *6; *Am. Bank Note*, 127 F. Supp. 2d at 430.  Particular costs are compensable if they are of the type normally billed by attorneys to paying clients.  *E.g., Mitland Raleigh-Durham v. Myers*, 840 F. Supp. 235, 239 (S.D.N.Y. 1993).  Courts have awarded such expenses so long as counsel's documentation of them is "adequate."  *NASDAQ*, 187 F.R.D. at 489.

Lead Counsel's expenses were spent on Lead Plaintiff's investigation, experts, photocopying of documents, on-line research, messenger services, postage, express mail, the retainer for bankruptcy counsel, Lowenstein, discovery, travel, including the requisite

international travel for the representative of Guevoura to appear for its class deposition, and other incidental expenses directly related to the prosecution and settlement of this Action. Brower Decl. at ¶165; Exhibit 4 to the Appendix. That amount also includes the fees and expenses charged by Lead Plaintiff's financial experts and the fees and expenses of Judge Layn R. Phillips, the private mediator used by the parties on April 18, 2017. Finally, the expenses requested for reimbursement also include the interim charges by JND, the Court appointed Claims Administrator for $46,495.42. These expenses are of the type that law firms typically bill to their clients. *See In re Independent Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients.") (internal quotation marks omitted). The items of out-of-pocket expense listed by Lowenstein, *see* Appendix, Ex. 4, are similarly the types of expenses customarily incurred by counsel representing clients in the bankruptcy courts.

Notably, although the Notice indicated Lead Counsel would seek reimbursement of expenses in an amount not to exceed $850,000, and the reimbursement request is very significantly below that amount, to date, no objections have been received to the reimbursement request.

Based upon the foregoing, and the matters set forth in the Brower Declaration, Lead Counsel respectfully submit that the requested reimbursement of expenses in the amount of $248,213.01 is reasonable and should be granted.

## IV.    LEAD PLAINTIFF'S REQUEST FOR REIMBURSEMENT OF ITS TIME IS REASONABLE

Court have found that the PSLRA permits courts to award lead plaintiffs in federal securities actions reimbursement for their time devoted to participating in and directing the

litigation on behalf of the class. Indeed, important policy considerations to encourage enforcement of the federal securities laws by shareholders underlie these awards:

> In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including the personal risks incurred by the plaintiff in becoming a lead plaintiff, the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by that plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery. Furthermore, courts consider not only the efforts of the representative plaintiffs in pursuing claims, but also the important policy role they play in the enforcement of the federal securities laws on behalf of persons other than themselves. Such enforcement is vital because if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted.

*In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (citations omitted).

Thus, as this Court has previously found, time spent by the lead plaintiff/class representative in managing the case is properly reimbursable from the settlement amount recovered. *See, e.g.*, *City of Providence v. Aéropostale, Inc.*, No. 11-7132, 2014 U.S. Dist. LEXIS 64517, at *56 (S.D.N.Y. May 9, 2014) (awarding $11,235.04 for Lead Plaintiff for its lost wages and expenses); *In re Flag Telecom Holdings*, No. 02-CV-3400 (CM) (PED), 2010 U.S. Dist. LEXIS 119702, at *92 (S.D.N.Y. Nov. 5, 2010) (awarded to Lead Plaintiffs for their services in prosecuting the Action in the amounts of $100,000 for one and $5,000 for the other); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04-8144, 2009 U.S. Dist. LEXIS 120953, at *62 (S.D.N.Y. Dec. 23, 2009) (awarding the Ohio Plaintiffs $70,000 and the New Jersey Plaintiffs $144,657.14 as compensation for their reasonable costs and expenses).

The Notice informed the Class that Lead Plaintiff may seek an award of reasonable costs and expenses related to its representation of the Class. Lead Plaintiff has now submitted a declaration from Joanne Sene, director and employee of Guevoura attesting to the reasonable time that she and Jeremy Boujnah, also a director, spent on behalf of the Class performing tasks such as reviewing

pleadings and documents, gathering documentation in response to discovery requests, being deposed by the Director Defendants, and discussing the case and the proposed Settlement with Lead Counsel. *See* Exhibit 6 to the Appendix. Based on the approximate amount of time devoted to this Action by directors and employees of the Lead Plaintiff, Guevoura seeks $10,000 in reimbursement for their time.

Lead Counsel submits that amount requested is reasonable and, indeed, modest compared to awards made to lead plaintiffs in other PSLRA cases, and should be granted. This Court agrees.

## CONCUSION

Lead Plaintiff's motion for approval of the settlement, the class notice, and the plan of allocation is GRANTED. Lead Counsel's motion for fees and reimbursement of expenses, as well as for the Lead Plaintiff's expenses, is GRANTED.

This constitutes the written opinion and order of the court.

The Clerk of Court should close the motions at Docket Number 192.

Dated: December 18, 2019

_____
Chief Judge

BY ECF TO ALL PARTIES

pleadings and documents, gathering documentation in response to discovery requests, being deposed by the Director Defendants, and discussing the case and the proposed Settlement with Lead Counsel. *See* Exhibit 6 to the Appendix. Based on the approximate amount of time devoted to this Action by directors and employees of the Lead Plaintiff, Guevoura seeks $10,000 in reimbursement for their time.

Lead Counsel submits that amount requested is reasonable and, indeed, modest compared to awards made to lead plaintiffs in other PSLRA cases, and should be granted. This Court agrees.

## CONCUSION

Lead Plaintiff's motion for approval of the settlement, the class notice, and the plan of allocation is GRANTED. Lead Counsel's motion for fees and reimbursement of expenses, as well as for the Lead Plaintiff's expenses, is GRANTED.

This constitutes the written opinion and order of the court.

The Clerk of Court should close the motions at Docket Number 192.

Dated: December 18, 2019

_____
Chief Judge

BY ECF TO ALL PARTIES